CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

4/17/2018
JULIA C. DUDLEY, CLERK
BY: s/ CARMEN AMOS
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

R. ALEXANDER ACOSTA,

                    *Plaintiff,*

    v.

ADAM VINOSKEY, *ET AL.*,

                    *Defendants.*

CASE NO. 6:16-CV-00062

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

       Congress enacted the Employee Retirement Income Security Act of 1974, or ERISA, to protect employees and the benefit plans employers create for them. Congress did this by imposing high standards of fiduciary duty on plan administrators and banning certain types of transactions with "interested parties." These transactions with interested parties are banned because they present opportunities for employer self-dealing at the employees' expense. But one specific type of benefit plan envisioned by ERISA is an employee stock ownership plan, or an ESOP. In an ESOP, part of the employees' remuneration is made in shares of their employer's company. Definitionally then, an ESOP requires the very transactions with interested parties that are generally anathema. And so ERISA carves out an exception for ESOPs, allowing these plans if any purchases of the employers' stock are for "adequate consideration."

       In this case, the Secretary of Labor ("the Secretary") alleges an employer ("Sentry"), its CEO ("Vinoskey"), and certain other alleged fiduciaries ("Evolve" and "New") violated ERISA by approving an ESOP's purchase of the employer's stock at an allegedly inflated price. The Secretary now moves for summary judgment on these claims. (Dkt. 78). The defendants respond by moving to exclude the Secretary's expert on "adequate consideration," (dkts. 80 & 82), and some of the defendants have additionally moved for summary judgment. (Dkts. 83 & 85). The Court will partially exclude the Secretary's expert testimony because portions of his

damages theory are novel and underdeveloped. Concomitantly, the Court will grant the defendants' motions for summary judgment on the claims the Secretary no longer has expert testimony to support. The Court will also grant one of the alleged fiduciaries' motions because no reasonable jury could find he is a *de facto* fiduciary. However, the Court will deny the parties' motions on the remaining claims because factual disputes (namely whether reliance on a valuation report was reasonable) remain.

## I. *DAUBERT* MOTIONS TO EXCLUDE THE SECRETARY'S EXPERT

The Court jointly addresses Vinoskey's and Evolve's motions to exclude the Secretary's expert, Dana Messina. (Dkts. 80 & 82). "Because the testimony defendants seek to strike is essential for plaintiffs to withstand defendants' summary judgment motion, the court will address [these] motion[s] first." *Ruffin v. Shaw Indus., Inc.*, 149 F.3d 294, 296 (4th Cir. 1998).

### A. Legal Standard

"The Federal Rules of Evidence provide that a qualified expert witness 'may testify in the form of an opinion or otherwise if [his] scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.'" *United States v. Landersman*, No. 16-4066, 2018 WL 1514417, at *13 (4th Cir. Mar. 28, 2018) (quoting Fed. R. Evid. 702). "Implicit in the text of Rule 702, . . . is a district court's gatekeeping responsibility to 'ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (alteration omitted, emphasis in original) (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993)). "With respect to reliability, the district court must ensure that the proffered expert opinion is based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Id.* (internal quotation

marks and emphasis omitted). With respect to relevance, the district court must ensure the proffered testimony will help "the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591.

Here, the parties are primarily concerned with the reliability of the Secretary's expert, and so the Court will also focus on that prong of its gatekeeping responsibility. Rule 702 provides expert testimony is only admissible if (1) "the testimony is based upon sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." Likewise, the Fourth Circuit has directed district courts to "consider whether the expert witness theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a high known or potential rate of error; and (4) is generally accepted within a relevant scientific community." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (citation and internal quotation marks omitted); *see also Daubert*, 509 U.S. at 593–94. This list of factors is not exhaustive. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Importantly, "courts may not evaluate the expert witness' conclusion itself, but only the opinion's underlying methodology." *Bresler*, 855 F.3d at 195. If the methodology is reliable, further criticisms of the expert's testimony will go to its weight, not its admissibility.

Finally, the Court has increased discretion in how to perform its gatekeeping role in bench trials: "There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005); *see also* 29 Charles Wright & Arthur Miller, Fed. Prac. & Proc. Evid. § 6270 (2d ed.) ("[S]ince Rule 702 is aimed at protecting jurors from evidence that is unreliable for reasons they may have difficulty understanding, in a bench trial there is greater discretion regarding procedure

and even the stringency of gatekeeping.").  But it is error for a district court to merely consider the *Daubert* factors in determining the weight attributable to certain evidence, a separate admissibility determination "still must be made at some point."  *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010).

**B.  Discussion**

Messina, the Secretary's expert, calculates two categories of damages allegedly suffered by the ESOP: (1) the amount overpaid for Sentry shares, and (2) the loss in value to existing plan participants' shares because of the structure of the purchase.  (Dkt. 79-19 at ECF 4–5).  The report calculates the first category of damages by determining a fair market value for Sentry stock and then asking how much more than that the ESOP actually paid.  The Court finds Messina's testimony concerning this category of damages will be partially admissible.  Messina's second category of damages is calculated by multiplying the amount allegedly overpaid per stock by the existing shares held by plan participants.  These damages are supposed to represent a separate harm: the loss in value to the existing shares because of the transaction's structure.  Because the Court finds this methodology is unreliable and underdeveloped, it will be excluded.  The defendants' other objections to the admissibility of Messina's testimony will be overruled.

*1.  Is the testimony the product of reliable principles and methods?*

The Court will overrule the defendants' objections to the reliability of the general method Messina used in calculating his first category of damages, *i.e.,* those damages the ESOP allegedly suffered by overpaying for the new Sentry stock.  Messina calculated these damages by subtracting his calculation of the fair market value of the shares purchased by the ESOP from the price the ESOP actually paid.  This is a common approach.  *See, e.g., Perez v. Bruister*, 823 F.3d

4

250, 265 (5th Cir. 2016) ("The court's basic approach was to estimate the FMV of the BAI stock at the time of each transaction and deduct it from the higher amount the ESOP actually paid. This is the approach generally used by courts to compute overpayments." (citation omitted)). Messina determined the fair market value of Sentry shares with a discounted cash flow model and a comparison to a guideline company. (Dkt. 79-19 at ECF 27–33). Other courts have accepted the use of these models. *See, e.g, Brundle on behalf of Constellis Employee Stock Ownership Plan v. Wilmington Tr. N.A.*, 241 F. Supp. 3d 610, 618 (E.D. Va. 2017) (referring to these models as "two basic methodologies" that valuation professionals "commonly employ"). As discussed below, Messina may not have reliably applied the methodology, but the methodology itself was reliable and there is no reason to exclude this first category of damages *in toto*.

Messina's second category of damages, *i.e.,* the damages the ESOP allegedly suffered from a decrease in the value of the Sentry stock it already owned, suffers from a more fundamental problem. Messina calculated these losses by multiplying the alleged overpayment per share from his first category of damages by the number of shares existing at the time of the transaction. (Dkt. 81-8 at ECF 36). This calculation falters for two primary reasons. First, it double counts the losses allegedly caused by the defendants. The defendants correctly demonstrate that any reduction or increase in the first category has a proportional effect on this second category. (*See* dkt. 79-26 at ECF 43). This is problematic because it effectively claims the ESOP overpaid twice: once for the shares it was purchasing in this transaction and once for the shares it already owned. Messina is never able to sufficiently explain why he is applying the overpayment damages to the shares the ESOP already owned. In his rebuttal report, he compares his methodology to a hypothetical situation where joint owners of a car receive a refund due to a

recall on the car.  (*See* dkt. 79-27 at ECF 21).  He correctly notes they should split those damages.  However, his analogy falls flat in this case because the first category of damages already includes the parties' entire alleged overpayment: the overpayment per share multiplied by all of the shares purchased.  If the joint car owners requested the entire refund be sent to one of the two owners, the other could not come asking for a separate refund.  Perhaps realizing these problems, the Secretary's opposition focuses on a separate "corroboration" for his calculation.  (Dkt. 92 at ECF 22–24).  But this corroboration is based on a different methodology, and does not support the unreliable methodology actually used to calculate this category of damages.

Second, despite the Secretary's allegations of loss in stock value to the existing employees, the account balances of the existing Sentry plan participants increased as a result of the transaction.  (Dkt. 79-11 at ECF 64 ("Their account balances probably went up because there was a significant amount of cash utilized to purchase the shares, and those shares would have immediately been allocated to their accounts as of year end.  Their share value may have dropped, but I think the value of their account balances would have stayed consistent or gone up, because they would have had more shares in their accounts."); dkt. 81-7 at ECF 42–44; dkt. 81-17 at ECF 4–5).  It is difficult to see how the existing shareholders could have incurred this second category of damages if their accounts increased.  Even if they hypothetically did incur some damage, for example, if their accounts would have increased more without the transaction, Messina's methodology does not provide any basis to figure out what those damages would be.  His methodology would produce the same damages regardless of whether the stock was purchased with cash or debt; it is entirely focused on the amount of overpayment, not where that money came from.

Finally, the Secretary briefly raises other defenses concerning the *relevance* of its calculations and the tax ramifications of the deal's structure.[1] But none of these arguments, even if credited, can rehabilitate the problems with *reliability* identified above. The Secretary has not provided any examples of this methodology being used or accepted elsewhere, and the Court has found none. Accordingly, the Court concludes the methodology used to calculate the second category of damages is unreliable, and so it will be excluded here. The Court addresses the defendants' remaining objections insofar as they concern the first category of damages.

### 2. *Has the expert reliably applied the principles and methods to the facts?*

Messina's methodology must not just be reliable, but it also must be reliably applied. Fed. R. Evid. 702(d). The defendants allege five different examples of unreliable application. One of these, the first discussed below, is significant enough to warrant exclusion of part of Messina's testimony. The other objections may provide reasons to assign less weight to Messina's testimony, but do not provide a basis to exclude it.

First, Messina complemented his discounted cash flow valuation of Sentry with a "market comparable" methodology. (Dkt. 79-19 at ECF 29). This methodology involves finding comparable companies, and then making adjustments to analogize them to Sentry. The defendants criticize Messina for only using one publicly traded company as a comparison. This criticism is valid: Normally a "market comparable" approach would look to the average of a group of comparable companies, not just one other company. *See, e.g., Horn v. McQueen*, 353

---

[1] The Secretary argues the transaction improperly favored the new recipients of stock over the holders of existing stock. But for the reasons discussed above, the Secretary has failed to demonstrate what damages existing stockholders suffered. Likewise, the Secretary argues the transaction impermissibly took advantage of the tax benefits that Sentry received for contributing to the ESOP. The Secretary claims the transaction drained value that had been contributed to the ESOP at advantageous tax rates away from the ESOP. But this argument is underdeveloped, and the Secretary fails to explain how it would justify the specific calculations it relies on above.

F. Supp. 2d 785, 826 (W.D. Ky. 2004) ("[W]e have used as few as two or three guideline companies . . . . Our confidence rises sharply when we can find four to seven good guideline publicly traded companies." (quoting Shannon P. Pratt, *et al.*, Valuing a Business: The Analysis and Appraisal of Closely Held Companies 233 (4th ed. 2000))); *In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 79 (Bankr. N.D. Ill. 2002) ("There should be at least several relevant transactions before a useful comparison can be made."); *Estate of Joyce C. Hall*, 92 T.C. 312, 339 (1989) ("[I]t is inconceivable to us that a potential buyer of Hallmark stock would consider only one alternative 'comparable.'"). This flaw does not necessarily require exclusion; it could simply lead the factfinder to place less weight on that part of a valuation. *See Hartmann v. United States*, No. 97-1335, 1999 WL 550252, at *2 (C.D. Ill. June 24, 1999) (noting *Hall* did not require exclusion of the expert report simply because it only relied on one comparable company).

Here, however, the Court concludes the application of this methodology is unreliable both because there is only one other company used and because that company is insufficiently comparable to Sentry. *See, e.g., Metabyte, Inc. v. Canal+ Technologies, S.A.*, No. C-02-05509, 2005 WL 6032845, at *3 (N.D. Cal. June 17, 2005) ("[The expert]'s selection of TiVo as the only 'guideline' company in itself renders his analysis unreliable. The differences between TiVo and MNI are so significant that [the expert]'s utilization of the ratio between the market capitalizations of the two companies for calculating MNI's value renders [the expert]'s analysis unreliable."). Messina's comparable company is Key Technology. (Dkt. 79-19 at ECF 29). This company derives approximately 44% of its revenue from conveyor systems similar to those produced by Sentry, but approximately 56% of its revenue from automated inspection systems that are distinct from Sentry's product line. (Dkt. 79-26 at ECF 34). Likewise, over 50% of Key Technology's revenue is generated internationally, while all of Sentry's business is domestic.

(*Id.*).  Taken by themselves, these distinctions would normally go to the weight this portion of Messina's methodology deserves.  But because Messina only utilizes one comparable company, the Court finds this market comparable approach was unreliably applied and so it will be excluded.[2]

Second, the defendants claim Messina disavowed the Secretary's guidance on how to value businesses under ERISA.  Specifically, they repeatedly argue Messina should have relied on IRS Revenue Ruling 59-60, guidance Messina did not find relevant.  The Secretary has Proposed Regulations that have some overlap with this IRS ruling, but has never adopted them.  The Secretary correctly points out this guidance is all unpromulgated, and Messina's approach considers similar factors by considering "fair market value" and ERISA's definition of "adequate consideration."  While some courts have still found these sources helpful, they are not mandatory, and Messina did not need to cite to the unpromulgated regulations or the IRS ruling in order to apply his methodology reliably.  *See Donovan v. Cunningham*, 716 F.2d 1455, 1473 (5th Cir. 1983) ("Judicial adoption of this revenue ruling is no substitute for the regulations the Secretary has never promulgated . . . . Appraisal of closely-held stock is a very inexact science; given the level of uncertainty inherent in the process and the variety of potential fact patterns, we do not think a court should require fiduciaries to follow a specific valuation approach as a matter of law under [ERISA] Section 3(18).").  Accordingly, this objection to admissibility will be overruled.

---

[2]    The Secretary responds to the above criticisms by noting that excluding the "market comparable" approach would lead Messina to a lower valuation of Sentry (and therefore higher damages).  (Dkt. 92 at 14).  But the Secretary's response misses the mark because the admissibility inquiry focuses only on the reliability of "principles and methodology" and not "conclusions."  *Bresler*, 855 F.3d at 195 ("[C]ourts may not evaluate the expert witness' conclusion itself, but only the opinion's underlying methodology.").

Third, the defendants criticize Messina for his application of a discount to Sentry's value for lack of control. They contend the ESOP did purchase a controlling interest in Sentry, and it paid more for the interest because it was controlling. Additionally, the defendants note Messina has applied an identical discount in cases that were factually different. Generally, there are multiple factors that may indicate shareholder control, including the shareholders' abilities to: "unilaterally direct corporate action, select management, decide the amount of distribution, rearrange the corporation's capital structure, and decide whether to liquidate, merge, or sell assets." *Brundle*, 241 F. Supp. 3d at 638. Here, the parties dispute which of these aspects of control the ESOP purchased. The defendants claim the ESOP was able to replace the board; Messina focuses on the control Vinoskey and management retained over the company. Whether or not the ESOP purchased control is a fundamentally factual dispute. *See Estate of Godley v. C.I.R.*, 286 F.3d 210, 215 (4th Cir. 2002) ("Our view that the question of whether to apply a minority discount is factual in nature is one that is widely shared."). Accordingly, Messina's disagreements with the defendants do not provide a basis for exclusion of his testimony and so this dispute will be left for trial.

Fourth, the defendants argue Messina's fair market valuation of Sentry is facially unreliable because it is less than the liquidation value of the Sentry's assets and less than half of the appraised value made at the time of stock purchase. The latter of these contentions can be dismissed quickly—the Secretary's general position is the initial appraisal was flawed in many ways, and so it is unsurprising that his valuation is significantly less than the defendants'. The former is more substantial—the Eastern District of Virginia has held that an expert's methodology is "questionable on its face" when the valuation was less than the value of the company's assets. *See Chesapeake Corp. v. Sainz*, No. 3:00cv816, 2002 U.S. Dist. LEXIS

28702, at *27–*28 (E.D. Va. Mar. 19, 2002). But the defendants overstate their argument here: Messina's valuation of Sentry ($20.8 million) is less than Vinoskey's calculation of Sentry's liquidation value ($30.3 million), but not less than Messina's own calculation of Sentry's liquidation value ($19.9 million). (*Compare* dkt. 79-26 at ECF 39 *with* dkt. 79-27 at ECF 20). This still raises questions—Messina is saying that Sentry's value as an operational company is only $1 million more than the "fire-sale price" of its assets "if the company was under extreme need to sell with time constraints and significant discounts." (Dkt. 81 at ECF 24–26). The defendants understandably make much of this, but the defendants' original comparison is of (Messina's) apples and (the defendants') oranges. This is different than the facial unreliability in *Sainz*, and is better considered as going to the weight of testimony. This objection to admissibility will be overruled.

Fifth and finally, the defendants put forward a battery of other alleged errors. None of them provide a basis to exclude Messina's testimony. The defendants claim Messina made transcription errors in his calculations of working capital as a percentage of revenue. These alleged errors flow into Messina's valuation of Sentry's fair market value and from there into his first category of damages. The parties also dispute other assumptions that flow into the working capital percentage, although any error here is less clear. Other alleged mistakes are smaller: Messina's report contradictorily describes Sentry both as a non-dividend paying company and as having a history of paying large dividends. Messina's control discount is also allegedly justified by a factor that he considered elsewhere. Messina, at one point, appears to compare seven years of Sentry's financial information to six years of a comparable company's. While the Secretary has not provided convincing responses to any of these mistakes, they are not significant enough to undermine Messina's testimony. *See Bresler*, 855 F.3d at 196 ("[C]hallenges to the accuracy

of [the expert]'s calculations 'affect the weight and credibility' of [the expert]'s assessment, not its admissibility." (citations omitted)).[3]

In conclusion, only one flawed application is sufficiently unreliable to merit exclusion: Messina's "market comparable" approach. The other alleged errors will go to the weight the Court assigns to Messina's testimony.

### 3. Is Messina qualified?

The defendants also argue Messina is not qualified to testify as an expert. In order to be excluded, "the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (internal quotations omitted). The Court must "liberally judge[]" the expert's qualifications when determining whether to exclude him. *Id.*

While the defendants concede Messina's general experience in private equity, they argue this experience is not relevant to the more specific ERISA context. Vinoskey repeatedly objects that Messina "holds no business valuation certifications, is not a Certified Public Accountant or Chartered Financial Analyst, and is not a member of any of the national ESOP organizations." (Dkt. 81 at ECF 6, 9). Evolve relatedly criticizes Messina for not paying enough attention to the internal standards of the ESOP community. Variations on this theme fill the defendants' briefs.

---

[3]     Various other objections raised by the defendants also fail. The defendants repeatedly criticize Messina for not incorporating Sentry's projections into his analysis. But Sentry simply did not make projections, and so there were no projections for Messina to incorporate. Likewise, the defendants' suggestions Messina should still have met with Sentry management to discuss his thoughts about their company seem misguided (*i.e.,* it seems unlikely that Sentry management would have sat down with the Secretary's expert during litigation to create these sort of projections, when none existed). The defendants also criticize Messina's report as not being peer-reviewed. But *Daubert* considered whether a more general methodology (*i.e.,* discounted cash flow valuations) or an opinion (*i.e.,* an investor needs to include X number of companies to have a diversified portfolio) has been peer reviewed, not whether a specific expert report has been.

(*See* dkt. 81 at ECF 6, 11 (arguing Messina is unqualified because he has only worked with one ESOP); *id.* at 10 (arguing Messina does not meet the Secretary's self-imposed standards)).

Despite Messina's limited experience with ESOPs, the Court finds he is sufficiently qualified to testify about the value of Sentry. He has a M.B.A. from Harvard Business School and more than twenty-five years of experience in valuing, buying, and selling businesses. (Dkt. 79-19 at ECF 37). Messina worked in investment banking before starting his own firm that provides "advice in connection with leveraged recapitalizations, restructurings, and other complex financial transactions." (*Id.*). Multiple other courts have found Messina qualified.[4]

Evolve separately argues Messina is unqualified to opine on "whether Evolve met its fiduciary obligations when acting as the Special Independent Trustee for [the ESOP]." (Dkt. 82 at ECF 4–6). Evolve notes that Messina focused on the standards in the private equity industry, and his first expert report did not discuss ERISA "trustee fiduciary process and procedure." (*Id.* at ECF 5–6). It was only after the defendant's expert, Howard Kaplan, criticized this that he included opinions on trustee process and procedure in his rebuttal report. (Dkt. 93-1). The Secretary responds by relying on Messina's vast experience advising in private equity transactions; the Secretary maintains this experience is relevant because "the private market has bearing on the prudence of ERISA transactions." (Dkt. 93 at ECF 9).

The Court finds Messina's experience with purchasing closely held companies provides guidance on the sort of diligence required in this transaction. This is especially true, as the

_____

[4]    *See* dkt. 92 at ECF 2, 8 (citing *Perez v. First Bankers Tr. Servs., Inc.*, No. CV12-4450 (MAS), 2017 WL 1232527, at \*70 (D.N.J. Mar. 31, 2017), *appeal dismissed sub nom. Sec'y United States Dep't of Labor v. First Bankers Tr. Servs. Inc.*, No. 17-1973, 2017 WL 5158640 (3d Cir. Sept. 21, 2017); *Brundle on behalf of Constellis Employee Stock Ownership Plan v. Wilmington Tr. N.A.*, 241 F. Supp. 3d 610, 621 (E.D. Va.), *reconsideration denied*, 258 F. Supp. 3d 647 (E.D. Va. 2017); *Perez v. Bruister*, 54 F. Supp. 3d 629, 639-40 (S.D. Miss. 2014), *aff'd as modified*, 823 F.3d 250 (5th Cir. 2016); and *Hans v. Tharaldson*, No. 3:05-CV-115, 2011 WL 6937598, at \*7 (D.N.D. Dec. 23, 2011)).

Secretary correctly notes, because "ERISA's standards for fiduciaries . . . are at least as high as the due diligence standards followed in private industry." (Dkt. 93 at ECF 9); *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 358 (4th Cir. 2014) (fiduciary duties under ERISA are "the highest known to the law"). To the extent Messina's testimony is inappropriately shaped by standards imported from private equity, the defendants are entitled to point out those flaws through cross-examination. The Court will overrule this objection to admissibility.

### 4.  Is the testimony based upon sufficient facts or data?

The defendants also argue Messina's opinion is based on insufficient data. The crux of their argument is that Messina finished his report before many relevant documents were produced in discovery, and so his report could not have considered them. Specifically, Messina's report does not make any mention of the communications between Evolve and Capital Analysts (the valuation firm Evolve retained). Additionally, the Secretary did not depose anyone from Capital Analysts who came up with the price. The defendants argue "[t]he documents Messina ignored directly contradict the Messina Report's factual recitations and assumptions." (Dkt. 81 at ECF 14–15). The Secretary responds that these sorts of objections generally go to the credibility of the expert's opinion, not its admissibility. (Dkt. 92 at ECF 12 (citing *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 955–56 (8th Cir. 2007); *Am. Heartland Port v. Am. Port Holdings*, 2014 WL 2931929, *4 (N.D. W.Va. June 30, 2014))).

The Fourth Circuit agrees with *Hurst* that arguments about the factual basis of an expert's opinion normally go to its weight and not its admissibility. *Bresler*, 855 F.3d at 195 ("[Q]uestions regarding the factual underpinnings of the expert witness' opinion affect the weight and credibility of the witness' assessment, not its admissibility." (citations, alteration marks, and quotation marks omitted)); *Estate of Godley v. Comm'r*, 286 F.3d 210, 214-15 (4th

Cir. 2002) (describing application of control premium or discount as a question of fact). While Messina neglected to consider important information that provides insight into the behavior of Napier and the defendants, his opinion still relied on sufficient information (about Sentry's financial information and investment norms) to provide help to the Court in its role as factfinder. The testimony will not be excluded for this reason; these failings go to the weight.

## C. Conclusion

In sum, the majority of Messina's testimony is both reliable and relevant. *Nease*, 848 F.3d at 229. Messina is qualified to testify; he considered sufficient data to provide helpful testimony (even if his failure to adequately consider certain portions of the record should lead the Court to discount some of his conclusions); he used a reliable methodology to calculate damages arising from overpayment for Sentry stock; and he reliably applied most of his methods. However, the Court will limit his testimony in two respects: He will not be able to present the methodology used to calculate damages to the existing shareholders or utilize the market comparable methodology in his valuation of Sentry's market value.

## II. CROSS-MOTIONS FOR SUMMARY JUDGMENT

In his amended complaint, the Secretary alleged:

- In Count I, that New and Evolve were fiduciaries who violated ERISA § 406(a)(1)(A) by causing the ESOP to purchase Sentry's stock for more than adequate consideration;

- In Count II, that New and Evolve violated ERISA §§ 404(a)(1)(A) and (B) by breaching their fiduciary duties of prudence and loyalty to the ESOP in the stock purchase;

- In Count III, that Vinoskey violated ERISA §§ 405(a)(1) and (3) as a co-fiduciary based on the fiduciary breaches of New and Evolve, and that Vinoskey and the Vinoskey Trust violated ERISA § 502(a)(5) as knowing participants in that prohibited transaction; and

15

- In Count IV, that New and Evolve both violated ERISA §§ 404(a)(1)(A) and (B) by violating their fiduciary duties in allowing the per-share value of stock held by existing participants to drop through the structure of the purchase.

(Dkt. 29).[5]  The Secretary has moved for summary judgment against all defendants on all counts. (Dkt. 79).  Defendants Evolve and New filed cross-motions for summary judgment, (dkts. 84, 86), but Vinoskey did not.  As described below, the Court will grant New's motion for summary judgment.  Otherwise, the motions concerning Counts I through III will not be granted.  Based on the above determination to partially exclude the Secretary's expert testimony, the defendants' motion for summary judgment on Count IV will also be granted.  The Court summarizes the record before working through each of the claims.

## A.  Legal Standard

Federal Rule of Civil Procedure 56(a) provides that a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact."  "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In order to preclude summary judgment, the dispute about a material fact must be "genuine."  *Id.*  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party.  *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).

---

[5]  ERISA § 404 is codified at 29 U.S.C § 1104; ERISA § 405 is codified at 29 U.S.C. § 1105; ERISA § 406 is codified at 29 U.S.C. § 1106; and ERISA § 502 is codified at 29 U.S.C. § 1132.  The Court follows the cases and parties in oscillating between use of the sections of the code and the sections of the act.

**B. Facts**

Sentry, "a Virginia corporation that designs and sells equipment such as conveyors and bottling machines for soft drink manufacturers," was founded in 1980. (Dkt. 34 at ECF 2–3). It was initially owned entirely by Adam and Carole Vinoskey. (*Id.*). The Vinoskeys created the ESOP, which included both a 401(k) defined-contribution plan and an employee stock-ownership feature. (*Id.* at ECF 3).[6] Adam Vinoskey was a trustee of the ESOP. (Dkt. 79-3). Sentry hired William Gust of Gentry Locke to provide legal services to the ESOP. (Dkt. 79-4 at ECF 27, 40–42). The ESOP was designed to invest primarily in employer stock. (Dkt. 34 at ECF 3). Under the terms of the ESOP, terminated employees, which included retirees, were permitted to sell their shares back to the ESOP at a price approved by the ESOP fiduciaries. (*Id.* at ECF 4). Sentry hired, on Gust's recommendation, Capital Analysts and Brian Napier to perform appraisals in order to determine a fair price. (*Id.*; dkt. 79-4 at ECF 43–45). From 2007 to 2011, the resulting stock price ranged from $215 to $285 per share. (Dkt. 34 at ECF 4; dkt. 79-6 at ECF 3). In 2004, the ESOP purchased 48% of the Vinoskeys' Sentry stock for $220 per share, for a total price of $9 million. (Dkt. 34 at ECF 3). The ESOP paid $1.5 million to the Vinoskeys, and the remainder of the purchase price was borrowed from Sentry. (*Id.*). In the following years, Sentry made contributions to the ESOP that allowed the ESOP to repay the loan it had received from Sentry. (*Id.*). The ESOP's debt was fully repaid before 2010, and the shares of Sentry stock purchased by the ESOP were allocated to individual participant accounts as the debts were paid. (*Id.*). At that point, shares were valued at $285 per share. (Dkt. 79-10 at ECF 2).

---

[6]     An ESOP is "a type of pension plan that invests primarily in the stock of the company that employs the plan participants." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2463 (2014).

In December 2010, Defendant Adam Vinoskey decided to retire and sell the remaining 52% of Sentry stock to the ESOP. (Dkt. 34 at ECF 4). William Gust advised Vinoskey he would need to recuse himself as a trustee of the ESOP. Gust then contacted Kenneth Lenoir and Michael New to ask whether Evolve would be interested in serving as the ESOP's trustee in the transaction. (Dkt. 87-2). Although Gust had met Lenoir through the ESOP Association, (dkt. 79-11 at ECF 13), this was the first time Evolve, Lenoir, or New worked with Sentry or the Vinoskeys. (*id.* at ECF 18). Lenoir, one of Evolve's largest shareholders, headed the bank's trust practice and supervised New. (Dkt. 87-9 at ECF 2–3). New was a lawyer employed by Evolve as a Senior Trust Officer. (Dkt. 79-12 at ECF 3; dkt. 87-9 at ECF 3).

Lenoir and New visited Sentry to engage in a site-visit. (Dkt. 87-9 at ECF 4). Lenoir led the visit and asked questions of Sentry representatives, while New took notes. (*Id.*; dkt. 79-11 at ECF 35, 37; dkt. 79-15). However, before Evolve could agree to take on the transaction, Lenoir and New were required to present their framework to Evolve's administrative committee. (Dkt. 79-11 at ECF 21–22). New led the discussion with the administrative committee, and Lenoir was the "Trust Officer Presenting." They represented that the transaction would be for roughly $21 million and that Evolve's fee would be $27,500. (Dkt. 79-13 at ECF 1, 4). That committee then gave Lenoir and New the greenlight to negotiate and accept Evolve's appointment as a trustee on behalf of the ESOP. (Dkt. 79-11 at ECF 23–34; dkt. 79-13). Evolve then sent Carole Vinoskey, Adam Vinoskey's wife and the CFO of Sentry, an engagement letter confirming Evolve would serve as the ESOP's trustee in the transaction. (Dkt. 79-14). She accepted Evolve's proposal to serve as an independent trustee for the ESOP. (*Id.*; dkt. 79-16).

New then sent Sentry a "Due Diligence Checklist" that requested financial information from the company. (Dkt. 79-11 at ECF 29–30; dkt. 79-14 at ECF 4–11). Sentry sent Evolve

some, but not all, of the requested documents. New reviewed the documents he received. (Dkt. 79-11 at ECF 34). Evolve also hired Bill Gust to write certain transactional documents. Gust required the ESOP to waive any conflict his representation might create. (Dkt. 79-21).

Napier conducted a special appraisal in November 2010 for this transaction. (Dkt. 34 at ECF 4; dkt. 79-17). Evolve engaged Napier and Capital Analysts to perform the appraisal at least partially because of its familiarity with the company from its previous audits. (Dkt. 79-11 at ECF 24). Evolve investigated Brian Napier's credentials, and found he had 35 years of experience valuing employee stock option plans and was certified by the American Society of Appraisers. Napier's first draft valuation noted it would be fair for the ESOP to pay up to $405.73 per share. (Dkt. 79-20 at ECF 8). This and Napier's other valuations were all based on the present value of the cash flows that Sentry would generate. Lenoir and New reviewed Napier's appraisal, and Lenoir led a phone call with Napier where they raised concerns with the appraisal. (Dkt. 87-9 at ECF 4–5; dkt. 79-20 at ECF 1; dkt. 87-9 at ECF 112 (Lenoir's handwritten notes on the draft appraisal)). Lenoir highlighted that the previous valuation, made one year before, was for $285 per share. (Dkt. 87-9 at ECF 185). Lenoir led a conversation raising similar concerns to Bill Gust. (Dkt. 87-9 at ECF 5). Napier addressed these concerns, largely by claiming Sentry would be able to create more value for the ESOP owners because they would now control the company (and its willingness to pay out dividends). (Dkt. 97-10 at ECF 1). Lenoir and New accepted these explanations. Napier then provided a final appraisal that said it would be fair for the employee stock option plan to pay between $405.73 to $408.58 per share. (Dkt. 79-18 at ECF 3).

Lenoir directed New to approve a $406 share price on behalf of Evolve as being fair to the ESOP and its participants. (Dkt. 87-9 at ECF 5). New did not "have the ability to select a

final stock price for any ESOP transaction for which Evolve was serving as trustee, including the Sentry ESOP transaction." (*Id.*). New relayed Lenoir's acceptance to Gust. Gust made the offer to Vinoskey. (*Id.*). After questioning the price, Vinoskey accepted the $406 per share price and sold his stock without making a counter-offer. (Dkt. 79-12 at ECF 7; dkt. 87-11). Vinoskey did note New "tried to beat this price down" and that "he was a nuisance." (Dkt. 87-12 at ECF 2). Evolve's Administration Committee ratified the Sentry transaction on December 29, 2010. (Dkt. 87-8 at ECF 1).

The ESOP paid for the Sentry shares with $8,500,016 in cash, $1,900,080 borrowed from Sentry, and a $10,305,904 note from Vinoskey at 4% interest. (Dkt. 79-22 at ECF 2). Sentry guaranteed the money borrowed from Vinoskey. (Dkt. 79-5 at ECF 38). The transaction resulted in each employee enrolled in the ESOP receiving more shares. (Dkt. 79-11 at ECF 63–65). Plan participants' balances increased. (*Id.*; dkt. 92-1 at ECF 139-144). After the sale was over, Evolve resigned its role as trustee. (Dkt. 79-23). Despite the ESOP's purchase of control, Vinoskey remained on the company's board. (Dkt. 79-24).

## C. Discussion of the claims against New

New raises two threshold challenges to the claims against him: (1) he argues he is not a fiduciary and (2) he argues the claims against him were filed after the statute of limitations had run. The Court will assume the claims against him were timely, but finds New was not a fiduciary within the meaning of ERISA. Accordingly, the claims against him will be dismissed. *See Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 60-61 (4th Cir. 1992) ("Before one can conclude that a fiduciary duty has been violated, it must be established that the party charged with the breach meets the statutory definition of 'fiduciary.'").

ERISA defines a fiduciary as a person who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i). The Secretary has provided additional guidance, stating "[s]ome offices or positions of an employee benefit plan by their very nature require persons who hold them to perform one or more of the functions described in section 3(21)(A) of the Act." 29 C.F.R. § 2509.75-8 (D-3). "Other offices and positions should be examined to determine whether they involve the performance of any of the functions [of a fiduciary]." *Id.* Accordingly, an ERISA fiduciary "is broader than the common law concept of a trustee"; it includes not only those named as fiduciaries in the ESOP instrument, "but any individual who *de facto* performs specified discretionary functions with respect to the management, assets, or administration of a plan." *Custer v. Sweeney*, 89 F.3d 1156, 1161 (4th Cir. 1996).

Unlike Evolve, New was not named as a fiduciary. And so the Court, in its Motion to Dismiss opinion, looked to whether the Secretary had alleged New had sufficient individual discretion in order to be a *de facto* fiduciary. (Dkt. 49). As the Fourth Circuit has stated, a *de facto* fiduciary is "any individual who . . . performs specified discretionary functions with respect to the management, assets, or administration of a plan." *Custer*, 89 F.3d at 1161. In this Court's prior opinion, the Court held the Secretary alleged sufficient facts to meet this standard. The Secretary alleged New was a lawyer employed by Evolve as the Senior Trust Officer, he was the head of the ESOP division, and he performed the duties of an independent transaction trustee. (Dkt. 29 ¶ 9). The Court held this job, by "[its] very nature," may have required New to "perform one or more of the functions" of a fiduciary. 29 C.F.R. § 2509.75-8 (D-3). The Court also relied on allegations New (1) selected the $406 share price; (2) signed a document dated December 20, 2010, stating the

$406 stock price was in the ESOP's best interest; and (3) was not required to obtain approval from Evolve's Trust Committee before approving the sale. (Dkt. 29 ¶ 9).[7]

Now at summary judgment, a focus on New's discretion still drives the Court's analysis. New's position as a Senior Trust Officer did not require him to perform as a fiduciary "by [its] very nature." 29 C.F.R. § 2509.75-8 (D-3) (internal quotation marks omitted). The prototypical examples of individuals who "by their very nature" exercise fiduciary discretion are plan administrators and trustees. *Id.* Evolve would be covered by this definition as a trustee, but New is not. Although New was a lawyer working at Evolve as Senior Trust Officer, he was not head of its ESOP division at the time of the transaction.[8] Instead, Lenoir, the Majority Owner and Executive Vice President of Evolve, led Evolve's work for the ESOP. At all relevant times, Lenoir was New's superior. And Lenoir's affidavit states New did not have the authority to authorize the transaction or agree to a price without Lenoir's approval. (Dkt. 87-9 at ECF 3–4). Additionally, undisputed evidence demonstrates it was Doug Kelso, not New, who was head of the ESOP Administration Committee in 2010. (Dkt. 79-11 at ECF 5-6, 22). New was an employee of a trustee who worked extensively on the deal, but not all employees of trustees "by their very nature" exercise fiduciary discretion. *C.f. Custer*, 89 F.3d at 1161 (holding an attorney employed by a trustee was not an individual fiduciary); 29 C.F.R. § 2509.75-8, at D-3 (emphasizing "final authority" in the hypotheticals provided by this guidance). Determining

---

[7]     The Court refused to consider various documents attached to the motion to dismiss. (Dkt. 49 at 8). Relying solely on the allegations, the Court did not consider Lenoir's supervision of New. As demonstrated below, that supervision and reporting structure dictates a different result now that this evidence is before the Court.

[8]     While the Secretary argues to the contrary, he has provided insufficient evidence to support this position. The Secretary relies on deposition testimony where New indicated he was head of the ESOP division. However, this testimony clearly concerned New's role at the time the question was asked, and not at the time of the transaction. (Dkt. 79-11 at ECF 5).

whether New exercised that sort of discretion requires the Court to look deeper than his title and instead look at the functions he performed.

 "[B]ecause the definition of ERISA fiduciary 'is couched in terms of functional control and authority over the plan,' we must 'examine the conduct at issue when determining whether an individual is an ERISA fiduciary.'" *Moon v. BMX Technologies*, *Inc.*, 577 Fed. App'x. 224, 229 (4th Cir. 2014) (quoting *Wilmington Shipping Co. v. New England Life Ins. Co.*, 496 F.3d 326, 343 (4th Cir.2007)).  The Court examines New's conduct to determine whether it involved the performance of discretionary authority and responsibility.  *Id.*; *see also* 29 U.S.C. § 1002(21) (defining fiduciaries).  These discretionary functions must be more than mere "ministerial functions."  *Custer*, 89 F.3d at 1163.  So to survive New's motion for summary judgment, the Secretary must put forward evidence a reasonable jury could rely upon to find New's conduct demonstrated individual discretion in approving the stock price or the structure of the deal. *Custer*, 89 F.3d at 1161; *Wilmington Shipping Co.*, 496 F.3d at 343.

Ultimately, Lenoir's supervisory role changes the complexion of all the facts the Secretary previously pled and still relies upon.  For example, the Secretary notes New received the initial email from Gust inquiring about Evolve's willingness to serve as a trustee.  But this email was addressed to Lenoir, and New was only copied.  (Dkt. 87-9 at ECF 3).  Likewise, the Secretary described New as leading the onsight visit with Sentry management.  But the undisputed evidence shows Lenoir led the conversation with Sentry management while New took notes.  (*Id.* at ECF 4).  And while New presented the project to the ESOP Administration Committee, Lenoir was the "Trust Presenting Officer" and additionally recommended Evolve accept the engagement.  (*Id.*).  Lenoir and New, alongside Chairman Doug Kelso, sat on the Committee that decided to approve the engagement.  New did send Evolve's due diligence

checklist to Sentry, and he was involved in sending engagement letters to Sentry, Gust, and Napier. This is consistent with Lenoir's testimony that he delegated tasks, like sending emails, to New. Lenoir worked alongside New to evaluate Napier's valuation of Sentry shares. (Dkt. 87-9 at ECF 4–5). And Lenoir led the phone call with Napier addressing Evolve's concerns, while New again took notes. Lenoir led another call, this time with Bill Gust, to discuss these same concerns. Most importantly, Lenoir selected the final price and directed New to pass his acceptance of that price on to Gust. (*Id.* at ECF 5).

What to make of all of this largely turns on how analogous one thinks the case is to *Custer v. Sweeney*, 89 F.3d 1156 (4th Cir. 1996). In that case, the Fourth Circuit's most complete discussion of whether an individual qualified as an ERISA fiduciary, the Court was reviewing a motion to dismiss. Nevertheless, its analysis is instructive. An attorney representing an ESOP allegedly breached his fiduciary duties to the ESOP, but he challenged whether he was a fiduciary at all. The trustee of the ESOP, his uncle, had used the ESOP's money for a private jet and home. The Court held the attorney was not a fiduciary because he represented subcommittees that "made only non-binding recommendations to the pension plan's board of trustees, who ultimately decided to enter into the [] transactions . . . ." *Id.* at 1163. The Court also described his conduct in "soliciting bids for contracting work and approving payment of bills" as ministerial, noting "he lacked check-writing authority." *Id.* This conduct, although potentially sufficient for legal malpractice claims, was not sufficient to make the attorney an ERISA fiduciary—at least partly because it arose "within a framework of policies, interpretations, rules, practices and procedures made by other persons." *Id.* at 1162 (quoting 29 C.F.R. § 2509.75–8 (D–2)).

Evolve, unlike the defendant in *Sweeney*, was hired for the specific purpose of serving as the ESOP's fiduciary. But other than this, New's tasks were closely analogous to those performed by the *Sweeney* defendant (*i.e.,* soliciting bids, approving payment of bills), and he too did not have final authority to agree to transactions. (Dkt. 87-9 at ECF 5 ("At no time during his employment with Evolve did Michael New have the ability to select a final stock price for any ESOP transaction for which Evolve was serving as a trustee, including the Sentry ESOP transaction.")). Both were employees of fiduciaries, but not fiduciaries themselves. Ultimately, New's role must be considered in light of Lenoir's. And it was Lenoir, and not New, who directed Evolve's work and retained discretion over the transaction. In light of this relationship, there is no genuine dispute that New was not acting as a *de facto* fiduciary here. His motion for summary judgment will accordingly be granted.

**D. Discussion of the claims against Evolve**

Counts I (alleging Evolve caused the ESOP to engage in the transaction for more than adequate consideration) and II (alleging Evolve breached its fiduciary duty by causing the transaction) are distinct claims, but "under the Secretary's theory of this particular case, our inquiry will be the same."[9] *Donovan v. Cunningham*, 716 F.2d 1455, 1465 (5th Cir. 1983).

---

[9] The former is prohibited by 29 U.S.C. § 1106(a)(1)(A), (D) and the latter by 29 U.S.C. § 1104(a). As relevant here, section 1106(a)(1) states "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect sale or exchange, or leasing, of any property between the plan and a party in interest; . . . [or] transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . ." The statute carves out exceptions to this prohibition, and they are listed at 29 U.S.C. § 1108. As relevant here, transactions made "for adequate consideration" are exempted. 29 U.S.C. § 1108(e)(1). The statute further defines "adequate consideration" as "fair market value" for securities that are not publicly traded. 29 U.S.C. § 1002(18).

29 U.S.C. § 1104(a) is more straightforward. As relevant here, it requires fiduciaries to act "for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan," to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like

Unlike New, Evolve concedes its status as a fiduciary. The central question under both counts is then whether Evolve breached its fiduciary duties by causing the ESOP to purchase Sentry's stock for more than "adequate consideration." Count IV (alleging Evolve breach its fiduciary duties by decreasing the value of existing stock) is based on a separate theory and will be addressed separately.

### 1. *Breach of fiduciary duties*

The question of whether Evolve breached its fiduciary duties to the ESOP is central to both the 29 U.S.C. § 1106(a)(1)(A), (D) and 29 U.S.C. § 1104(a) claims. Section 1104 directly penalizes the breach of fiduciary duties, and so the Secretary will bear the burden of proof on this claim. This is reversed for section 1106. There, the Secretary only has the initial burden of proof that the transaction was presumptively prohibited because it was between parties in interest, an undisputed fact. Evolve then bears the burden of proving it fits within the exception for transactions of "adequate consideration." *See Perez v. Bruister*, 823 F.3d 250, 262 (5th Cir. 2016) ("The fiduciaries have the burden to prove this affirmative defense."). So while the substance of these claims is the same, the parties bearing the burden of proof are different.

ERISA defines "adequate consideration" as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan in accordance with regulations promulgated by the Secretary." 29 U.S.C. § 1002(18)(B). An oft-cited Proposed Regulation also defines adequate consideration in terms of the following requirements: (1) "the value assigned to an asset must reflect its fair market value," and (2) "the value assigned to an asset must be the product of a determination made by the fiduciary in good

capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," and to act in accordance with the documents that govern the plan.

faith." Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed.Reg. 17,632, 17,633 (May 17, 1988); *Henry v. Champlain Enterprises, Inc.*, 445 F.3d 610, 619 (2d Cir. 2006) ("Although proposed regulations have no legal effect, numerous circuit courts have adopted the DOL's proposed definition of adequate consideration." (citation omitted)). The reference to "good faith" in the adequate consideration definition incorporates the fiduciary duties imposed by Section 1104. *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 680–81 (7th Cir. 2014). The general fiduciary duties can more specifically be described as duties of prudence, loyalty, and a duty to act in accordance with the ESOP's governing documents. *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 358 (4th Cir. 2014). These duties are significant; the Fourth Circuit has said that they are "the highest known to the law." *Id.* at 356 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982)).

### a. *Standard of review*

But there is one last analytical hurdle to clear before finally reaching the merits. Evolve argues its behavior can only be reviewed for abuse of discretion. This argument finds its strongest support in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). In that decision, the Supreme Court commented that "[t]rust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers." *Id.* at 111. This comment, however, came in the context of reviewing fiduciary determinations of benefits to plan participants. The Court's precise holding was that a fiduciary's decisions should be reviewed under a deferential standard of review only if the ESOP gives the fiduciary discretion to make certain decisions (*e.g.,* who is entitled to what benefits). The Supreme Court expressly limited the holding to 29 U.S.C. § 1132(a)(1)(B), which provides a cause of action for plan beneficiaries "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms

of the plan, or to clarify his rights to future benefits under the terms of the plan." *Id.* at 108 ("We express no view as to the appropriate standard of review for actions under other remedial provisions of ERISA.").

In benefits cases, the Fourth Circuit has followed *Firestone* and broadly stated "the standard for review under ERISA of a fiduciary's discretionary decision is for abuse of discretion, and we will not disturb such a decision if it is reasonable." *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342 (4th Cir. 2000); *see also Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 319, 321 (4th Cir. 2008). While other circuits have held some other fiduciary decisions should also be reviewed deferentially, *see, e.g., Armstrong v. LaSalle Bank Nat. Ass'n*, 446 F.3d 728, 732 (7th Cir. 2006) (collecting cases), *Firestone*'s application beyond benefits cases and 29 U.S.C. § 1132(a)(1)(B) remains an open question in the Fourth Circuit. *See DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 419 n.4 (4th Cir. 2007).

The Court finds the extension of *Firestone* deference to this case would be inappropriate. Evolve's decision to purchase Sentry stock at a specific price is fundamentally different than the benefit administrator determinations in *Firestone* and the Fourth Circuit cases applying it. Unlike those cases, Evolve was not required to perform "a balancing of competing interests under conditions of uncertainty." *Armstrong*, 446 F.3d at 733. Deference is owed in those benefit determinations because, "whatever the call on our compassion in a particular case," "the 'price [of greater coverage] would almost certainly [be] lower benefits levels and lower levels of plan formation.'" *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 326 (4th Cir. 2008) (quoting John H. Langbein, *The Supreme Court Flunks Trusts*, 1990 Sup.Ct. Rev. 207, 213) (alterations in *Evans*). Plan administrators deserve deference when they seek to find the

right balance between awarding benefits to employees and maintaining a sustainable plan. *Id.*; *see also Conkright v. Frommert*, 559 U.S. 506, 520 (2010) (explaining *Firestone* deference is necessary in benefits cases because of the careful balancing of interests in ERISA). But here there are no analogous competing interests: The trustee only needed to focus on paying no more than a fair price for the Sentry shares on the ESOP's behalf.

This difference also separates this case from the extensions of *Firestone* deference in other circuits. The Seventh Circuit, in *Armstrong*, reviewed a trustee's determination to set a stock price that was fair to both departing employees and those that stayed on. 446 F.3d at 732. That court relied on the fiduciary's duty to weigh competing interests in extending deference beyond the terms of *Firestone*. *Id.* If the trustee found the stock was worth too little, "departing employees would have cause for complaint" because the redemption price would be too low. *Id.* at 733. But if the trustee found the stock was worth too much, the trustee "might find itself sued, just as it has been, only by another set of plaintiffs." *Id.* Here alternatively, Evolve's only focus should have been on paying no more than a fair price for the Sentry shares: No members of the ESOP would be harmed if the ESOP had paid less for the Sentry stock it bought.[10] The justifications for extending *Firestone* deference do not apply in this case.

Accordingly, this Court will review *de novo* whether Evolve violated its fiduciary obligations to the ESOP, obligations that are "the highest known to the law." *Tatum*, 761 F.3d at 356. In doing so, the Court specifically relies on the Fourth Circuit's statement in *Tatum* that the duty of prudence "requires fiduciaries to employ 'appropriate methods to investigate the merits

---

[10] Unlike *Armstrong*, Evolve did not need to consider what price would be fair for redemption of the departing employees' shares because it resigned right after the transaction ended. And, as actually transpired, a different and lower valuation was actually used to determine what departing employees would be paid.

of the investment and to structure the investment' as well as to 'engage in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity.'" *Id.* at 358.

### b. Application

A genuine dispute remains about Evolve's prudence in entering into the transaction. Evolve claims it satisfied the standard because it: "(1) retained a qualified, independent valuation expert, CAI; (2) obtained voluminous due diligence materials from Sentry, and provided that information to CAI; (3) reviewed the valuation report prepared by Napier at CAI; and (4) questioned the assumptions and methods used by Napier in arriving at the stock value." (Dkt. 102 at ECF 11–12). Retaining an independent expert is "evidence of a thorough investigation," if the fiduciary "(1) investigate[s] the expert's qualifications, (2) provide[s] the expert with complete and accurate information, and (3) make[s] certain that reliance on the expert's advice is reasonably justified under the circumstances." *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996) (citations omitted); *see also Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 301 (5th Cir. 2000) (same). But these factors are not exclusive; this inquiry should be informed by the relevant facts and circumstances surrounding the independent expert. *See Perez v. Bruister*, 823 F.3d 250, 263 (5th Cir. 2016) (criticizing district court for mechanically applying these three factors).

Here, there is not serious dispute Evolve investigated and was appropriately satisfied by Napier's credentials. The Secretary does criticize Evolve for not providing Napier with projections for the company. While these projections did not exist, the parties' dispute about whether projections of some sort should have been created and then provided is the first of many factual disputes that will prevent summary judgment. The disputes intensify when the parties discuss whether Evolve's reliance on Napier's appraisal was "reasonably justified under the

circumstances." The Secretary questions whether he was independent. Napier was paid a flat fee regardless of his valuation and was hired because of his previous experience with Sentry. But his previous relationship with Sentry and questions about the facial validity of his appraisals create material disputes.

The Secretary relies on its expert's criticisms of Napier to demonstrate why Evolve should not have trusted the valuation. The Secretary specifically argues the increase in valuation between the previous years' appraisal and the 2010 appraisal should have been sufficient to alert the fiduciaries the 2010 appraisal was problematic. But this brings the Court back to the factual question of the reasonableness of the 2010 appraisal and the parties' experts. For example, Evolve's expert calculated approximately $74 per share of the increase in value was based on excess cash and land held by Sentry. The experts disagree on whether the ESOP's new position as the exclusive shareholder justifies valuing this cash and land differently than before. The experts claim large portions of the rest of the differential between the prices are also explained by purchase of a controlling interest. The prudence of relying on Napier's appraisal is inextricably tied up in these disputes. While Evolve was not required to be an "expert in the valuation of closely held corporations," it was required "to make an honest, objective effort to read the valuation, understand it, and question the methods and assumptions that do not make sense." *Howard v. Shay*, 100 F.3d 1484, 1489–90 (9th Cir. 1996). Whether Evolve did this and whether it was then permissible for Evolve to be satisfied by Napier's responses are factual questions reasonable factfinders could disagree on.

These experts' disputes about whether the transaction's stock price reflected fair market value will prevent Evolve from prevailing on its motions for summary judgment. So the remaining question under either of these first two counts is whether the Secretary can prove a

separate breach of fiduciary duty. *See also Henry*, 445 F.3d at 619 ("Although fair market value and good faith are often stated as distinct requirements, they are closely intertwined."). The parties here are focused on whether Evolve violated its duty of prudence. The duty of prudence "requires fiduciaries to employ 'appropriate methods to investigate the merits of the investment and to structure the investment' as well as to 'engage in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity.'" *Tatum*, 761 F.3d at 358 (citation, some internal quotation marks, and alteration marks in the original omitted); *see also DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420 (4th Cir. 2007).

The Secretary puts forward three other arguments that Evolve breached its fiduciary duties, but, in light of the experts' dispute about the reasonableness of the valuation, none of them require summary judgment for the Secretary. First, the Secretary criticizes Evolve for hiring William Gust to work as an attorney on behalf of the ESOP. The Secretary argues Gust was not independent, because he had long term relationships with both Sentry and Vinoskey, and because he did not pursue the best interests of the ESOP. As evidence of this conflict, the Secretary notes Gust required Vinoskey and Evolve to waive any potential conflicts in his engagement letter. (Dkt. 79-21 at ECF 1–2). But Gust had previously represented the ESOP, not just Vinoskey and Sentry, and Gust did not choose the price to offer Vinoskey, Lenoir and Evolve did. Specifically in light of the other evidence, reasonable factfinders could disagree about whether the hiring of Gust constituted a breach of fiduciary duty.

Second, the Secretary says Evolve's review of the transaction was done too quickly to provide meaningful review. The Secretary notes the Eastern District of Virginia recently commented that a fiduciary "did not have sufficient time to complete its work thoroughly" when it had less than six weeks to work on the transaction. *Brundle v. Wilmington Tr. N.A.*, 241 F.

Supp. 3d 610, 642 (E.D. Va. 2017)  But *Brundle* does not draw a bright line, and the lack of sufficient time was considered alongside other failings, many of which were more egregious than anything found here.  *Id.*  Evolve and New worked on this transaction for approximately six weeks (Evolve was contacted on November 9, 2010 and the closing was on December 20, 2010), and so the Secretary argues this demonstrates a lack of prudence.  But there is no clear amount of time a fiduciary is required to dedicate to a transaction, and the Court finds the amount of time spent on the deal is likely less important here than whether reliance on Napier's valuation was prudent.

Third and finally, the Secretary argues the lack of negotiation over the price signals Evolve violated its fiduciary duties.  But the facts surrounding the negotiation are disputed.  The Secretary notes New thought the deal would be for about $21 million dollars when he presented it to Evolve's ESOP Advisory Committee, and then it came out to be only slightly less than that amount.  The Secretary also reiterates Vinoskey accepted the bid without counteroffering.  While Vinoskey did state he and New "never disagreed about the sale price," he also stated, in the next sentence, he "could have sold it for a whole lot more than what they paid for it."  (Dkt. 79-4 at ECF 91).  Vinoskey went on to characterize New as a "good bargainer."  (*Id.* at ECF 94).  In an interview with the Secretary, Vinoskey stated New "tried to beat this price down."  (Dkt. 87-12 at ECF 2).  In light of the other evidence, there is too much dispute about the negotiation to grant summary judgment.

The ultimate question remains whether this evidence, taken together, would prevent a reasonable factfinder from finding the fiduciaries employed "appropriate methods to investigate the merits of the investment and to structure the investment" and "engage[d] in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity."  *Tatum*,

761 F.3d at 358. The Court finds reasonable factfinders could disagree about whether Evolve acted prudently, and so summary judgment is inappropriate on Counts I and II.

### 2. *The effect of the alleged breach on existing stockholders*

In Count IV, the Secretary alleged Evolve breached its fiduciary duties to the ESOP by allowing the value of existing stocks to decrease. But as discussed above, the Court will exclude the Secretary's expert testimony on this category of damages because the expert's methodology was unreliable. With that testimony excluded, the Secretary cannot provide evidence the value of the existing stocks did decrease because of the transaction, and so Evolve is entitled to summary judgment on this claim.[11]

## E. Discussion of the claims against the Vinoskey Defendants

The Vinoskey Defendants (Adam Vinoskey and his trust) did not move for summary judgment, and so the only remaining issue concerning them is whether the Secretary's motion for summary judgment against them should be granted. The Secretary puts forward two theories of Vinoskey's liability, but both of them depend on Evolve's or New's liability. The Secretary's first theory of liability against Vinoskey, that he knowingly participated in the other fiduciaries' breaches, requires: (1) one of the other defendants to breach a fiduciary duty, (2) Vinoskey to participate in that breach, and (3) Vinoskey to have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *See Harris Trust and Savings Bank v. Solomon Smith-Barney*, 530 U.S. 238, 251 (2000). The second theory, co-fiduciary liability,

---

[11] While the structure of the deal involved the ESOP taking on debt, it also involved the immediate distribution of new shares to the ESOP participants. And so, at the end of the transaction, the total value of Sentry stock held by each individual plan participant (*i.e.,* the value of the existing shares plus the value of the newly distributed shares) had increased. (Dkt 79-11 at ECF 64; dkt. 81-7 at ECF 41–44; dkt. 81-17 at ECF 4–5). The Secretary does not provide any authorities that have recognized a similar breach when plan participants' accounts increased.

requires: (1) Vinoskey to have actual knowledge of another fiduciary's breach, (2) Vinoskey to fail to make reasonable efforts to cure the breach, and (3) damages to result from the failure to cure. *See Silverman v. Mut. Ben. Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998) ("Silverman must show that (i) Principal had knowledge of the trustees' embezzlement, (ii) Principal failed to make reasonable efforts to remedy the trustees' breach, and (iii) the fund's loss resulted from that failure.").

Because the Court is unable to determine whether any other fiduciary breach occurred, the Court will also deny the Secretary's motion against the Vinoskey defendants.

### III. CONCLUSION

Messina's expert testimony will be admitted in part; he will be allowed to testify on everything except his second category of damages and his market comparable approach. The Court will exclude that testimony as unreliable. New's motion for summary judgment will be granted because reasonable factfinders would agree he is not a fiduciary. This is largely due to the Lenoir's supervisory role. Summary judgment will be denied, for both Evolve and the Secretary, on Counts I and II. This is because of remaining factual disputes concerning the reasonableness of Evolve's reliance on Napier's appraisal. The Secretary's motion for summary judgment against Vinoskey will be denied because Count III requires a breach by another fiduciary, something that is still disputed. Evolve's motion for summary judgment on Count IV will be granted, however, based on the exclusion of Messina's second category of damages.

An appropriate order will issue. The Clerk of Court is requested to send a copy of this Opinion and the accompanying Order to the parties.

Entered this __17th__ day of April, 2018.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

35