CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

8/2/2019

JULIA C. DUDLEY, CLERK
BY:   s/ CARMEN AMOS
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

PATRICK PIZZELLA, ACTING SECRETARY OF
LABOR, U.S. DEPARTMENT OF LABOR,

*Plaintiff,*

v.

ADAM VINOSKEY, *ET AL.*,

*Defendants.*

CASE NO. 6:16-cv-00062

**MEMORANDUM OPINION**

JUDGE NORMAN K. MOON

The Employment Retirement Income Security Act of 1974 (ERISA) permits an employer to create an Employee Stock Ownership Plan ("ESOP").  An ESOP is "an employee pension plan that invests primarily in the employer's stock."  *Brundle v. Wilmington Trust, N.A.*, 919 F.3d 763, 769 (4th Cir. 2019).  ERISA imposes stringent "duties and obligations on all pension plan fiduciaries, including those of ESOPs."  *Id.*  Among these obligations are robust duties of prudence and loyalty.  *See* 29 U.S.C. §§ 1104(a)(1)(A)-(B).  Moreover, ERISA prohibits ESOP fiduciaries from causing a "sale or exchange . . . of any property between the plan and a party in interest."  *Id.* § 1106(a)(1)(A).  However, ERISA provides an exception for party-in-interest transactions where the ESOP "receives no less, nor pays no more, than adequate consideration" for the employer's stock.  *Id.* § 1108(e)(1); *Brundle*, 919 F.3d at 769.

In this case, the Secretary of the Department of Labor alleges that an independent transactional trustee (Evolve Bank and Trust ("Evolve")) and Adam Vinoskey, the CEO of Sentry Equipment Erectors, Inc. ("Sentry") violated ERISA by approving the Sentry ESOP's purchase of Adam Vinoskey's stock in December 2010 at an allegedly inflated price.  Specifically, the Secretary alleges that the $406.00 per share paid for Adam Vinoskey's 51,000 shares was not the fair market value of the stock, resulting in the ESOP overpaying for the stock

1

by $11,526,000.00, which the Secretary seeks to recover for the ESOP. The Secretary alleges that Evolve violated its duties of prudence and loyalty, and that Adam Vinoskey is jointly liable for the ESOP's losses as a knowing participant in a prohibited transaction and as a co-fiduciary of the Sentry ESOP.

After a week-long bench trial, and for the reasons that follow, the Court holds that Evolve violated § 1106(a)(1)(A) by approving a prohibited party-in-interest transaction for more than adequate consideration; that Evolve failed to live up to ERISA's stringent duties of prudence and loyalty; and that Adam Vinoskey is jointly liable for the losses caused by Evolve's breaches as a knowing participant in a prohibited transaction and as a co-fiduciary of the ESOP. The Court finds that the ESOP overpaid for Adam Vinoskey's stock by $6,502,500.00, an amount for which Evolve, Adam Vinoskey, and the Adam Vinoskey Trust are jointly and severally liable.

## I.  FINDINGS OF FACT[1]

### A.  Sentry Background

Adam and Carole Vinoskey founded Sentry Equipment Erectors, Inc. in 1980. (Dkt. 34 ¶ 10 ("Vinoskey Answer")). Sentry designs and sells equipment such as conveyors and bottling machines for soft drink manufacturers, and maintains its principal place of business in Forest, Virginia, near Lynchburg, Virginia. (Vinoskey Answer ¶ 6; Tr.2 178:24-25, 179:1-11 (Vinoskey)).[2] To retain workers, Sentry offered generous benefits, such as the Sentry ESOP and

---

[1]  All of the Court's findings in Sections I, II, and III of this memorandum opinion are made by a preponderance of the evidence.

[2]  Citations to trial transcripts are denoted as "Tr.1," "Tr.2," "Tr.3," "Tr.4," and "Tr.5," which refer sequentially to docket numbers 198-202. Citations to trial transcripts include the relevant witness's surname in parentheses where the witness's identity is not otherwise obvious. Citations to the Secretary's trial exhibits are referred to as "PTX," citations to Defendants' trial exhibits are referred to as "DTX," and citations to the parties' joint trial exhibits are referred to as "JX." Citations including specific page numbers refer to "VINOSK" or "EVOL" pagination if such pagination exists; if such pagination does not exist for a given exhibit, citations refer to the

paying 100 percent of employees' health care premiums. (Tr.1 179:17-25, 180:1-5 (Holcomb)). Over the decades, Sentry has attracted major corporations as customers, including Coca-Cola, Dr. Pepper, and Snapple. (Tr.4 208:24-25, 209:1-4 (Connor)).

Adam Vinoskey served as Sentry's CEO and the Chairman of Sentry's Board of Directors, and Carole Vinoskey, who passed away in July 2011, served as Sentry's Secretary/Treasurer. (JX 28 at 3479; JX 69; Tr.1 180:14-21 (Holcomb)). Although Adam Vinoskey maintains that "[p]eople came to visit [Sentry] and wanted to buy the company" on at least three occasions over the decades, Sentry has never received any formal offers to purchase the company "that included prices." (Tr.2 188:12-25, 189:1-17; *see also* Tr.1 79:21-24 (Lenoir); Tr.4 199:23-25; 200:1-3 (Lenoir)). Because Sentry's clients are primarily concentrated in the soft drink industry, Sentry's income generally varies depending on when bottling plants decide to make large capital improvements. (Tr.1 231:16-21 (Napier); *id.* 71:3-6, 72:8-9, 73:1-8 (Lenoir); *id.* 197:9-20 (Holcomb); Tr.4 236:6-25 (Connor); JX 23; PTX M 10:14-20 (Vinoskey Depo., stating that soft drink companies account for 80 percent of Sentry's business)).

**B.      Formation of the Sentry ESOP and the 2004 Transaction**

Since "day one" of founding Sentry, Adam Vinoskey aspired for Sentry's employees to eventually own the company "because they helped build it." (Tr.2 184:7-10, 188:15-17 (Vinoskey)). In pursuit of that goal, Sentry formed an ESOP in 1993. (*See* JX 1-6). The purpose of the ESOP was to provide employees "with an additional means of accumulating funds for retirement as well as a meaningful stake in the Company, with future economic security and ultimately with an additional source of future income." (JX 1 at 818; *see also* Tr.1 169:12-25, 170:1-25, 171:1-8 (Holcomb) (noting similar goals)).

source's original pagination.

Under the ESOP Plan, the shares of company stock held by ESOP participants would "generally" be voted by the ESOP Trustee(s), except in "certain limited but important corporate matters, such as a sale of all the Company's assets or merger of the Company," when ESOP participants would "have the right to instruct the Plan Trustee as to [their] wishes relative to the shares of Company Stock held in [their] ESOP Account." (JX 1 at 831 (ESOP Plan Summary Description); JX 2 at 111 (Restated ESOP Plan)). From 2006 to at least July 31, 2012, Adam Vinoskey was a named ESOP Trustee. (JX 69 at 95; PTX A-D). The Sentry ESOP had 224 participants as of December 2010. (JX 64 at 528).

After founding the ESOP, Sentry hired W. William ("Bill") Gust of the law firm Gentry Locke to provide legal services related to the ESOP. (Tr.2 182:18-25; 183:1-2 (Vinoskey)). Gust recommended that Sentry hire the appraisal company Capital Analysts, Inc. ("CAI") to conduct annual appraisals of Sentry's stock. (*Id*. 5:3-14 (Napier); *id*. 183:24-25,184:1-6 (Vinoskey); Tr.1 222:2-6 (Napier)). CAI is a valuation firm founded in 1981 by its president Brian Napier. (Tr.2 81:24-25, 82:1-5 (Napier)). Napier is certified to perform valuations by the American Society of Appraisers, and has completed "at least a thousand" ESOP valuations. (*Id*. 81:3-25; 82:1-14 (Napier)).

From 2005 through at least 2015, Napier has drafted and finalized appraisals of Sentry's stock. (PTX A-I; JX 84-86). Between 2005 and 2009, Napier's appraisal of Sentry's stock ranged from $215.00 per share in December 2005, (PTX A at 2502), to $285.00 per share in December 2009, (JX 84 at 267). (*See* PTX B-D).[3] When Sentry ESOP participants retired, Sentry bought their shares at the price established by Napier's latest appraisal. (Tr.1 174:4-7

---

[3] Napier appraised Sentry's stock at $215.00 per share as of December 2005, (PTX A); $220.00 per share as of December 2006, (PTX B); $241.00 per share as of December 2007, (PTX C); $285.00 per share as of December 2008, (PTX D), and $285.00 per share as of December 2009, (JX84 at 267).

(Holcomb)).  At some point before 2010, upon Gust's recommendation, Sentry developed a working relationship with Corporate Capital Resources ("CCR"), a business that helps companies establish ESOPS.  (Tr.2 183:24-25, 184:1-6 (Vinoskey); 139:5-6 (Lenoir)).  Michael Coffey served as Sentry's primary contact at CCR.  (*Id*. 184:23-24 (Vinoskey)).

In 2004, the ESOP purchased 48 percent of Sentry's stock at $220.00 per share. (Vinoskey Answer ¶ 12; Tr.1 222:7-9 (Napier)).  Sentry did not hire an independent fiduciary to review the prudence of this transaction.  (Tr.2 185:6 (Vinoskey)).  The ESOP borrowed a portion of the purchase price from Sentry, and Sentry subsequently made contributions to the ESOP that allowed the ESOP to fully repay the loan by 2010.  (Vinoskey Answer ¶ 12).  As the debt was paid down, the shares were allocated to individual participant accounts.  (*Id*.).  In 2009, 48 percent of Sentry's stock had been allocated to participant accounts, and Adam Vinoskey, through the Adam V. Vinoskey Revocable Trust ("Adam Vinoskey Trust"), owned the remaining 52 percent of Sentry's shares.  (JX 84 at 276; Vinoskey Answer ¶ 7).  Adam Vinoskey is the trustee of the Adam Vinoskey Trust, exercises control over the Trust's assets, and owns at least 50 percent of the beneficial interest in the Trust.  (Vinoskey Answer ¶ 7).

## C.  Prelude to the 2010 Transaction: Adam Vinoskey Decides to Sell; Sentry ESOP Hires Evolve; Evolve's Background

In or around 2010, as Adam Vinoskey approached his anticipated retirement, Adam Vinoskey informed Bill Gust that he was interested in selling all of his shares to the ESOP, a transaction that would give the ESOP 100 percent ownership of Sentry ("the 2010 Transaction"). (Tr.2 184:7-19 (Vinoskey)).  Carole Vinoskey planned to retire around the same time, with Barbara Holcomb, Sentry's current Chief Financial Officer (CFO), joining the company in the summer of 2011.  (Tr.1 164:24-25, 205:12-25, 206:1-20 (Holcomb)).  Gust suggested that Evolve Bank and Trust ("Evolve") be hired as an independent fiduciary to represent the ESOP in

the proposed transaction. (PTX M 47:1-10 (Vinoskey Depo.)).

Evolve is a bank with headquarters in Memphis, Tennessee that has served as a trustee for ESOPS and other trust assets since 2005. (JX 100 at 5, 33). From 2006 to 2016, Kenneth ("Kenny") Lenoir served as Executive Vice President / Manager of Evolve's trust department, a role in which Lenoir was primarily responsible for Evolve's ESOP trustee business. (Tr.1 35:8-16 (Lenoir); Tr.4 169:12-18 (Lenoir)). Lenoir has worked in the retirement trust business since approximately 1970, and has worked with roughly 500 ESOPs. (Tr.4 168:24-25, 169:1-3 (Lenoir)). Lenoir worked alongside two other individuals in operating Evolve's trustee business: Michael New, who served as Senior Trust Officer from 2006 to 2017, and C. Douglas Kelso, who served as Executive Vice President of Operations from 2007 to 2017. (Tr.1 41:4-16, 43:15-20 (Lenoir); JX 100 at 6-7; PTX K 10:14-24, 15:1-2 (New Depo.)). In 2010, Lenoir, New, and Kelso comprised three out of four members of Evolve's ESOP Administration Committee, which ostensibly "provide[d] an independent review of all proposed ESOP transactions involving the purchase or sale of the sponsor's stock." (Tr.1 42:19-25, 43:3-8 (Lenoir); JX 100 at 35).[4]

On November 9, 2010, Bill Gust e-mailed Lenoir, copying New, stating that he had a client in Lynchburg "contemplating the purchase of the remaining shares of S Stock from the two owners who are also the sole Trustees," that the "value of the remaining stock as determined by Brian Napier is approx $21 Million," and that he "would like to suggest Evolve as the Transaction Trustee if you guys could squeeze another deal in Dec." (JX 19). Although Napier was aware from conversations with Carole Vinoskey at some point before 2010 that Adam Vinoskey hoped to one day sell his shares to the ESOP, Napier testified that he did not know

---

[4]    On January 1, 2017, Lenoir, New, and Kelso formed a new corporation named Invictus Fiduciary Services and transferred Evolve's ESOP trustee engagements to Invictus. (Tr.4 136:24-25, 137:1-5 (Lenoir)). Although Lenoir is "not with Evolve now," (Tr.1 51:10), he maintains an ongoing relationship with Evolve. (Tr.4 137:6-8).

how Gust came up with a projected value of $21 million for the 2010 Transaction, and that he did not have any conversation with Adam or Carole Vinoskey, or anyone at Sentry, prior to November 9, 2010 about the potential value of Adam Vinoskey's shares. (Tr.1 225:18-22, 226:6-13, 18-25, 227:1-25, 228:1-3). Regardless whether Napier, Gust, Coffey, or some other party computed this estimated $21 million value, a preponderance of the evidence suggests, and the Court finds, that this estimated value drove many of the discretionary choices underlying Napier's 2010 Transaction appraisal, which reached a total transaction value very close to $21 million. (JX 85).[5]

On November 12, 2010, Evolve sent an engagement letter to Sentry; this engagement letter was a contract in which Evolve agreed to serve as the independent fiduciary to review the proposed sale of Adam Vinoskey's stock to the ESOP, and ensure that the proposed transaction was prudent, the purchase price did not exceed adequate consideration, and "the transaction [was] fair from a financial viewpoint to the ESOP and its participants." (JX 21 at 35; *see also* Tr.1 46:25; 47:1-7 (Lenoir)). Evolve's fee would be $27,500.00. (JX 21 at 35). Evolve agreed to hire CAI as its "independent appraiser and financial advisor," as well as the law firm Gentry Locke as its legal counsel. (*Id.* at 35-36). Under the engagement letter, Sentry agreed to

---

[5]     Lenoir and Howard Kaplan, Evolve's expert on fiduciary duties in ESOP transactions, testified at trial that it is not unusual for a potential ESOP trustee to receive a price estimate before accepting an engagement as an independent fiduciary. (Tr.1 40:23-25, 41:1 (Lenoir); *see also* Tr.4 99:1-9, 140:1-4 (Kaplan, testifying that it is normal for a fiduciary to receive a "ballpark figure" of the value of the transaction from "the selling shareholders or the company," and that "trust companies that are chartered banks" have to know the potential size of the transaction under banking regulations). This may well be true but it misses the point. The relevant question is not whether it is standard in ESOP transactions for a fiduciary to receive an initial estimate of the value of the transaction but rather whether it is standard in ESOP transactions for an initial price estimate to drive an appraiser's discretionary choices and for an independent trustee to rely on an appraisal completed under such circumstances, as the Court finds by a preponderance of the evidence happened in the 2010 Transaction. No evidence suggests that the latter is a standard or acceptable practice in ESOP transactions.

indemnify Evolve for any fiduciary breaches it might commit. (*Id*. at 36).

On November 17, 2010, Coffey sent an e-mail to New, copying Gust and Napier, with a copy of the ESOP Plan and various financial analyses, including Coffey's "guesstimate" that the transaction was valued at $20,931,963.00. (JX 22 at 3231, 3364-3365). Napier received this e-mail and all attachments, including Coffey's "guesstimate." (Tr.2 166:20-25, 167:1-15 (Napier)). On the same day, New and Lenoir presented information about the proposed 2010 Transaction to Evolve's ESOP Administration Committee. (JX 24 at 42). Both the meeting minutes and an attachment to the minutes, entitled "ESOP Transaction Trusteeship Checklist," state that the approximate size of the transaction was $21 million. (*Id*. at 39, 40). The checklist noted that the transaction was low risk; that Sentry had strong successor management in place; that Sentry was a debt-averse, closely-held company with good earnings; and that Evolve would use a "[g]ood & [e]xperienced [v]aluation [a]dvisor" for the transaction. (*Id*. at 41-42).

On November 18, 2010—the same day as Evolve's visit to Sentry discussed below—the ESOP Administration Committee authorized New to accept the Transactional Trustee engagement on behalf of Evolve, (*id*. at 39), and Carole Vinoskey signed Evolve's engagement letter on behalf of Sentry, agreeing to Evolve's terms. (JX 21 at 37). At a special meeting of Sentry's Board of Directors on November 19, 2010, the Board adopted a corporate resolution formally appointing Evolve as the ESOP's "Special Independent Trustee" for purposes of "assessing the fairness of the proposed purchase of" Vinoskey's shares by the ESOP and "[i]mplementing [the] purchase if appropriate." (JX 25).

## D. Evolve's Activity Prior to Receiving Napier's Draft Appraisal

Evolve's due diligence for the 2010 Transaction was rushed and cursory. Lenoir could not remember how many hours Evolve spent on the deal, only that Evolve's work began on

approximately November 9, 2010 when Gust reached out and ended on December 20, 2010 when the deal closed. (Tr.1 54:1-21 (Lenoir)). The Court finds by a preponderance of the evidence that the rushed nature of Evolve's due diligence was due to the parties' agreement to close the deal by the end of the tax year, initially by December 17, 2010 and then by December 20, 2010. (Tr.1 147:9-16 (Lenoir); *see also* JX 39; JX 40; JX 42; JX 45). Lenoir testified at trial that he did not know why Adam Vinoskey wanted to close the transaction by the end of 2010. (Tr.1 163:19-21 (Lenoir)). But both Napier and Kaplan acknowledged that once the ESOP (a tax-exempt entity) owned 100 percent of Sentry, the company would owe no taxes, supporting a finding that the parties' rush to close the deal was motivated at least in some significant part by the tax benefits that would accrue to Sentry as a result of the 2010 transaction. (Tr.2 109:8-13 (Napier); Tr.4 91:8-13, 123:15-23 (Kaplan)).

### 1. Evolve Hires Napier of CAI and Gust of Gentry Locke

Somewhere between November 11-12, 2010, Evolve interviewed Napier on the phone, and hired him as an independent appraiser for the 2010 Transaction based on CAI's "history representing the trustee of the Sentry firm." (Tr.1 48:21-25; 49:1-19 (Lenoir)). Evolve had not previously worked with CAI or Napier. (*Id.*). Prior to formally engaging CAI, Michael New reviewed at least some of Napier's prior appraisals. (PTX K 68:12-24, 69:1 (New Depo.)). On November 29, 2010, Evolve formally engaged CAI as its financial advisor for the 2010 Transaction for a fee not to exceed $7,500. (JX 27).

On approximately December 14-15, 2010, Bill Gust of Gentry Locke circulated a letter to Adam Vinoskey, Carole Vinoskey, and Michael Connor, in their roles as co-trustees of the Sentry ESOP / CEO, as well as to Evolve, confirming that Gust would represent Sentry, the Sentry ESOP, and Evolve for purposes of the ESOP Transaction but not Adam Vinoskey

personally. (JX 35). Adam and Carole Vinoskey signed the letter as ESOP Trustees, acknowledging Gust's role and consenting to the representation. (*Id*.). Lenoir agreed at trial that Gust concurrently represented Sentry, the ESOP, and Evolve for purposes of the 2010 Transaction. (Tr.1 117:11-18, 122:10-13 (Lenoir)).

## 2. Evolve's Review of Due Diligence Checklist & Other Materials

At some point prior to November 18, 2010, Evolve sent Sentry a due diligence checklist requesting various documents and records from "the past three year period." (JX 26; Tr.1 75:10-17 (Lenoir)). Michael New compiled this checklist. (*Id*. 75:6-9; PTX K 61:23-24, 62:1 (New Depo.)). The checklist requested financial statements, corporate governance and transactional documents, shareholder information, operational and real estate information, employment and compensation records, and banking records. (JX 26). At some point on or soon after Evolve's November 18, 2010 visit to Sentry discussed below, Sentry returned a completed checklist to Evolve and sent various documents in response to the checklist. (Tr.1 75:14-24 (Lenoir)).

In filling out the checklist, Carole Vinoskey noted "DNE" (*i.e.*, "does not exist") in response to several of Evolve's requests, including Evolve's request for "[a]ny Company business budgets and forecasts, business plan, operations plan or projections . . . for as long as available," (JX 26 at 1634; *see also* Tr.1 77:14-25, 78:1-8 (Lenoir); PTX K 64:14-19 (New Depo.)); and "[b]ona fide offers to purchase the Company in the last five years," (JX 26 at 1635; *see also* Tr.1 79:21-24 (Lenoir)). Carole Vinoskey noted "Amy Emailing" to several requests, such as Evolve's request for "[a]nnual financial reports of the Company for the last five years and quarterly reports for the last eight quarters." (JX 26 at 1634).

The record is unclear as to exactly what documents Evolve received in response to the due diligence checklist, but New reviewed all materials Sentry sent in response to the checklist.

(PTX K 67:12-23 (New Depo.)).  Evolve also reviewed Napier's appraisals from prior years, including Napier's 2009 appraisal, which appraised Sentry's stock at $285.00 per share.  (*Id.* 68:1-10, 69:1-24; Tr.1 135:2-3 (Lenoir); JX 84 at 267).  Additionally, Evolve reviewed Sentry's bylaws and ESOP Plan.  (JX 26 at 1641; PTX K 133:8-24, 134:1-6 (New Depo.)).

### 3. Evolve's November 18, 2010 Visit to Sentry

On November 18, 2010, New and Lenoir toured the Sentry plant, talked with some Sentry employees (primarily mechanics), and then met with Adam and Carole Vinoskey, Gust, and Michael Connor, Sentry's incoming president.  (Tr.1 54:11-14, 54:24-25, 55:1-17, 58:1-25 (Lenoir)).  This marked Evolve's only visit to Sentry before the 2010 Transaction closed on December 20, 2010.  (*Id.* 128:7-9 (Lenoir)).  New took notes during the November 18 meeting. (JX 23; Tr.1 56:23-25 (Lenoir)). During the meeting, New and Lenoir asked about several matters, six of which are of particular importance.

First, Lenoir asked about how much cash Sentry had on hand, and was told that the company had $6 million at SunTrust Bank.  (JX 23; Tr.1 59:24-45, 60:1-14 (Lenoir)). Second, Lenoir inquired about Sentry's Board of Directors, and was told that the Board met once per year.  (JX 23).  Lenoir stated that it would be a better practice to meet quarterly, and Adam Vinoskey indicated that he would "follow whatever they need to do."  (*Id.*; Tr.1 60:15-25, 61:1-5 (Lenoir)).  At the time, Sentry's Board consisted of Adam Vinoskey, Carole Vinoskey, and another Sentry manager, Wright Lambert, with Adam Vinoskey serving as Chairman.  (*See, e.g.*, JX 28 at 3479–3480).  Lenoir suggested that Adam Vinoskey stay on as Chairman after the transaction.  (JX 23).  Gust and Lenoir recommended a five-member Board after the 2010 Transaction consisting of Adam and Carole Vinoskey, Michael Connor, and two outside (*i.e.,* non-manager) Directors. (*Id.*; Tr.1 62:1-15 (Lenoir)).  Lenoir did not include a requirement that

two outside Directors be added to the Board in the transaction documents because he thought he and Adam Vinoskey had a "gentleman's agreement" since "Mr. Vinoskey said that he would do what it took." (Tr.1 62:16-25 (Lenoir)). Lenoir conceded that he "should have had it in the [written] agreement]," since Evolve could not enforce any "gentleman's agreement" after the transaction closed and Evolve resigned as the independent transactional trustee. (*Id*. 63:2-20).

Third, Lenoir inquired about Michael Connor's employment status and compensation. Adam Vinoskey stated that Connor would be "running the show" by December 15, 2010 or January 1, 2011. (JX 23). Adam Vinoskey further stated that he had a verbal agreement to pay Connor $300,000 per year plus some unspecified percentage of Sentry's profits. (*Id*.). Lenoir indicated that an outside Board member should chair the compensation committee that eventually determined Connor's exact compensation. (*Id*.; Tr.1 66:4-13 (Lenoir)). Connor stated during the meeting that he expected 2011 to be a more challenging year for Sentry than 2010, although Adam Vinoskey stated that 2011 would be a good year. (JX 23; Tr.1 72:8-13 (Lenoir)). Connor stated that Sentry would likely need to diversify into the food sector because the beverage sector had experienced slower growth than it had historically but that no capital would be used to achieve that diversification within the next six to seven years "because of the way [Sentry] [has] postured themselves." (JX 23; Tr.1 72:8-9, 73:1-8 (Lenoir)). At trial, Connor similarly testified that, in 2010, he believed Sentry "needed to diversify . . . into other industries." (Tr.4 236:6-25 (Connor)).

Fourth, Lenoir suggested that Sentry could raise its value and save money by requiring employees to pay part of their health insurance costs, but Adam Vinoskey unequivocally refused to consider this. (Tr.2 205:1-25 (Vinoskey); *see also* Tr.1 88:18-25, 89:1-6, 100:3-10 (Lenoir); JX 33). Fifth, Lenoir asked whether there were any projections of Sentry's future performance,

and Adam Vinoskey stated that Sentry had never forecasted. (JX 23). Finally, Lenoir inquired whether Sentry had ever received serious offers to purchase the company, and Carole Vinoskey replied that, although Sentry had received informal inquiries, the company had never received an official offer. (*Id.*).

## E. Napier's 2010 Transaction Appraisal

### 1. Napier's Capitalization of Cash Flow Methodology and Past Appraisals

In performing appraisals for Sentry, Napier utilized the "capitalization of cash flow" methodology.[6] (Tr.1 222:10-12 (Napier)). Under this income-based (as opposed to market- or asset-based) approach, an appraiser arrives at a stock value by dividing a measure of earnings (*i.e.*, "cash flow") by a capitalization rate, which is calculated by subtracting a company's assumed growth rate from the discount rate. (*Id.* 222:17-25, 223:1-6, 237:2-13 (Napier)). The capitalization of cash flow methodology does not require projections of a company's future performance. (*Id.* 222:13-16 (Napier)).

In calculating Sentry's cumulative cash flows, Napier utilized a five-year look-back period until 2008, when Napier began using a three-year look-back period. (*Id.* 235:1-16 (Napier); Tr.2 7:9-17 (Napier); Tr.3 161:3-5, 162:1 (Messina); *see also* JX 96 at 24, Figure 18 (Messina's Report showing switch to three-year period in 2008 and continuing through the 2010 Transaction appraisal)).

In computing the capitalization rate, Napier generally measured a company's assumed growth rate using "[s]ome measure of historic performance against . . . anticipated inflation," which typically resulted in a growth rate between zero and 3-4 percent. (Tr.1 223:7-15 (Napier)). Broadly defined, the discount rate is "the expected rate of return (or yield) that an

---

[6]    This method is also commonly referred to as the "capitalization of earnings" methodology but the Court will use Napier's "capitalization of cash flow" term.

investor would have to give up by investing in the subject investment" and generally reflects the "size, liquidity risk, and character of the investment in the subject firm." (*Id*. 239:18-22 (Napier); *see also* JX 84 at 301). More specifically, the discount rate is the sum of the "risk free rate" (*i.e.*, the rate on long-term U.S. Treasury bonds), an "equity risk premium" determined using empirical studies in appraisal literature, and a subjective "company-specific risk premium" determined in large part by a company's size. (Tr.1 240:22-25, 241:1-2 (Napier); Tr.2 23:17-25, 24:1-25 (Napier)).

Napier's 2009 appraisal illustrates how the capitalization of cash flow methodology works in practice. For his 2009 appraisal, Napier computed the discount rate at 18.5 percent. (JX 84 at 306). Napier then subtracted a 2 percent growth rate from the discount rate, to reach a 16.5 percent capitalization rate, which he then adjusted for growth by dividing by 1.02 (1 plus the growth rate of 2 percent), for a final capitalization rate of 16.2 percent. (*Id.*; Tr.1 241:5-19 (Napier)). Napier calculated the cash-flow-to-equity value to be capitalized by adding Sentry's earnings (plus depreciation amortization and adjusted for working capital changes) and operating working capital (adjusted for long-term debt), and subtracting Sentry's capital expenditures from its earnings. (Tr.1 242:10-20 (Napier)). This resulted in a per share value of $48.59, which, when divided by the 16.2 percent capitalization rate, resulted in a stock price of $300.00 per share. (JX 84 at 306-307; Tr.1 242:21-25, 243:1-7 (Napier)). Napier then applied a discount of 5 percent for lack of marketability and liquidity, resulting in a final stock price of $285.00 per share. (Tr.1 243:14-25 (Napier); JX 84 at 309-311).

Using the capitalization of cash flow methodology, Napier appraised Sentry's common stock at $215.00 per share as of December 2005, (PTX A); $220.00 per share as of December 2006, (PTX B); $241.00 per share as of December 2007, (PTX C); $285.00 per share as of

December 2008, (PTX D), and $285.00 per share as of December 2009, (JX 84 at 267).

Although Napier generally computed a stock value using an asset-based methodology, he never gave the asset-based approach any weight, as he felt this methodology ignored intangibles such as good will and the going concern value of a business. (Tr.1 237:2-6, 238:14-17 (Napier)). Napier similarly did not use a market-based methodology because he could not find enough comparable companies on which to base this analysis. (*Id*. 237:7-10 (Napier)).

Both for his past appraisals and the 2010 Transaction appraisal, Napier also declined to use another income-based approach: the discounted cash flow (DCF) methodology. (*Id*. 238:2-13 (Napier)). DCF "estimates the available cash flow an investor would expect the subject company to generate over the life of the business." (JX 96 at 28). Each year's estimated available cash flow is discounted "to its present value equivalent using an appropriate rate of return." (*Id*.). The business's "residual value" at the end of the projection period is similarly estimated and "discounted to its present value." (*Id*.). "The summary of these values equals the enterprise value," from which the company's current debt is then subtracted to reach the fair market value of the company's equity. (*Id*.). Essentially, DCF "takes [a company's] stream of cash flows and uses a discount rate to tell you what that stream of cash flows is worth today." (Tr.3 44:6-8 (Messina)). Since DCF is, by default, calculated on a controlling-interest basis, additional discounts may be necessary to account for the actual degree of control a buyer is acquiring. (*Id*. 33:23-24, 34:1-6 (Messina)).

Napier is generally of the opinion that DCF is an inappropriate methodology for ESOP valuations, unless a company has a history of "detailed forecasts." (Tr.1 223:16-25, 224:1-10 (Napier); *see also* JX 30 at 208 (Napier's notation in 2010 Transaction draft appraisal that DCF is "inappropriate to valuations for ESOP purposes" in part because "application of projected

operations is . . . extremely difficult for most closely-held companies"). Since Sentry did not have forecasts or projections, Napier used the above-described capitalization of cash flow method. (Tr.1 224:11-17 (Napier)).

Both experts who testified about Napier's 2010 Transaction appraisal employed DCF. Dana Messina, the Secretary's expert on the fair market value of Sentry's stock in December 2010, founded a valuation firm, Kirkland Messina, in 1994. (JX 96 at 37). Messina holds an M.B.A. from Harvard Business School and served as CEO of Steinway Musical Instruments from 1996 to 2011. (*Id.*). Frank ("Chip") Brown, Defendants' expert, holds a Master's in Accounting from the University of Virginia and is currently employed as a Senior Vice President at First Bankers Trust Services. (Tr.4 254:11-22, 255:3-7 (Brown)). Brown is a certified public accountant and has been performing valuations for ESOPs since approximately 2004-2005. (*Id.* 255:8-13, 18-20 (Brown)).

Messina testified that DCF "is the most widely used valuation methodology," (Tr.3 26:13-16), and wrote in his report that DCF can be more reliable than Napier's capitalization of earnings methodology because DCF "considers the financial performance of future years." (JX 96 at 12; *see also* Tr.3 43:24-25, 44:1-8 (Messina)). Brown also acknowledged this feature of DCF, noting in his report that the "DCF method inherently is based on a long-term investment horizon based on the estimates of future earnings by the company." (JX 98 at 24 ¶ 67). Although Brown stated in his report that Napier's capitalization of earnings method is "an accepted mathematical way of calculating the fair market value" and that it would be a "mistaken impression" to conclude that DCF is "much more robust than the CAI capitalized earnings method," (JX 98 at 44-45), Brown himself employed DCF, (*see, e.g., id.* at 30), and testified that it is an appropriate methodology to assess the fair market value of Sentry as of December 20,

2010. (Tr.5 47:16-24 (Brown)).[7] Moreover, as discussed below, Evolve itself expressed concern that Napier did not utilize DCF. (*See, e.g.,* JX 30 at 166; JX 31 at 161). Accordingly, although Napier's capitalization of cash flow methodology is not necessarily inappropriate or unreliable if applied correctly, the Court finds that DCF is, on the margins, a more widely-used methodology for evaluating the fair market value of closely-held stock.[8]

## 2. Napier's Draft Appraisal for the 2010 Transaction

On December 9, 2010—ten days after Evolve engaged CAI—Napier e-mailed a draft appraisal to Michael New and Bill Gust. In his draft appraisal, Napier valued Sentry's shares at $405.73 per share, which would equate to an overall transaction price of $20,692,230.00 for Adam Vinoskey's 51,000 shares. (JX 29 at 5576, 5579, 5586). This price was strikingly close to the "approx[imately] $21 million" transaction value included in the November 17, 2010 e-mail Napier received from Michael Coffey twelve days prior to Evolve formally engaging CAI for the 2010 Transaction. (JX 22 at 3231, 3365; Tr.2 166:20-25, 167:1-15 (Napier)).

The Secretary points to various alleged flaws in Napier's 2010 Transaction appraisal. Since these flaws are relevant to Evolve's review of Napier's draft appraisal (discussed below), and since all appeared in Napier's final appraisal (also discussed below), the Court will address each alleged flaw at this juncture.

### i. Napier's Controlling-Interest Assumption

Napier computed the 2010 Transaction appraisal on a controlling-interest basis. (JX 85 at 1803). As discussed at various points below, many of the discretionary choices Napier made

---

[7]     Brown also asserted in his report that "the capitalization of earnings method typically indicates a lower value than the DCF method." (JX 98 at 45). But Brown provides no substantive support for this assertion. The Court also notes that Evolve states in briefing that DCF is "an accepted method in the abstract." (Dkt. 212 at 76).

[8]     Both methods will feature in the Court's calculation of damages in Section III.

reflected his view that the ESOP would gain total control over Sentry as a result of the 2010 Transaction. (*Id*. at 1809; Tr.2 33:19-25 (Napier)). The Court will reach legal conclusions about control in Section II. Here, the Court finds as a factual matter by a preponderance of the evidence that the ESOP did not stand to gain total control over Sentry after the 2010 Transaction.

Under the Sentry ESOP Plan and Sentry's bylaws, the Board of Directors has the power to appoint and remove ESOP Trustees, (JX 2 at 134; *see also* JX 7 at 1857), and the ESOP Trustees in turn have the power to vote the ESOP's shares in all but "certain limited but important corporate matters, such as a sale of all the Company's assets or merger of the Company." (JX 1 at 831; JX 2 at 111). In these limited matters, ESOP participants "have the right to instruct the Plan trustee as to [their] wishes relative to" their shares. (*Id*.). Under Sentry's bylaws, the Board of Directors is elected by an annual vote of Sentry shareholders. (JX 7 at 1852, 1854). After the 2010 Transaction, the ESOP would have been the sole shareholder, and the ESOP Trustees would have been able to unilaterally vote the ESOP's shares to elect Directors, since the election of Directors is not one of the "important corporate matters" listed in the ESOP Plan. (JX 7 at 1854; JX 2 at 111). Under the bylaws, the shareholders (*i.e.,* the ESOP and its Trustees after the transaction) can remove any Director and elect his or her successor at a special meeting called for that purpose, but only the Board can, by majority vote, remove and replace officers appointed by the Board (such as ESOP Trustees). (JX 7 at 1857-58). The bylaws call for annual shareholder meetings and for "special [shareholder] meetings" as called for by the President, Vice President, Secretary, or Board of Directors, or upon application to the Secretary by shareholders holding at least one-tenth of Sentry's stock. (*Id*. at 1852).

Prior to the 2010 Transaction, Sentry's Board of Directors consisted of Adam and Carole Vinoskey, and a Sentry co-founder, Wright Lambert. (JX 28 at 3479-80). Although Evolve had

a "gentleman's agreement" that the Board would be expanded to include outside Directors, no requirement for this expansion was added to the transaction documents. (Tr.1 62:16-25 (Lenoir)). Prior to the 2010 Transaction, Adam and Carole Vinoskey served as two of Sentry's three ESOP Trustees. (JX 69; JX 6 at 56; JX 24 at 40; JX 35). There is no evidence that Evolve took any steps to ensure that the Vinoskeys would step down as Trustees after the transaction, and in fact they did not. (JX 69). Finally, Carole Vinoskey served as Sentry's Secretary prior to the 2010 Transaction and remained in this role after the transaction. (*See, e.g.*, JX 3 at 44; JX 4 at 49; JX 5; JX 69). Here again, there is no evidence that Evolve took any action to ensure that Carole Vinoskey stepped away from this role after the transaction.

The implications of Sentry's corporate structure and leadership personnel are clear enough: Absent changes removing Adam and Carole Vinoskey as ESOP Trustees, the Vinoskeys could exert total control over how to vote the ESOP's shares in the vast majority of corporate matters as two out of the three ESOP Trustees. If the ESOP wanted to remove Adam and Carole Vinoskey as Directors, Adam and Carole Vinoskey would have to agree not to reelect themselves as Directors at the annual shareholder meeting or agree to remove themselves at a special meeting, since Adam and Carole Vinoskey, as two out of three ESOP Trustees, would be empowered to vote the ESOP's shares in electing and removing Directors without taking instruction from the ESOP participants. If the ESOP wanted to remove Adam and Carole Vinoskey as ESOP Trustees, the ESOP would have to petition the Secretary (Carole Vinoskey) to call a special meeting of the Board of Directors, a body that, absent changes, would have been *elected by* Adam and Carole Vinoskey as ESOP Trustees and that, absent changes, would have *included* Adam and Carole Vinoskey as two out of three Directors. Assuming Carole Vinoskey would call a special meeting for the purpose of firing herself and her husband as ESOP Trustees,

the Vinoskeys, as two of the three Directors, would have to agree to fire themselves as Trustees.

Essentially, given the lack of provisions in the transaction documents altering Sentry's corporate structure, reducing the Vinoskeys' leadership roles, or ensuring that the ESOP could control the Board and the ESOP Trustees with relative ease, Adam and Carole Vinoskey stood to retain a tight grip over Sentry after the 2010 Transaction. Under these circumstances, the Court finds by a preponderance of the evidence that the Sentry ESOP did not stand to gain total control over Sentry after the 2010 Transaction, and that Brian Napier's assumption that the ESOP would gain total control simply by purchasing 100 percent of Sentry's stock was unreasonable.

The Court makes the further factual finding that Evolve understood the ESOP would not gain total control over Sentry after the transaction. As mentioned above, Evolve had reviewed Sentry's bylaws and the ESOP Plan. (PTX K 133:24-26, 134:1-6 (New Depo.); JX 26 at 1641). Evolve was also aware of other indicators that Adam Vinoskey did not intend to fully relinquish control over Sentry, such as Adam Vinoskey's intention (at Evolve's recommendation) to stay on as Chairman of the Board of Directors and Adam Vinoskey's refusal on November 18, 2010 to entertain cutting health benefits after the 2010 Transaction. (*See* Tr.1 88:18-25, 89:1-6, 100:3-10 (Lenoir)). Evolve took this refusal seriously enough to request that Napier not add-back half of Sentry's health-care expenses, suggesting that Evolve understood who would essentially remain in control of Sentry after the 2010 Transaction: Adam Vinoskey. (JX 33, 34).

Moreover, the Court finds that Evolve never seriously probed whether it was appropriate for Napier to conduct his appraisal on a controlling-interest basis. Although New stated in his December 11, 2010 e-mail to Napier that Evolve would "like the report to include a discussion of the modifications that were made to your methodology to account for the ESOP acquiring a controlling interest in the company as compared to the minority interest approach utilized in the

past," (JX 33), there is no evidence that Evolve ever questioned the *substance* of Napier's underlying assumption that the ESOP was acquiring total control of Sentry. (JX 34). In response to New's request, Napier added two bullet points to the final appraisal (which, as discussed below, Evolve did not review) directing the reader to other charts showing the add-back of Sentry's excess land, cash, ESOP contributions, and health-care expenses. (JX 85 at 1809). But Napier did not add any thorough explanation of why it was appropriate to assume that the ESOP would be able to exert total control over Sentry even as the owner of 100 percent of Sentry's shares given Sentry's likely post-transaction corporate structure and leadership personnel.

### ii. Napier's Healthcare Expenses & ESOP Contributions Add-back

When calculating Sentry's net income, Napier made various "normalization adjustments" by adding back projected cost savings, including an add-back of half of Sentry's health care costs. (Tr.2 42:15-17 (Napier); *see also* JX 85 at 1856). This add-back had the effect of increasing Napier's calculation of representative cash flow by $650,000, adding $5.3 million to Napier's enterprise value calculation and raising the stock price for the 2010 Transaction by $50.00 per share. (Tr2 62:1-9, 156:12-25, 157:1-7 (Napier); *see also* Tr.3 70:2-7 (Messina)).

As discussed in more detail below, Lenoir and New questioned Napier about the appropriateness of this add-back given Adam Vinoskey's clear statement on November 18, 2010 that he would not consider cutting health expenses after the transaction. (JX 34 at 162; Tr.2 43:22-25, 44:1-10, 148:9-14 (Napier)). Napier declined to remove this add-back because, in his view, the ESOP would gain total control over Sentry after the 2010 Transaction, and an "absolute controlling shareholder would look at those expenses of a hundred percent of the health care benefits and make adjustments to increase the earnings of the company." (*Id*. 43:2-8, 44:3-10, 156: (Napier)). Napier was aware, however, that Sentry had no business plan to reduce

health care costs, that Adam Vinoskey was opposed to reducing health care costs, and that Sentry's generous health care benefits were a major factor in Sentry's ability to attract workers. (*Id*. 45:18-21, 148:15-25 (Napier); *see also* Tr.1 180:17-22 (Holcomb, acknowledging that Sentry's health care benefits facilitate worker retention)). Yet Napier still elected to add back half of Sentry's health care costs without considering the effect such cuts would have on employee retention and productivity, and without thoroughly explaining in his report how or why his assumptions about control required this add-back. (Tr.2 149:11-17, 150:1-5 (Napier); Tr.3 83:7-11, 218:20-25, 219:1-16 (Messina, noting offsetting benefits of Sentry's health care costs Napier did not consider)). Ultimately, it was Evolve's decision to leave the health care add-back in the 2010 Transaction appraisal. (Tr.4 202:2-5 (Lenoir, conceding this point)).

The Court concludes that Napier's decision to add back half of Sentry's health care costs—particularly without analyzing the ramifications of that add-back in terms of profits and worker retention—was unreasonable given Adam Vinoskey's clear statement that Sentry would not cut health care expenses, and Napier's understanding that Sentry's health care benefits had a major impact on worker satisfaction, recruitment, and retention. Moreover, Napier's decision to add back half of Sentry's health care expenses based on an assumption that the Sentry ESOP would fully gain control of Sentry after the 2010 Transaction is unreasonable given the Court's conclusion above that the Sentry ESOP did not, in fact, stand to gain total control of Sentry. Indeed, even assuming that the ESOP stood to gain full control over Sentry, it still would have been questionable to assume that the ESOP participants would vote in favor of cutting their own generous health care benefits. Finally, neither Messina nor Brown added back any of Sentry's health care expenses, (Tr.5 92:12-15, 107:21-25 (Brown); *id*. 125:13-22 (Messina)), and Evolve itself noted that the health-care add-back was inappropriate in its review of Napier's draft

appraisal.  (*See, e.g.*, JX 33 at 161).

Similarly, the Court finds that Napier unreasonably added back Sentry's ESOP contributions when calculating Sentry's net-adjusted income.  (JX 85 at 1856; Tr.2 49:1-8, 49:24-25, 50:1-13 (Napier)).  As Messina testified, such add-backs or "normalizations" without other adjustments are appropriate only if an appraiser believes that "removing this expense" would have "no impact on the company going forward," such that, for instance, Sentry "could have eliminated [the] ESOP and nothing would have happened with sales," profit, or employee turnover.  (Tr.5 122:14-25, 123:1-18).  Messina testified, and the Court finds, that such normalizations are highly discretionary and typically favor the seller in a transaction.  (*Id*. 122:1-12).  Napier's apparent assumption that Sentry could eliminate the ESOP without negative repercussions was unreasonable, since the express purpose of the ESOP was to increase worker satisfaction and productivity, and since it is highly unlikely that the ESOP participants would move to eliminate an attractive retirement benefit.  (*See* JX1 at 818; Tr.1 169:12-25; 170:1-25; 171:1-8 (Holcomb)).  There is no evidence before the Court that Evolve noticed or questioned Napier's add-back of Sentry's ESOP contributions.

### iii.    Napier's Inconsistent Capitalization Rates

As described above, appraisers utilizing the capitalization of cash flow methodology arrive at a stock value by dividing a measure of earnings (*i.e.*, cash flow) by a "capitalization rate," which is calculated by subtracting a company's assumed "growth rate" from the "discount rate."  (*See, e.g.,* Tr.1 222:17-25, 223:1-6 (Napier)).  The discount rate is comprised of the sum of a risk-free rate, typically measured by reference to the rate on U.S. Treasury bonds, (Tr.2 23:17-22 (Napier); *see, e.g.*, JX 85 at 1839); an equity risk premium, which Napier calculated using published studies on equity risk, (Tr.2 23:23-25, 24:1-6 (Napier)); and a company-specific

23

risk percentage, based on subjective assessments of a company's size and other company-specific characteristics bearing on risk. (*Id*. 24:7-17 (Napier)). Changes in the discount rate have a major impact on stock price: generally, the higher the discount rate, the lower the stock price, and vice versa. (Tr.3 51:6-9 (Messina); Tr.4 296:7-11 (Brown)). Napier measured a company's growth rate using "[s]ome measure of historic performance against . . . anticipated inflation," which, according to Napier, typically resulted in a growth rate between zero and 3-4 percent. (Tr.1 223:7-15 (Napier)). Generally, the higher the capitalization rate, the lower the stock price, and vice versa. (Tr.3 51:21-25, 52:1-3, 55:14-16 (Messina)).

As demonstrated by the table below from Messina's report, Napier computed a capitalization rate of at least 16.2 percent in every annual appraisal since 2005, but his capitalization rate for the 2010 Transaction appraisal dropped to 12.2 percent.[9] (JX 85 at 1844). Just eleven days after the 2010 Transaction closed, the capitalization rate in Napier's December 31, 2010 appraisal rose to 18.2 percent. (JX 86 at 1471). Napier's 2011 appraisal used a capitalization rate of 18 percent. (PTX E at 1560).



---

[9] Messina's table, (JX 96 at 15, Figure 11), accounts for the capitalization rates used in Napier's appraisals from 2007–2012. Napier's capitalization rates in 2005 and 2007 were also above 16.2 percent: in 2005, Napier calculated a capitalization rate of 17.8 percent, (PTX A at 2543), and in 2006, Napier calculated a capitalization rate of 17.7 percent, (PTX B at 392).

(JX 96 at 15, Figure 11). The following table demonstrates how the various inputs Napier used to calculate the capitalization rate changed over time:

| CAI's Inconsistent Discount Rates | 12/31/2007 | 12/31/2008 | 12/31/2009 | 11/30/2010 | 12/31/2010 | 12/31/2011 |
|---|---|---|---|---|---|---|
| Risk free rate | 4.6% | 3.0% | 4.5% | 4.0% | 4.2% | 4.0% |
| Equity risk and size premia | 10.8% | 11.8% | 6.0% | 5.5% | 6.0% | 6.0% |
| Company specific risk | 6.0% | 4.0% | 8.0% | 6.0% | 8.0% | 8.0% |
| Discount rate | 21.4% | 18.8% | 18.5% | 15.5% | 18.2% | 18.0% |
| | | | | | | |
| Growth | 3.0% | 2.0% | 2.0% | 3.0% | 0.0% | 0.0% |
| Capitalization Rate | 18.4% | 16.5% | 16.2% | 12.2% | 18.2% | 18.0% |
| *Source: Capital Analysts, Inc. Sentry Valuation from 2007 to 2011* | | | | | | |

(JX 96 at 16, Figure 12).[10] As this table demonstrates, Napier's risk-free rate dropped from 4.5 percent in 2009 to 4 percent for the 2010 Transaction appraisal, because of fluctuations in rates on U.S. Treasury bonds. (JX 84 at 304; JX 85 at 1841; Tr.2 34:20-25, 35:1-4 (Napier)). The Court finds that this particular decision was reasonable. (*See* Tr.3 91:20-1 (Messina, noting that the "risk-free rate may change . . . slightly")). However, the Court finds by a preponderance of the evidence that Napier adjusted the equity risk and company-specific risk percentages in an unreasonable manner, apparently for the purpose of arriving at a lower discount rate and thereby raising the stock price for the 2010 Transaction.

With respect to equity risk, this percentage dropped from 6 percent in 2009 to 5.5 percent for the 2010 Transaction. (JX 84 at 304; JX 85 at 1841). Napier testified that he tries to keep this percentage "within the 5-to-6 percent range" as recommended by ESOP appraisal literature, and selected 5.5 percent for the 2010 Transaction appraisal "since this is a controlling-interest valuation," and "the expectation is that the benefits in the lower risk of control will be imputed

---

[10] The column entitled "11/30/2010" shows the inputs Napier used to calculate the capitalization rate for the 2010 Transaction.

into the discount rate." (Tr.2 24:1-6, 35:8-13). As discussed above, the Court finds that the ESOP did not stand to gain full control over Sentry. But even assuming that the ESOP stood to gain total control, the Court still finds Napier's decision with respect to equity risk questionable, as Napier's appraisal did not cite control as the reason for his decision to lower the equity risk percentage to 5.5 percent. Moreover, the Court finds Messina's testimony persuasive that it is generally inappropriate to consider control when calculating the discount rate. (Tr.3 37:17-25, 38:1-7, 56:2-20, 93:2-4; Tr.5 131:12-24). Thus, although Messina testified that "the equity risk premium may change slightly" from one appraisal to the next, (Tr.3 91:20-22), Napier's sole justification for decreasing the equity risk percentage for the 2010 Transaction—an assumption that the ESOP stood to gain unfettered control over Sentry—renders this decision unreasonable.

With respect to Napier's company-specific risk calculation, this figure dropped from 8 percent in 2009 to 6 percent in the 2010 Transaction appraisal. (JX 96 at 16; JX 84 at 304; JX 85 at 1841). Napier testified that company-specific risk depends in large part on a company's size, but Napier conceded that Sentry's size had not changed in any way that would justify a 2 percent drop in company-specific risk between 2009 and the 2010 Transaction. (Tr.2 24:23-25, 36:5-11). Rather, Napier based his "subjective judgment" to decrease company-specific risk to 6 percent on "the benefits of control and lower risk of control." (*Id*. 36:13-19 (Napier); *see also* Tr.5 94:16-19 (Brown, agreeing that company-specific risk is one of the more subjective aspects of calculating a discount rate)). Again, Napier's appraisal did not cite control as a justification for lowering the company-specific risk percentage, and the Court finds persuasive Messina's testimony that it is inappropriate to consider control when calculating the discount rate. (Tr.3 37:17-25, 38:1-7, 56:2-20, 93:2-4; Tr.5 131:12-24). Moreover, as discussed above, the ESOP was not acquiring total control of Sentry through the 2010 Transaction. Napier's discretionary

choices about equity risk and company-specific risk had the effect of lowering the discount rate for the 2010 Transaction to 15.5 percent, a rate Napier conceded at trial was "certainly on the low end." (Tr.2 150:20-23 (Napier); *see also* Tr.1 101:8-13 (Lenoir, acknowledging that Napier's discount rate in the 2010 Transaction appraisal was unusually low)).

Additionally, the Court finds by a preponderance of the evidence that Napier unreasonably raised the growth rate from 2 percent in 2008 and 2009 to 3 percent for the 2010 Transaction. Here again, Napier testified that he decided to increase the growth rate to 2 percent because the Sentry ESOP would be gaining total control over Sentry as a result of the 2010 Transaction. (Tr.2 38:5-7, 95:13-19). And, here again, the Court finds this explanation untenable: the Sentry ESOP did not stand to gain total control over Sentry, and Napier did not cite control (or any other factor) as a justification for this change in growth rate. Moreover, Messina testified persuasively that a 3 percent perpetual growth rate would be an aggressive assumption for the vast majority of companies. (Tr.3 65:11-25, 66:1-16). Additionally, Napier's decision to increase the growth rate is at odds with the trend of Sentry's earnings and cash flow: Sentry's earnings in 2009 and 2010 were lower than in 2008, when Napier chose a 2 percent growth rate. (Tr.2 40:7-9 (Napier)).

Napier conceded that his choices about equity risk, company-specific risk, and growth were discretionary and had the effect of raising the stock price for the 2010 Transaction. (Tr.2 60:7-25, 61:1-24). As discussed in further detail below, Evolve noticed Napier's unusually low discount rate and raised it with Napier in an email. (JX 33). But there is no evidence in the record that Evolve specifically probed Napier's discrete decisions surrounding equity risk, company-specific risk, and the growth rate. Moreover, Napier made no changes to the discount rate as a result of his conversation with Lenoir and New. (Tr.2 150:24-25, 151:1 (Napier);

*compare* JX 30 at 208, *with* JX 85 at 1841).

### iv. Napier's 3-Year Lookback Period for Assessing Sentry's Cash Flows

The Secretary and Messina critiqued Napier for employing a three-year look-back period in the 2010 Transaction appraisal to compute Sentry's average yearly cash flow at $4.5 million. (JX 85 at 1856). Messina contends that using only a three-year look-back period had "the effect of lifting the average cash flow result and increasing the valuation," (JX 96 at 24), because Sentry's earnings peaked from 2008-2010. Indeed, Napier's table of Sentry's yearly cash flows (displayed below) shows higher earnings in, for instance, 2007-2009, but significantly lower earnings in, for instance, 2004-2006:



(JX 85 at 13). Messina testified that a seven-year look-back period would have been more reasonable, as a longer look-back period would have captured both Sentry's peaks and valleys. (JX 96 at 14; *see also* Tr.3 59:2-12 (Messina)). Napier testified that an appraiser's decision about the temporal length of the look-back period is subjective and favored Adam Vinoskey "to a small extent." (Tr.2 57:15-25, 58:7-16). Napier testified that using a three-year average period was "about the same" as using a five-year average. (*Id.* 57:18-21). But Napier also testified that when a company experiences significant variation in its yearly income, as Sentry did, (*see, e.g.,* JX 84 at 312; JX 85 at 13), it can be important to use a look-back period temporally broader than 3 years when capitalizing cash flows. (Tr.1 245:5-8 (Napier)).

Because Napier's use of a three-year look-back period began in 2008 rather than in his 2010 Transaction appraisal,[11] the evidence does not support a finding that Napier intentionally employed a three-year look-back period specifically for the purpose of inflating the 2010 Transaction stock price and benefitting Adam Vinoskey. However, the Court nonetheless finds that a longer look-back period of at least five years (as Napier consistently used in his pre-2008 appraisals) would have more accurately captured Sentry's business cycle, which centers around the soft drink industry, with income varying depending on when bottling plants decide to make large capital improvements. (Tr.1 231:16-21 (Napier); *id.* 71:3-6, 72:8-9, 73:1-8 (Lenoir); *id.* 197:9-20 (Holcomb); Tr.4 236:6-25 (Connor); JX 23). Indeed, although he stated that Napier's three-year look-back period was "not necessarily" inappropriate, Brown employed a six-year period in his DCF analysis. (Tr.5 71:9-15 (Brown); JX 98 at 17).

There is no evidence that Evolve noticed or questioned Napier's three-year look-back period, even though Lenoir testified that he personally "looked at three, five, and six years of profit" when assessing the fair market value of Sentry's stock, and even though Napier's subjective choice to use a three-year average benefited the seller rather than the ESOP. (*See* Tr.1 131:10-14; PTX K at 114-115 (New Depo., noting that he did not recall noticing the look-back period "at all")).

v.    **Napier's Working Capital Assumption**

In the 2010 Transaction appraisal, Napier made certain assumptions about how much "working capital" Sentry required to operate. "Working capital" is a measurement of the amount of cash required to operate a business, reached by subtracting a company's current liabilities

---

[11]    (Tr.1 235:1-16 (Napier); Tr.2 7:9-17 (Napier); Tr.3 161:3-5, 162:1 (Messina); *see also* JX 96 at 24, Figure 18 (Messina's Report showing switch to three-year period in 2008 and continuing through the 2010 Transaction appraisal)).

from the company's current assets. (Tr.1 188:11-17 (Holcomb); Tr.2 73:13-15 (Napier); Tr.5 118:3-8 (Messina)). Working capital and stock price are negatively correlated: the lower the working capital percentage, the higher the stock price, and vice versa. (Tr.2 66:2-14 (Napier)).

Since 2004, Sentry has kept least 30 percent of its total assets in cash. (Tr.2 78:18-25, 79:1-11 (Napier)). In his 2010 Transaction appraisal, however, Napier assumed that Sentry required 10 percent of its total assets of $22,535,299 in cash (*i.e.*, $2,253,530 in cash) to operate. (JX 85 at 1835). Napier based this assumption on two factors. First, Napier reviewed Robert Morris Associates studies for the North American Industry Classification System (NAIC) code showing "the reported percent of total assets attributable to cash was somewhere between 6 and 7 percent of total assets," a figure Napier then raised to 10 percent for Sentry, even though he concluded elsewhere in his report that companies comparable to Sentry do not exist on the public market. (Tr.2 64:2-12 (Napier)). Second, Napier based his working capital assumption on conversations with Carole Vinoskey, who felt that Napier's assumption that Sentry needed approximately $2.25 million to operate was "high." (*Id*. 65:1-8 (Napier)). Napier's assumption that Sentry could operate with 10 percent of its total cash assets had the effect of adding $68.15 to the 2010 Transaction price. (*Id*. 65:20-23 (Napier)).

Napier had discretion in choosing the 10 percent working capital figure. (*Id*. 65:24-25, 66:1 (Napier)). Messina assumed that Sentry could operate on a 15 percent working capital basis, (Tr.5 116:15-25 (Messina)), while Brown assumed that Sentry could operate on a 5 percent working capital basis. (*Id*. 56:9-13 (Brown); JX 98 at 16).[12]

---

[12] Messina and Brown articulated different definitions of "working capital," (Tr.5 56:21-23 (Brown)), but the Court credits Messina's definition of working capital as a company's current assets minus its current liabilities, because Brown conceded that both definitions are "accepted" and because Messina's definition is consistent with other witnesses' definitions of working capital, namely Holcomb and Napier. (*Id*. 57:6-11 (Brown)).

For three reasons, the Court finds by a preponderance of the evidence that Napier's assumption that Sentry could operate with $2.5 million in cash (*i.e.*, 10 percent of its total assets) was unreasonable. First, Napier conceded that since 2004, Sentry had at least 30 percent of its total assets in cash, (Tr.2 78:18-25, 79:1-11 (Napier)), suggesting that his 10 percent figure was low as compared to Sentry's historical cash reserves. Second, Adam Vinoskey testified that he "wouldn't be sleeping very well" if Sentry had only $2.5 million in cash, that operating with such a low amount would be a "good trail to failure," and that he "never tried to let [Sentry] get below probably . . . $15 million." (Tr.2 214:1-25, 215:1-10). Although Vinoskey did not testify that Sentry absolutely *required* $15 million in cash to operate, his reticence at the idea that Sentry could operate on only $2.5 million in cash has some bearing on the reasonableness of Napier's working capital assumption and calls into question whether Napier sufficiently discussed his working capital assumption with Sentry's management.

Third, in a post-transaction appraisal of Sentry completed on December 31, 2010—just eleven days after the 2010 Transaction closed—Napier changed his working capital assumption to 20 percent rather than 10 percent. (JX 86 at 30; *see also* JX 96 at 26 (Messina Report noting this shift)).[13] This abrupt shift strongly suggests, and the Court finds by a preponderance of the evidence, that Napier manipulated his working capital assumption in the 2010 Transaction appraisal for the purpose of raising the stock price in Adam Vinoskey's favor. There is no

---

[13] Evolve has challenged the use of any post-2010 Transaction appraisal as irrelevant. The Court denied Evolve's pretrial motion to quash Napier's post-transaction appraisals as irrelevant, and reiterates the rationale underlying that decision now. (Dkt. 183). Evolve is correct that in determining whether a fiduciary has fulfilled his obligations under ERISA, the relevant inquiry is whether the fiduciary made a good faith determination of the fair market value at the time of the challenged transaction. *See Henry v. Champlain Enterprises, Inc.*, 445 F.3d 610, 618 (2d Cir. 2006); *Acosta v. Vinoskey*, 310 F.Supp.3d 662, 680 (W.D. Va. 2018). But this does not render post-transaction appraisals irrelevant for all purposes. Post-transaction appraisals may still be used, as in the above instance, to assess the credibility of a witness or to probe the reliability and consistency of a witness's methodology in completing appraisals.

evidence that Evolve ever noticed or questioned Napier's working capital assumption.

### vi. Napier's Decision to Add Back Cash and Land

After calculating Sentry's discounted future income, Napier added the value of Sentry's excess cash and land ($6,641,800 and $552,000, respectively) to arrive at Sentry's enterprise value. (JX 85 at 1847). This addition raised Napier's stock price for the 2010 Transaction by $73.81 per share. (*Id.*). Napier had omitted excess cash and land from his appraisals prior to the 2010 Transaction appraisal. (Tr.2 102:23-25 (Napier)). The Secretary concedes that "Napier was correct to include the cash and land in his Transaction Appraisal," (dkt. 211 at 33), and, indeed, Messina also added back Sentry's excess cash and land in the same amounts as Napier in his report. (JX 96 at 33, Fig. 25; *id.* at 25, Fig. 19; Tr.3 166:20-25, 167:1, 20-25, 168:1-3 (Messina)). The Court finds Messina's testimony persuasive that the excess land and cash should also have been added back for Napier's prior appraisals. (Tr.3 38:8-13, 167:2-19 (Messina)). Thus, the Court finds that Napier's decision to add back Sentry's excess cash and land was technically proper but illustrative of Napier's inconsistent discretionary choices for the 2010 Transaction appraisal, choices apparently motivated by a desire to reach the estimated $21 million transaction value and to raise the stock price in Adam Vinoskey's favor.

### vii. Napier's Lack of Projections

Napier's 2010 Transaction appraisal did not include or draw on projections or forecasts of Sentry's future performance. (Tr.1 87:6-9 (Lenoir); JX 96 at 12; JX 31 at 426; JX 33 at 161). Projections are generally important in valuations because "an investor buying stock is really buying the right to the future profits and distributions of a Company" and thus needs a sense of a company's long-term financial prospects. (JX 96 at 12; Tr.3 8:2-23, 43:2-19 (Messina); Tr.5 149:2-19 (Messina)). Napier did not consider projections in completing the 2010 Transaction

appraisal because Sentry historically did not conduct forecasts. (Tr.1 224:11-17 (Napier)).

Napier testified that small-to-mid-sized companies like Sentry typically do not conduct projections, (Tr.2 99:5-6), and Evolve's expert on ESOP fiduciary duties, Howard Kaplan, testified that independent fiduciaries do not require projections "in every case." (Tr.4 154:21-25). However, Messina disagreed, and Evolve itself was concerned about Napier's lack of projections, as discussed in greater detail below. (JX 33 at 161; Tr.1 101:14-25, 102:18-21 (Lenoir)). Lenoir testified at trial that he felt comfortable proceeding with the transaction even without forecasts because he "d[ug] out a forecast by looking at the financials" and noticed that Sentry "had a backlog of four to six months going into 2010," because Michael Connor had told him that Sentry was "going into the food business" in the future, and because Adam Vinoskey had told him that 2011 would be a strong year. (Tr.1 69:1-24, 70:10-16 (Lenoir)). However, the Court finds this explanation untenable because Lenoir later conceded that Connor had indicated that Sentry would not be entering the food industry for at least six to seven years "because of the way [Sentry] [had] postured [itself]" and that 2011 would more challenging for Sentry than 2010. (*Id.* 73:1-8 (Lenoir)).

The Court finds by a preponderance of the evidence that Evolve could have asked Sentry's management to assist with developing projections, required Napier to create projections with input from Sentry's management, or hired a third-party firm to assist with making projections for Sentry. (Tr.3 124:4-12, 128:14-25, 129:1-15 (Messina); Tr.4 183:2-9 (Lenoir)). Evolve's own expert testified that, although this practice is "not ideal," an appraiser "can try to get [management] to do" projections, that "at a minimum, [he] would get management's buy-in" if he created his own projections for a transaction, and that projections created by the appraiser with management's input can be appropriately considered "with professional skepticism." (Tr.5

24:11-24 (Brown); *see also id.* 151:16-25, 152:1-7 (Messina) (noting that private companies often hire consulting firms to vet their projections)).

### 3. Evolve's Review of Napier's Draft Appraisal: December 11, 2010 E-mail to Napier and December 13, 2010 Phone Call with Napier

Lenoir and New each reviewed Napier's draft appraisal, and each made handwritten notes of several problems. (Tr.1 90:15-20 (Lenoir); JX 30, 31). Lenoir noted that the appraisal included no forecasts of Sentry's performance, (JX 31; Tr.1 87:6-9 (Lenoir)); that he wanted to verify Vinoskey's previous statement that Sentry had "no employment contracts," (JX 31; Tr.1 87:12-14 (Lenoir)); and that the appraisal included no "sensitivity report," which generally probes the terms of a transaction, whether the transaction will be financed by a loan, the terms of any such loans, and other factors that go beyond price to assess the deal's possible impact on cash flow and the company's overall wellbeing. (JX 31; Tr.1 87:15-25, 88:1-17 (Lenoir)). Lenoir also noted Napier's "*add back of group ins.". (JX 31).

New made similar handwritten notes, writing that Napier indicated he used an "asset based approach & [an] income approach, but [no] weight[] [was] given to [the] asset approach"; that Napier did not use DCF because he found it "inappropriate for ESOP valuations"; that Napier had given 100 percent weight to the capitalization of cash flow method, resulting in a specific stock price rather than a range; and that Napier had declined to use a market approach because he could not "find any publicly traded co[mpanies] in this segment" comparable to Sentry. (JX 30 at 166). New also wrote the following: "[H]ow can we add back ½ health care insur[ance] cost[s] when we know they are going to continue to pay it?" (*Id.*).

New outlined these concerns in an e-mail to Napier on December 11, 2010, stating that he and Lenoir found it inappropriate to add back half of Sentry's health care costs when "Mr. Vinoskey has indicated that the company will continue to pay 100% of these costs going

forward"; questioning how the "company's industry [and] the overall economy" would impact the company's performance going forward"; questioning why the report did not "include a discussion of the modifications that were made to [Napier's] methodology to account for the ESOP acquiring a controlling interest in the company"; and noting that he and Lenoir wanted to "discuss the calculation of the discount rate" because they had not "seen a rate this low for some time." (JX 33 at 161).

New also raised several concerns with Napier's use of the capitalization of cash flow method, asking whether "there are any similar / comparable companies in related industries that could be used to construct a market based approach model"; questioning why Napier gave no weight to the asset-based approach; and noting that he wanted to discuss "why it is proper to assume that the company's historical cash flows are a reasonably proxy for its future cash flow, and why utilization of [DCF] is inappropriate for ESOP purposes." (*Id.*).  Additionally, New expressed concern that "there is no forecasting incorporated into the report," since Evolve wanted "some assurance that the company will continue to meet or exceed its past performance in light of the acquisition debt that will result from this transaction, as well as the enhanced repurchase obligation it will now be facing." (*Id.*; *see also* Tr.1 97: 21-25, 98-102 (Lenoir)).

On December 13, 2010, Lenoir and New had a phone conversation with Napier to discuss these concerns.  (JX 34 at 162; Tr.1 108:2-12 (Lenoir)).  During this conversation, Napier agreed to make several minor changes to his report that did not affect the stock price.  (Tr.1 98:14-25, 99:1-6, 19-24, 108:13-25, 109:1 (Lenoir)).  Lenoir asked Napier not to add back half of Sentry's health care costs and stated that they could "revisit" this subject if "Adam [changes] his mind," but Napier replied only that "he'd think about it."  (JX 34 at 162; Tr.1 109:10-25, 110:1-11 (Lenoir)).  Napier stated that "they [*i.e.,* Sentry and/or the Vinoskeys] feel that next [year] will be

good" but that he had not verified Sentry's backlog of orders. (JX 34 at 162; Tr.1 110:15-25, 111:1-13 (Lenoir)). Lenoir asked whether Napier could "go to them [and] get something that indicates 2011 will be good," and Napier stated that Dr. Pepper had "built a new plant" and that he would "talk to Carole again." (JX 34 at 162; Tr.1 111:14-20 (Lenoir)).

Regarding New and Lenoir's concerns about Napier's methodology, Napier stated that he had "always had a concern w[ith] using DCF" for ESOP transactions and that he felt that the "asset based approach" did not "adequately address the core of the business" and "ignores the value of going concern." (JX 34 at 163A; Tr.1 112:18-25, 113:1-4 (Lenoir)). Napier did agree to provide a range of values in his final report but noted that he had "not had a conversation w[ith] Adam [and] Carole Vinoskey re[garding] value in some time." (JX 34 at 163A; Tr.1 113:5-7, 15-18 (Lenoir)). As discussed below, most of the concerns Lenoir and New raised with Napier in the December 11, 2010 e-mail and December 13, 2010 phone conversation did not result in changes to Napier's final report.

On the same day, New and Lenoir also had a phone conversation with Bill Gust, in which Gust stated that Adam Vinoskey would not ask Michael Connor to sign an employment agreement. (JX 34). Gust stated that he normally would not be comfortable with this arrangement but felt comfortable because "A[dam] V[inoskey] is going to be involved" and because "Adam's got to get paid." (JX 34 at 163A; Tr.1 114:14-16 (Lenoir)). Lenoir testified at trial that he had "no idea" what Gust meant by this remark. (Tr.1 118:17-25, 119:1-6 (Lenoir)).

### 4. Napier's Updated and Final 2010 Transaction Appraisal

Napier delivered an updated appraisal at some point after Adam Vinoskey accepted Evolve's offer of $406.00 per share on December 15, 2010 (as discussed below) but before New's December 16, 2010 e-mail to Napier (also discussed below). (*See* JX 40 (December 15 e-

mail from Gust noting Napier would "get [Evolve] a report this evening or in the morning"); JX 41 (Napier's December 15 e-mail to New stating that the report would "be ready later tomorrow"); JX 44 (December 16 e-mail from New to Napier after Adam Vinoskey had accepted $406.000 per share, indicating New had reviewed updated report and instructing Napier to insert the range he previously e-mailed in the final report)).

Sometime after approximately 5:30 P.M. on December 20, 2010—after the 2010 Transaction had already closed and Evolve had resigned as the independent trustee—Napier delivered his final appraisal. (*See* JX 61 (December 20 e-mail from New to Gust checking to see whether "Brian Napier's final report was forthcoming"); JX 85 (final 2010 Transaction appraisal)). Most of the concerns Lenoir and New raised with Napier in the December 11, 2010 e-mail and December 13, 2010 phone conversation did not manifest in changes to Napier's final report: Napier continued to use the capitalization of cash flow methodology; did not adjust the unusually low capitalization rate; continued to add back half of Sentry's health care costs despite Lenoir's request that he refrain from doing so; and did not incorporate any projections into the final report. (JX 85).

## F. Evolve's Pre-Closing Activity & Closing of the 2010 Transaction

### 1. Evolve Offers $406.00 per Share Before Receiving Napier's Updated or Final Appraisal

As discussed above, Evolve's due diligence process in the days leading up to the closing of the 2010 Transaction was rushed and cursory. At some point, a closing date of Friday, December 17, 2010 was selected, although this date was eventually moved back to Monday, December 20, 2010. (Tr.1 147:9-16 (Lenoir); *see also* JX 39; JX 40; JX 42; JX 45).

On December 14, 2010—just one day after Lenoir and New's calls with Napier and Gust, and before Napier had even sent Evolve an updated appraisal addressing Evolve's concerns—

Sentry's Board of Directors drafted a resolution that the ESOP would purchase Adam Vinoskey's 51,000 shares "at a per share value not to exceed $406.00 for an aggregate purchase price not to exceed $20,706,000.00."  (JX 36 at 1897).  The draft resolution stated that the transaction would be financed by a $1,900,080.00 loan from Sentry to the ESOP, a $10,305,904.00 loan from Adam Vinoskey to the ESOP, and $8,500,016.00 in cash from the ESOP.  (*Id.*).

On December 15, 2010 at 12:39 A.M., Gust e-mailed the following message to Lenoir and New: "I heard nothing today from anyone relative to the stock value. If we are going to get this closed on Friday we need a stock value to get draft documents done and circulated for review. Let me know what's going on when you get a chance."  (JX 39).  Lenoir and New were in California attending another ESOP client's annual shareholder meeting on December 15, 2010.  (Tr.1 at 124:22-25, 125:1-3 (Lenoir)).  At 1:55 A.M., Gust e-mailed Lenoir and New again, writing: "Brian said he has a range of values of between $405 and $408 per share. He will get you a report this evening or in the morning. . . . If I don't have an agreed per share price, I can't get documents done and circulated before Friday. Please get with Brian when you can."  (JX 40).  At 3:01 A.M., Napier e-mailed New, writing: "The range of fair market values for Sentry Equipment, on a controlling interest basis, as of 11/31/10, is $405.73 to $408.58 per share. The revised report, with the additions we discussed yesterday, will be ready late tomorrow. Please forward this information to Kenny [Lenoir]."  (JX 41).

At 9:25 P.M. on the same day, Gust e-mailed New, copying Lenoir, the following message: "Based upon Michaels [sic] email response to my question about price, I communicated the offer to purchase Adams [sic] stock for $406.00 per share. Adam questioned the price but accepted it.  As a result, we are moving as quickly as possible to complete the

various documents and circulate them for all to review before the scheduled closing date of Friday the 17th. . . . Brian Napier has issued his opinion letter in draft form and I assume that you each have seen it. Any contact to ensure that you are both alive would be appreciated." (JX 42).

The Court finds on the basis of this correspondence, and testimony concerning this correspondence, that Evolve, through New and Gust, offered Adam Vinoskey $406.00 per share on December 15, 2010, and that Adam Vinoskey accepted this price on the same day. As discussed below, this all occurred without any negotiation by Evolve. Moreover, Evolve offered, and Adam Vinoskey accepted, $406.00 per share before Brian Napier had even updated or finalized his appraisal report and without Evolve ever reviewing Napier's updated or final report to determine whether Napier had addressed the issues Evolve highlighted in the December 11, 2010 e-mail and December 13, 2010 phone conversation with Napier. (*See* JX 44 (December 16 e-mail from New to Napier, stating that Evolve had used Napier's e-mailed range of $405.73 to $408.58 per share to offer Vinoskey $406.00 per share)). Although Napier sent an invoice to Evolve for $7,500.00 on December 15, 2010 signaling he had finished his work, Napier was still finalizing his report when Vinoskey agreed to the $406.00 price, (Tr.1 128:15-20 (Lenoir)), and continued to finalize his report on December 16, 2010. (*Id*. 139:10-25, 140:1-2; JX 44).

On December 15, 2010—again, before Napier had updated or finalized his report, and without reviewing Napier's updated or final appraisal—Evolve drafted a "Resolution of the Special Independent Trustee of Sentry Equipment" stating that the "negotiated purchase price" of $406.00 per share did "not exceed the 'fair market value'" of the shares and that Evolve had determined the 2010 Transaction "to be in the best interest of the Plan and its participants." (JX 37; Tr.1 123:6-23 (Lenoir)). This document was a "resolution that [Evolve was] going to close the deal at that price." (PTX K at 88:19-20 (New Depo)).

## 2. Evolve's Lack of Negotiation and Divided Loyalties

Evolve failed to engage in any negotiation to lower the price the ESOP would pay for Adam Vinoskey's 51,000 shares, in large part because Evolve misapprehended its role as an independent transactional trustee charged with advocating for the ESOP's exclusive benefit.

Lenoir admitted at trial that Evolve made no attempts to negotiate a lower price than $406.00 per share for the ESOP, and that he thought a price of $406.00 per share "was a steal." (Tr.1 129:8-10, 18-20). Evolve did not even make an initial offer of $405.73, the low end of the range Napier e-mailed on December 15, 2010. (JX 41, 44). Lenoir testified that he "thought the price should have been [$]450 to $500 a share," and that he was therefore "aghast at the [$]406" price agreed to. (*Id*. 130:20-23). In Lenoir's view, his negotiating tactic "was to be silent" if Adam Vinoskey was willing to accept what Lenoir saw as a low price. (*Id*. 133:3-10). Lenoir stated that only a "rookie" would subscribe to the view of negotiation that the "person representing the buyer will try to get a lower price while the person representing the seller will try to get a higher price." (*Id*. 138:8-12). In Lenoir's view, it would be "cheat[ing]" to "go in and . . . say I'll pay you [$]285. I'll pay you 300" when he felt he was "stealing it already at [$]406." (*Id*. 148:2-14). Lenoir testified that Evolve offered $406.00 per share without having Napier's final appraisal because, in his view, he "didn't need that appraisal" given his own calculations that the stock was fairly valued at $450 to $500 per share. (*Id*. 130:24-35, 131:1-25, 132:1-25). But Lenoir later testified, and the Court finds, that he did in fact rely on Napier's appraisal rather than his own business judgment. (Tr.4 189:12-16).

Lenoir also admitted at trial that his goal was to secure a deal that was fair to *both* Adam Vinoskey *and* the Sentry ESOP. When asked whether, as an independent fiduciary, he cared whether the deal was fair to Sentry, Lenoir testified that he "care[d] if the deal is fair." (Tr.4

190:7-10; *see also* Tr.1 129:8-9 (Lenoir, stating that his role was to reach "a fair price to try to make a fair deal").  When asked whether he was "trying to make sure that the purchase was fair to the company and to the ESOP," Lenoir replied that he "was trying to make sure the deal was fair and we could buy it at the very best price that we were within the bounds of buying."  (Tr.4 190:24-25, 191:1-4).  When asked "Fair to whom?", Lenoir replied: "[P]robably fair to both." (*Id*. 191:5-6).  Although Lenoir later stated that he "was never acting on behalf of Adam Vinoskey," "was always acting as the transactional trustee for the Sentry Equipment ESOP Trust," and was "more concerned about the exclusive benefit to the participants," (Tr.4 192:16-18, 193:4-5), he stated on cross-examination that his use of the word "more" in relation to his concern for the participants' exclusive benefit had been a "bad term," and that he "was concerned about the participants and this being a fair deal . . . for everyone."  (*Id*. 193:11-13).

On the basis of this testimony and the correspondence discussed in the previous subsection, the Court finds by a preponderance of the evidence that Evolve engaged in no negotiation over the $406.00 stock price, in large part because Evolve viewed its role as reaching a deal that was fair to both the ESOP and Adam Vinoskey rather than advocating in the sole interest of the ESOP.[14]

### 3.      Post-December 15, 2010 Communications Regarding Napier's Fairness Opinion and Final Range

At some point between Adam Vinoskey's acceptance of $406.00 per share on December 15, 2010, and the early morning of December 16, 2010, Napier delivered an updated report.  (*See* JX 40, 41, 44).  On December 16, 2010 at 8:19 A.M., New emailed Napier, copying Lenoir and Gust, reminding Napier to provide his fairness opinion including "the standard three elements we

---

[14]      The Court will further analyze Evolve's lack of negotiation and divided loyalties in Section II in assessing whether Evolve lived up to the strict duty of loyalty ERISA imposes.

find in all of our ESOP transaction fairness opinions." (JX 44). New indicated that he had reviewed Napier's "updated report" and noted that it did "not include the range of value that you referred to in your 12/14 email to us, which we used to negotiate the sale price. As it turns out, we've agreed to a sales price higher tha[n] the dollar value[] indicated in your report. Obviously, we cannot pay more than the value included therein. Please modify your report to reflect the $405.73 – $408.58 per share range of value you indicated to us as the range of value in your email Tuesday evening." (*Id.*).

Lenoir testified that Napier had simply made a typographical error when listing the range in his updated report, putting the low end of the range at $405.00 rather than $405.73, (Tr.1 141:3-8 (Lenoir)), but Napier testified that he "forgot" to put a range at all in the updated report, listing the stock price as $405.73. (Tr.2 142:1-9 (Napier)). Since Napier would have more intimate first-hand knowledge of his own errors, the Court credits his testimony that the updated report did not contain a range of values. In essence, then, rather than utilizing the lower value of $405.73 in Napier's updated report as a bargaining tool to negotiate a lower price for the ESOP, Evolve asked Napier to insert the previously-emailed range in his final report, so that Napier's final report would conform to the $406.00 stock price Evolve had already offered and Adam Vinoskey had already accepted. New's instruction to insert the range to justify the already-accepted price of $406.00 per share is illustrative of Evolve's overriding concern with the surface, rather than the substance, of Napier's report.

### 4. 2010 Transaction Closes on December 20, 2010

On December 16, 2010, Michael Coffey of CCR e-mailed Gust and Carole Vinoskey the "Final Sentry Numbers" for the 2010 Transaction. (DTX 10). This e-mail stated that the 2010 Transaction would be financed as follows: 1) the Sentry ESOP would receive a $1.9 million loan

from Sentry by Monday, December 20, 2010; 2) the ESOP would use its available cash ($8.5 million) plus the $1.9 million loan to write a check at closing for $10.4 million; and 3) Adam Vinoskey would take a note from the ESOP for $10,306,000.00. (*Id.*). The e-mail stated that the total closing value of the 2010 Transaction would be $20,706,000.00, a figure remarkably close to the $21 million estimated transaction value. (*Id.*; *see also* JX 19, JX 22).

On December 19, 2010, New made some alterations to a final resolution finding that the 2010 Transaction was in the ESOP's best interest; these alterations did not affect the $406.00 per share stock price. (JX 37). At some point thereafter, but before closing on December 20, 2010, New signed the final resolution, which was backdated to December 15, 2010. (JX 38). On December 20, 2010—the same day the 2010 Transaction closed—Napier submitted his fairness opinion stating that the 2010 "Transaction [would be] fair to the ESOP from a financial point of view." (JX 47 at 3157).[15] Gust prepared various transaction documents, including the Stock Purchase Agreement and loan agreements; none of these documents included any provision for appointing outside Directors, holding quarterly Board meetings, an outside Director chairing a compensation committee to determine Connor's compensation, or expanding Sentry's Board from 3 to 5 members. (JX 48-60). Lenoir conceded at trial that Evolve should have required Gust to include these measures in the transaction documents. (Tr.1 62:16-25, 63:1-20, 66:4-13; Tr.4 184:19-25, 186:6-18, 187:13-25, 188:1-3).

On December 20, 2010, the 2010 Transaction closed: Adam Vinoskey signed the Stock Purchase Agreement as the seller; Carole and Adam Vinoskey signed on behalf of Sentry; and New signed on behalf of Evolve. (JX 48 at 2775-76). No representative from Evolve attended

---

[15]     Lenoir testified that he completed a "sensitivity report" probing the terms of the deal, loans financing the deal, payoff dates, and other factors beyond the price of the transaction. (Tr.1 87:15-25, 88:1-11 (Lenoir)). This report does not appear in the record.

the closing. (Tr.1 128:4-9 (Lenoir)). After signing the Agreement, New returned it, among other documents, to Gust via e-mail at 5:39 P.M. on December 20. (JX 61). This e-mail indicated that Evolve would be resigning shortly as the independent transactional trustee and stated: "As a final piece of housekeeping, I wanted to make sure that Brian Napier's final report was forthcoming, and that his invoice and Evolve's invoice were being paid today at closing." (*Id.*). The Court finds on the basis of this e-mail and a preponderance of the evidence that Evolve never actually received or reviewed Napier's final appraisal report prior to closing the 2010 Transaction and resigning as trustee. Evolve resigned on December 20, 2010, effective 5:00 P.M. (JX 46).

### G.     Post-Transaction Events

The ESOP owned 100 percent of Sentry's stock following the closing of the 2010 Transaction. (*See* JX 48; Tr.3 233:3-18 (Messina)). As a result of the 2010 Transaction, ESOP participants gained more shares in Sentry, and individual account balances rose. (*See* JX 62). Following the 2010 Transaction, Sentry had $8.688 million in cash in the bank, (JX 96 at 22), and the ESOP owed the Adam Vinoskey Trust $10.3 million. (*See, e.g.*, JX 48 at 2767). In 2014, amid a downturn in the soda industry, Adam Vinoskey forgave $4.6 million of the Sentry ESOP's outstanding debt, and the interest rates associated with the loan were reduced to 3 percent. (PTX H at 2965, 3001, 3016, 3018 (Napier's December 2010 Appraisal noting debt forgiveness); Tr.2 113:8-25, 114:1-6 (Napier)).

Following the 2010 Transaction, Michael Connor had already assumed his role as president of Sentry. (Tr.5 250:7-10 (Connor); Tr.1 209:11-18 (Holcomb)). But Adam Vinoskey never fully stepped away from Sentry: he remained on as Chairman of the Board until at least July 31, 2012, and remained a "good source of information" for Sentry's management. (JX 69; Tr.1 209:11-18, 211:4-8 (Holcomb)). Barbara Holcomb took over as Sentry's CFO, replacing

Carole Vinoskey, in April 2011, with the understanding that Carole would be "cut[ing] way back" in December 2011 but "still helping with the ESOP for another year" before retiring. (Tr.1 206:14-20 (Holcomb)). Carole Vinoskey passed away in July 2011. (JX 69 at 95).

As of approximately December 2011, Sentry's Board consisted of Adam Vinoskey and four other Sentry managers, none of whom were designated independent ESOP representatives or outside Directors. (Tr.1 180:14-25, 181:1-16 (Holcomb)). At the time of trial, Sentry's Board of Directors consisted of Holcomb (acting as Chairwoman), Adam Vinoskey, Greg Goff, and Taylor Woodson, none of whom are designated independent ESOP representatives or outside Directors. (*Id.* 182:5-17, 22-25 (Holcomb)). Between December 8, 2010 (before the 2010 Transaction) and August 23, 2011, Adam Vinoskey, Carole Vinoskey, and Michael Connor served as ESOP Trustees. (JX 69 at 95; Tr.4 246:7-9 (Connor)). At the time of trial, Barbara Holcomb and Leslie Womack served as the ESOP trustees. (Tr.1 176:10-16 (Holcomb)).

On December 31, 2011, then-ESOP Trustees Adam Vinoskey and Michael Connor "made the final decision" to purchase the corporate form of Sen-Pack, a Florida corporation owned by Adam Vinoskey, without allowing the ESOP participants to vote on the purchase or otherwise taking instruction from the ESOP. (Tr.1 181:17-25, 182:1-4 (Holcomb); Tr.4 251:14-18 (Connor); Tr.5 105:3-9 (Brown); *id*. 133:15-25, 134:1-2 (Messina)).[16]

## H.  Adam Vinoskey's Knowledge of, and Involvement in, the 2010 Transaction

Throughout their active tenure at Sentry, Adam Vinoskey served as CEO, and Carole Vinoskey, who passed away in July 2011, served as Sentry's Secretary/Treasurer. (JX 28 at

---

[16]  Connor testified that Carole Vinoskey was a trustee who participated in the decision to purchase Sen-Pack in December 2011, (Tr.4 251:17-18), but Carole Vinoskey passed away in July 2011. There is no evidence in the record about when exactly Carole Vinoskey was replaced as an ESOP Trustee, so the Court finds by a preponderance of the evidence that Adam Vinoskey and Michael Connor ultimately made the decision to purchase Sen-Pack without taking instruction from the ESOP.

3479; JX 69; Tr.1 180:14–21 (Holcomb)). The Vinoskeys comprised a majority of the ESOP Trustees and Sentry's Board of Directors before and after the 2010 Transaction. (JX 28 at 3479-3480; JX 69). Although Carole Vinoskey handled most of Sentry's financial operations, (*see, e.g.*, Tr.2 180:8-21 (Vinoskey)), Adam Vinoskey reviewed at least the stock price in each of Napier's annual appraisals and was aware that from 2004 to 2009, Napier's appraisal ranged from $220.00 to $285.00 per share. (*Id*. 180:6-25, 181:1-22 (Vinoskey)). Napier testified that he discussed his appraisals with Adam "from time to time," that Adam "understood the general approach" underlying his appraisals, that he received input regarding production from Adam before completing most of his annual appraisals, and that the two had specific discussions about the importance of cash flow and Sentry's earnings to Napier's capitalization of cash flow methodology. (Tr.2 8:10-21, 9:8-24). Holcomb testified that Adam Vinoskey did not look at full financial statements and appraisals but regularly examined "what the cash balance was, what receivables were, what the liabilities were," as well as "dump sheets" that included information about the "profit margin" of jobs currently in progress. (Tr.1 214:4-25, 215:1). Holcomb had the impression that Adam Vinoskey "knew the key numbers" Carole Vinoskey would give him involving Sentry's inventory, cash, and receivables. (*Id*.).

Adam Vinoskey participated fully in the November 18, 2010 meeting following Evolve's tour of Sentry, providing critical information bearing on Sentry's fair market value, including his refusal to consider cutting Sentry's health care expenses, his decision not to offer employment contracts with Michael Connor or others, and his view of Sentry's expected performance in 2011. (JX 23; *see also* Tr.2 204:17-25, 205:1-24 (Vinoskey)). While present at the meeting, Adam Vinoskey would have heard multiple pieces of information that would have been relevant to how he later perceived Napier's 2010 Transaction appraisal and the $406.00 per share stock

price, including Connor's statement that 2011 would be a more difficult year than 2010, Connor's discussion of the lack of growth in the soft drink industry, and Carole Vinoskey's statement that Sentry had never received a formal offer to purchase the company.

The Court finds that Adam Vinoskey reviewed Napier's 2010 Transaction appraisal prior to accepting $406.00 per share. Adam Vinoskey stated in his deposition that he reviewed Napier's appraisal and Sentry's financials prior to closing. (PTX M 113:3-12, 146:4-13). Although Adam Vinoskey denied reviewing Napier's appraisal at trial, (Tr.2 225:4-11), he conceded that it was "possible" that he reviewed it, (*id*. 229:25), and that his memory was "[m]uch better" at the time of his deposition. (*Id*. 218:1-8). Given Adam Vinoskey's admission that his memory of the transaction was sharper at the time of his deposition, the Court credits his deposition testimony and finds by a preponderance of the evidence that he reviewed Napier's draft appraisal and Sentry's financials before the 2010 Transaction closed.

Beyond Adam Vinoskey's participation in the November 18, 2010 meeting with Evolve, Evolve did not have direct contact with Adam Vinoskey in conducting its due diligence for the 2010 Transaction. (Tr.162:8-11 (Lenoir)).

## II.    CONCLUSIONS OF LAW

## A.    Whether Evolve Caused a Section 1106(a) Prohibited Transaction (Count One)

In Count One of the amended complaint, the Secretary alleges that Evolve caused the Sentry ESOP to engage in a prohibited party-in-interest transaction by forcing the ESOP to purchase Adam Vinoskey's 51,000 shares for $406.00 per share, a price the Secretary alleges exceeded the stock's fair market value.

Section 1106(a)(1)(A) of ERISA "prohibits the fiduciary of any ERISA plan from causing a 'sale or exchange . . . of any property between the plan and a party in interest.'"

*Brundle*, 919 F.3d at 763 (quoting 29 U.S.C. § 1106(a)(1)(A)).[17]  However, ERISA provides an exception, permitting party-in-interest transactions if the "ESOP pay[s] no more than 'adequate consideration' for the employer's stock." *Brundle*, 919 F.3d at 770; 29 U.S.C. § 1108(e)(1).[18] This exception is an affirmative defense, and an ESOP fiduciary raising the defense "bears the burden of proving by a preponderance of the evidence that the sale was for adequate consideration." *Brundle*, 919 F.3d at 770 (citing *Elmore v. Cone Mills Corp.*, 23 F.3d 855, 864 (4th Cir. 1994) (en banc)).  "This burden is a heavy one." *Id.* (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)).

ERISA defines "adequate consideration" as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary." 29 U.S.C. § 1002(18).[19]  Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both

---

[17]  This opinion frequently cites the Fourth Circuit's decision in *Brundle v. Wilmington Tr., N.A.*, 919 F.3d 763 (4th Cir. 2019) ("*Brundle*"), as well as the two underlying district court opinions: *Brundle v. Wilmington Tr., N.A.*, 241 F.Supp.3d 610 (E.D. Va. 2017) ("*Brundle I*"); *Brundle v. Wilmington Tr., N.A.*, 258 F.Supp.3d 647 ("*Brundle II*").

[18]  Section 1108(e)'s exception includes two other prongs that are not at issue in this case. *See* 29 U.S.C. § 1108(e)(2)-(3).

[19]  DOL has proposed, but never enacted, regulations defining "adequate consideration." Under these proposed regulations, "adequate consideration" must (1) reflect the stock's "fair market value," and (2) be "the product of a determination made by the fiduciary in good faith." Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg. 17, 632, 17, 633 (proposed May 17, 1988) (to be codified at 29 C.F.R. pt. 2510). "[C]ourts look to these regulations for guidance," *Brundle*, 919 F.3d at 770, n.2, but "proposed regulations have no legal effect." *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 619 (2d Cir. 2006).  Nonetheless, several circuits "have adopted the DOL's proposed definition of adequate consideration." *Id.* (collecting decisions from the Seventh, Sixth, and Ninth Circuits).  The Fourth Circuit has noted that "in practice, the 'fair market' value inquiry overlaps considerably with the 'good faith' inquiry." *Brundle*, 919 F.3d at 770, n.2 (quoting *Champlain Enters.*, 445 F.3d at 618–19).

having reasonable knowledge of relevant facts." *Brundle I*, 241 F.Supp.3d 610, 617–18 (E.D. Va. 2017) (quoting *Estate of Godley v. Comm'r of Internal Revenue*, 286 F.3d 210, 214 (4th Cir. 2002)).

In evaluating whether a trustee has established the § 1008(e) affirmative defense, "a court does not determine the fair market value from scratch and then compare its calculation to the trustee's." *Id.* at 632–33; *see also Perez v. Bruister*, 823 F.3d 250, 263 (5th Cir. 2016) (noting that "the reviewing court does not determine fair market value de novo"). Instead, the primary "focus of the adequate-consideration inquiry rests on the *conduct* of a fiduciary, as judged by ERISA's 'prudent man' standard of care." *Brundle,* 919 F.3d at 770 (emphasis in original); *see also Brundle I*, 241 F.Supp.3d at 633 ("[T]he focus is on whether the process the trustee used to determine fair market value is consistent with professional norms and its ERISA fiduciary obligations."). Under this standard, a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Courts must apply this "prudent man" standard "bearing in mind the special nature and purpose of employee benefit plans," and that the fiduciary duties ERISA imposes are "'the highest known to the law.'" *Brundle*, 919 F.3d at 770 (quoting *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356–57 (4th Cir. 2014)).

"Expert advice, like an advisor's independent valuation, can of course serve as evidence of prudence in the discharge of an ESOP trustee's duties under § 1108(e)." *Brundle*, 919 F.3d at 773 (citing *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 300–01 (5th Cir. 2000)). But expert advice is "not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled." *Id.* (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1474

(5th Cir. 1983)).  Rather, ESOP trustees must, at a minimum, show that they "(1) investigate[d] the expert's qualifications, (2) provided the expert with complete and accurate information, and (3) [made] certain that reliance on the expert's advice was reasonably justified under the circumstances."  *Id*. (alterations in original, internal quotes omitted); *see also Bruister*, 823 F.3d at 263 (noting same); *Shay*, 100 F.3d at 1490 ("[T]he fiduciary is required to make an honest, objective effort to read the valuation, understand it, and question the methods and assumptions that do not make sense.").

"Whether a trustee has met these expectations is a question 'not easily satisfied by application of bright-line rules,'" but rather must be considered under the totality of the circumstances.  *Brundle I*, 241 F.Supp.3d at 633 (quoting *Donovan*, 716 F.2d at 1465).  "[A] trustee must prove that it considered" the above factors "and any others relevant under the particular circumstances it faced at the time of the decision."  *Brundle*, 919 F.3d at 773; *see also Bruister*, 823 F.2d at 262–63 (noting that courts should assess whether fiduciaries "arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing").

Importantly, whether an ESOP fiduciary acted in bad faith is irrelevant to this inquiry.  "[A]n ESOP fiduciary is liable to the plan participants if it breached its fiduciary duties," and the focus of that inquiry is not on the fiduciary's "motives (good or bad) but on whether it acted 'solely in the interest' of the plan participants" and "engaged in a reasoned decisionmaking process, consistent with that of a prudent man in like capacity."  *Brundle*, 919 F.3d at 773 (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420 (4th Cir. 2007)).  "[A] pure heart and an empty head are not enough."  *Id*. (quoting *Donovan*, 726 F.2d at 1467).

There is no dispute that Adam Vinoskey, as the owner of more than half of Sentry's stock

and the company's CEO, was a party-in-interest and that the 2010 Transaction was therefore prohibited under § 1106(a)(1)(A) unless Evolve can show by a preponderance of the evidence under § 1108(e) that the Sentry ESOP paid no more than adequate consideration for Adam Vinoskey's stock. For the reasons explored below, the Court finds that Evolve has failed to meet its heavy burden under § 1108(e).

Specifically, Evolve has failed to show that its reliance on Napier's 2010 Transaction appraisal was "reasonably justified" under the circumstances prevailing at the time. *Brundle*, 919 F.3d at 773 (quoting *Shay*, 100 F.3d at 1489). Evolve failed to notice and investigate several concerning features of Napier's appraisal, including Napier's assumptions about control and working capital, Napier's use of a three-year look-back period, and Napier's decision to add back Sentry's ESOP contributions when calculating Sentry's cash flows. Moreover, although Evolve noted Napier's rejection of DCF, add-back of half of Sentry's health care expenses, and unusually low discount rate, Evolve did not thoroughly probe these items or follow through on whether or how Napier addressed these issues in his final report. Additionally, other evidence illustrates Evolve's lack of prudence in relying on Napier's appraisal, such as the generally rushed nature of Evolve's due diligence and Evolve's failure to question whether Napier had manipulated certain inputs to reach the estimated $21 million transaction price. Finally, the Court concludes that Evolve's imprudence caused the ESOP to sustain a loss by purchasing Adam Vinoskey's stock at a price exceeding fair market value. "Although these failings independently might not be sufficient to conclude" that Evolve failed to live up to its fiduciary duties by relying on Napier's appraisal and approving the 2010 Transaction, "cumulatively they demonstrate that" Evolve violated its fiduciary duties and failed to carry its burden under § 1108(e) of establishing by a preponderance of the evidence that the Sentry ESOP paid not more

than adequate consideration for Adam Vinoskey's stock. *Brundle I*, 241 F.Supp.3d at 634.

Before delving into Evolve's various shortcomings, a brief word on the two relevant experts is in order. Howard Kaplan testified as Evolve's expert on fiduciary duties in ESOP transactions, and David Messina provided rebuttal for the Secretary. Kaplan is the owner of Kaplan Financial Group LLC in Atlanta, Georgia, a company that provides consulting services to ESOPs. (JX 100 at 3 (Kaplan Report)). From 2004-2014, Kaplan worked as a Senior Vice President at Reliance Trust Company, where he headed the fiduciary consulting group. (*Id*. at 28; Tr.4 81:1-12 (Kaplan)). Kaplan has served as an independent fiduciary in five ESOP transactions. (Tr.4 81:19-25 (Kaplan)). Because the question of whether an ESOP trustee "breached their fiduciary duties is an issue for the trier of fact to decide," the Court acknowledges that Kaplan and Messina's opinions provide relevant context, but the Court has not placed significant weight on either expert's testimony or opinions unless specifically noted below. *Perez v. Bruister*, 54 F.Supp.3d 629, 640 (S.D. Miss. 2014), *aff'd*, 823 F.3d 250. However, the Court notes that as between the two experts, the Court generally found Messina more credible than Kaplan, as Kaplan conceded at trial that he has known Kenny Lenoir, Michael New, and Bill Gust for years, and that Evolve had been a competitor and client of Kaplan's former employer, Reliance, who would sometimes refer work to Evolve. (Tr.4 95:16-25, 96:1-7, 109:6-14).[20]

---

[20]     Defendants made much—before, at, and after trial—of Messina's limited experience with ESOPs. (*See, e.g.,* dkt. 212 at 76 (noting that Messina has only participated in one ESOP transaction)). As the Court held in its opinion denying Defendants' *Daubert* motion to exclude Messina as an expert, Messina was "sufficiently qualified to testify about the value of Sentry" and whether Evolve met its fiduciary obligations. *Acosta v. Vinoskey*, 310 F.Supp.3d 662, 672–73 (W.D. Va. 2018). "Messina's experience with purchasing closely held companies provide[d] guidance on the sort of diligence required in" an ESOP transaction, particularly since "ERISA's standards for fiduciaries . . . are at least as high as the due diligence standards followed in private industry." *Id*. at 673 (citing *Tatum*, 761 F.3d at 358 (noting that fiduciary duties under ERISA

1.    **Evolve Failed to Notice Several Red Flags in Napier's Appraisal**

Evolve failed to notice, question, or investigate several red flags in Napier's 2010 Transaction appraisal.  Perhaps the most glaring of these was Napier's assumption that the ESOP would gain total control over Sentry as a result of the 2010 Transaction.  This assumption played a robust role in Napier's appraisal, as Napier cited control for several discretionary choices that had the effect of raising the stock price, such as Napier's add-backs of Sentry's ESOP contributions and half of Sentry's health-care expenses, and Napier's decisions surrounding the appropriate equity risk, company-specific risk, and growth rate percentages.

"Purchasers will generally pay more for 'rights associated with control of the enterprise.'"  *Brundle*, 919 F.3d at 777 (citing *Estate of Godley*, 286 F.3d at 214).  "[T]here is no hard and fast rule for determining who 'controls' a company."  *Brundle I*, 241 F.Supp.3d at 638.  However, the Fourth Circuit defines "control" as "an interest which allows the shareholder to unilaterally direct corporate action, select management, decide the amount of distribution, rearrange the corporation's capital structure, and decide whether to liquidate, merge, or sell assets."  *Brundle*, 919 F.3d at 777.  A shareholder does not gain unfettered control simply by purchasing 100 percent of a company's shares.  For instance, in *Brundle*, 919 F.3d at 777, the Fourth Circuit affirmed the district court's finding that an ESOP fiduciary should have questioned an appraiser's application of a 10 percent control premium where the ESOP purchased 100 percent of the company's shares and gained "elements of control" but did not have the power to appoint a majority of the company's Board and could only "exercise its independent voting authority by filing a lawsuit," the "same limited relief available to a *minority shareholder*."

---

are "the highest known to the law").  Accordingly, the Court does not find that Messina's limited experience with ESOPs diminished his credibility as an expert witness.

Napier completed the 2010 Transaction appraisal on a controlling-interest basis. (Tr.2 33:19-25 (Napier); JX 85 at 1809). However, as the Court found in Section I, the ESOP did not stand to gain full control over Sentry simply by purchasing Adam Vinoskey's stock and thereby acquiring 100 percent of Sentry's shares. To be sure, the Sentry ESOP stood to gain "powers beyond those of an ordinary shareholder," such as the ability to instruct the ESOP Trustees in certain limited "important corporate matters." *Brundle I*, 241 F.Supp.3d at 627. But Sentry's corporate structure and leadership personnel before the 2010 Transaction meant that, absent changes, Adam and Carole Vinoskey would retain a firm grip over the levers of power at Sentry after the 2010 Transaction.

As two out of three ESOP Trustees, Adam and Carole Vinoskey could vote the ESOP's shares in almost all corporate matters without taking instruction from the ESOP participants, including electing the Board of Directors, "a key indicator of control." *Brundle*, 919 F.3d at 777. Moreover, under Sentry's bylaws and ESOP Plan, only the Board can remove ESOP Trustees, and only the ESOP Trustees (voting on behalf of the sole shareholder, the ESOP, without taking instruction from the ESOP participants) would be able to remove Directors. (JX 7 at 1857-58). Since Adam and Carole Vinoskey made up a majority of both the Board of Directors and the ESOP Trustees prior to the 2010 Transaction, and Evolve took no concrete steps to reduce the Vinoskeys' dominant presence in these roles, the ESOP essentially had no meaningful ability to remove the Vinoskeys from either role: no matter the configuration, the Vinoskeys would have to either voluntarily relinquish power or agree to fire themselves. Under these circumstances, it could hardly be said that the ESOP would be able to "unilaterally direct corporate action, select management," or "rearrange the corporation's capital structure." *Brundle*, 919 F.3d at 777.

Moreover, Evolve understood that the Sentry ESOP would not be gaining total control of

Sentry: as found in Section I, Evolve had reviewed Sentry's bylaws and the ESOP Plan, knew Adam Vinoskey intended to remain active at Sentry as Chairman of the Board, took no concrete steps to have designated ESOP representatives or outside Directors added to the Board of Directors or to reduce Adam and Carole Vinoskey's hold on key leadership positions, and heard Adam Vinoskey refuse to consider cutting Sentry's health care costs after the 2010 Transaction as if he would be the ultimate decisionmaker. Despite being on notice that the ESOP would not truly be able to control Sentry, Evolve made no serious effort to probe whether it was appropriate for Napier to conduct his appraisal on a controlling-interest basis. Although New asked Napier to add a section to his report discussing modifications Napier made because of his controlling-interest assumption, (JX 33), there is no evidence that Evolve substantively questioned Napier about whether this assumption was even appropriate under the circumstances outlined above.

A prudent fiduciary would have probed Sentry's underlying corporate structure thoroughly to determine whether the ESOP would be able to control Sentry and, if so, to what degree and through what mechanisms. Upon discovering the likely post-transaction corporate structure described above, a prudent fiduciary would have, at a minimum, "vigorously question[ed]" whether the ESOP was really acquiring control over Sentry. *Brundle I*, 241 F.Supp.3d at 639. And, as Lenoir admitted at trial, Evolve should at least have insisted on provisions in the transaction documents to ensure that the ESOP could truly exercise the control it was paying for, such as provisions requiring expansion of the Board to include designated ESOP representatives or outside Directors. (Tr.1 63:2-20). The Court finds that Evolve breached its fiduciary duty by failing to seriously probe Napier's assumption about a factor as weighty as the degree of control the ESOP stood to gain as a result of the 2010 Transaction.[21]

---

[21]     The Court gives Kaplan's opinion on control little weight. Consistent with his view that

Evolve also failed to notice or question at least three other red flags in Napier's appraisal, namely Napier's decision to use a three-year look-back period when calculating Sentry's average yearly cash flow; Napier's assumption that Sentry could operate on 10 percent of its working capital; and Napier's add-back of Sentry's ESOP contributions. As outlined in Section I, all of these decisions were subjective and raised the stock price in Adam Vinoskey's favor. Moreover, as the Court found in Section I, the evidence and expert testimony supports the conclusion that Napier made unreasonable decisions with respect to each of these items. Fiduciaries "contemplating an otherwise prohibited transaction" have a duty to "ask questions" and "probe [their] own experts," "question[ing] and test[ing] the underlying financial data and assumptions." *Brundle I*, 241 F.Supp.3d at 643. "[T]he fiduciary is required to make an honest, objective effort to read the valuation, understand it, and question the methods and assumptions that do not make sense." *Shay*, 100 F.3d at 1490. Evolve's failure to notice, or ask any questions whatsoever about, these three pro-seller discretionary choices is further evidence of Evolve's lackluster due diligence and unreasonable reliance on Napier's appraisal.

---

once an ESOP owns over 50 percent of a company's shares, "it possess[es] the right to operate [the company] as it [sees] fit," Kaplan's opinion was that the Sentry ESOP would be able to "replace, increase, or decrease the size of Sentry's board of directors and executive management and to change Sentry's operations, the overall strategy of the company, the entire corporate organization, and sell the company." (JX 100 at 23; Tr.4 103:16-18 (Kaplan)). Although Kaplan reviewed Sentry's ESOP Plan, the list of materials he reviewed does not appear to include Sentry's bylaws. (JX 100 at 26). Moreover, Kaplan's opinion that an ESOP necessarily gains unfettered control over a company simply by purchasing 100 percent of the company's shares is not well supported, as courts have found assumptions of total control unwarranted even where, as here, an ESOP was acquiring 100 percent of a company's stock and some elements of control. *See, e.g., Brundle I*, 241 F.Supp.3d at 638–39, *aff'd*, 919 F.3d at 777–78. Finally, Messina persuasively rebutted Kaplan's opinion on control, noting that Kaplan offered no specific explanation of how the ESOP could remove existing management and exert the prerogatives of control when the seller and his spouse / fellow manager comprised a majority of the Board of Directors and the ESOP Trustees. (JX 103 at 8-9).

## 2. Evolve Failed to Adequately Follow Through on Errors it Noticed and Discussed with Napier

Evolve highlighted several concerns with Napier's draft appraisal in its November 11, 2010 e-mail and November 13, 2010 phone call with Napier, including Napier's rejection of DCF, lack of projections of Sentry's future performance, decision to add back half of Sentry's health care expenses, and unusually low discount rate. (*See, e.g.,* JX 33, 34). The Court made detailed factual findings about each of these items in Section I, but a brief discussion of Evolve's conduct surrounding each item provides necessary context for the Court's legal conclusions.

With respect to Napier's rejection of DCF and use of the capitalization of cash flow methodology, the Court found in Section I that DCF is, on the margins, a more commonly used and reliable method for evaluating the fair market value of closely-held stock. (*See, e.g.,* JX 96 at 12; Tr.3 43:24-25, 44:1-8 (Messina); *see also* Tr.5 47:16-24 (Brown)). With respect to Napier's lack of projections, the Court found that projections are important indicators of a company's long-term financial prospects, that Sentry did not historically conduct projections, and that it is not uncommon for fiduciaries like Evolve to ask management to assist in developing projections or to hire a third-party firm to assist with making projections. (*See, e.g.,* Tr.3 8:2-23, 43:2-19, 124:4-12, 128:14-25, 129:1-15 (Messina); Tr.5 151:16-25, 152:1-7, 224:11-17 (Messina); *id*. 24:11-24 (Brown)). The Court does not decide whether a prudent fiduciary must *always* require use of DCF or provide an expert with projections. Rather, the Court focuses solely on whether, under "the circumstances prevailing at the time," Evolve acted imprudently *in this case* by not supplying Napier with projections and by not asking more probing questions about Napier's rejection of DCF. *Tatum*, 761 F.3d at 358.

Clearly, Evolve was concerned about Napier's rejection of DCF and the lack of projections, as Evolve raised both issues with Napier in the December 11, 2010 e-mail and/or the

December 13, 2010 phone call. (JX 33, 34). But it does not appear that Napier ever gave satisfactory answers about either issue. With respect to his rejection of DCF, Napier told Lenoir and New simply that "he's always had a concern w/ using DCF with ESOPs." (JX 34 at 163A). Moreover, it appears that Evolve's primary concern with respect to Napier's rejection of DCF was Napier's language in the draft appraisal that DCF is "inappropriate to valuations for ESOP purposes." (*Id*. (Napier stated during December 13, 2010 phone call that he would "[change] his language"); JX 30 at 208; JX 85 at 1841-42 (final appraisal removing language Evolve objected to)). A prudent fiduciary concerned about the lack of projections and an expert's rejection of a widely-used methodology would have asked more probing questions about the expert's views on DCF and made efforts to supply the expert with projections. Evolve's failure to take these steps is further evidence that Evolve unreasonably relied on Napier's appraisal and that, at least with respect to projections, Evolve failed to "provide[] the expert with complete and accurate information." *Brundle*, 919 F.3d at 773; *see also Bruister*, 823 F.3d at 263.

Similarly, the Court found in Section I that Evolve raised Napier's inappropriate add-back of half of Sentry's health-care expenses, as well as Napier's unusually low discount rate, in the December 11, 2010 e-mail and December 13, 2010 phone conversation. (JX 33, 34). With respect to Napier's health-care add-back, Lenoir asked Napier not to include the add-back, and Napier replied that he would "think about it." (JX 34). With respect to Napier's discount rate, Evolve noted in its December 11, 2010 e-mail that it had not "seen a rate this low for some time, but we don't see companies with financials like Sentry's often / ever either." (JX 33). Napier stated in the December 13, 2010 phone conversation that he would "add some language" addressing Evolve's concerns. (JX 34).

However, despite Evolve's awareness of these flaws and initial expressions of concern

about them, Evolve did not wait to review Napier's updated or final appraisal to see whether Napier had adequately addressed these issues before offering Adam Vinoskey $406.00 per share. (*See, e.g.,* JX 42, 44). Had Evolve done so it would have seen that Napier continued to add back half of Sentry's health-care expenses, and left the discount rate and other capitalization rate inputs unchanged in the final appraisal. (JX 85). A prudent fiduciary would at least have reviewed Napier's updated and final appraisal before negotiating a price based on his e-mailed range to see how both the health care add-back and the discount rate had been addressed.

Moreover, with respect to the discount rate, Evolve noted that the overall discount rate was unusually low, (JX 33, 34), but there is no evidence that Evolve ever specifically probed Napier's discretionary choices about the risk-free rate, equity risk percentage, and company-specific risk percentage (*i.e.,* the inputs that make up the discount rate). As the Court found in Section I, Napier's choices about equity risk and company-specific risk were suspect and inconsistent with previous appraisals, and therefore should have piqued Evolve's interest. Evolve's failure to ask any questions about the inputs comprising the discount rate is yet another example of Evolve's shallow review of Napier's appraisal. "A prudent fiduciary would have sought an explanation" of, and "questioned the[] assumptions" underlying, Napier's discretionary choices about equity risk and company-specific risk. *Shay*, 100 F.3d at 1489.

Evolve contends that it complied with its duty of prudence and reasonably relied on Napier's appraisal because it investigated Napier's credentials before hiring him, "read Napier's initial valuation report, understood it, and questioned it." (Dkt. 212 at 46, 49, 54–55; *see also* JX 100 (Kaplan Report, espousing similar opinion)). The Court agrees that Evolve adequately probed Napier's credentials, reviewed Napier's past appraisals, and interviewed Napier before hiring him, therefore satisfying Evolve's duty to "investigate[] the expert's qualifications."

*Brundle*, 919 F.3d at 773 (quoting *Shay*, 100 F.3d at 1489). And, to be sure, Evolve reviewed Napier's *draft* appraisal and questioned *some* of its numerous flaws. But, as discussed at length above, Evolve failed to notice or question other flaws in Napier's appraisal, and failed to review Napier's updated or final appraisal to see if Napier had addressed the flaws Evolve pointed out before offering Adam Vinoskey $406.00 per share.

ERISA demands more. A prudent fiduciary would not simply point out some flaws in a draft appraisal, leave others unaddressed, and settle on a price using an expert's range of value without ever reviewing that expert's final appraisal. Part of a fiduciary's duty in relying on an expert's appraisal is to "double-check" and "significantly review [the expert's] ultimate conclusions." *Bruister*, 823 F.3d at 264. "[A] careful review of the valuation and a discussion with the expert" are not necessarily sufficient; if, as here, "there are still uncertainties" after a review of the expert's draft appraisal and a discussion with the expert, the fiduciary should consider having "a second firm review the valuation." *Shay*, 100 F.3d at 1490. At the very least, the fiduciary should actually review the expert's final appraisal before relying on the expert's range of fair market value, negotiating a price, and closing the deal. Evolve's failure to notice and question various flaws in Napier's appraisal, follow through on other flaws it initially questioned, and review Napier's final appraisal to see if or how Napier addressed these flaws lends support to the conclusion that Evolve did not reasonably rely on Napier's appraisal.

### 3.    Other Evidence of Evolve's Lack of Prudence

Several other aspects of the 2010 Transaction support the Court's conclusion that Evolve did not reasonably rely on Napier's appraisal and failed to act with the prudence ERISA demands. "These considerations are relevant to the Court's obligation to consider the totality of the 'circumstances then prevailing.'" *Brundle I*, 241 F.Supp.3d at 640 (quoting *Donovan*, 716

F.3d at 1468); *see also Bruister*, 823 F.2d at 262–63.

Evolve overlooked indicia strongly suggesting that Napier completed his 2010 Transaction appraisal with an eye toward reaching the predetermined $21 million estimated transaction price. (*See, e.g.,* JX 27, 19). Although Lenoir and Kaplan testified that it is typical for independent transactional trustees, particularly banks, to receive estimates of the overall value of a deal at the outset, no evidence suggests that it is standard or appropriate for an expert appraiser to make discretionary choices geared toward ensuring their appraisal matches or approximates that initial estimate. A prudent fiduciary would have noticed that someone—likely either Gust, Coffey, or Napier—had predetermined that Adam Vinoskey's shares were worth $21 million, and that the overall transaction value reached in Napier's draft appraisal came extremely close to that figure. (*See* JX 30, 85). Upon noticing this, a prudent fiduciary would have scrutinized Napier's appraisal closely and rigorously to determine whether Napier had made certain discretionary choices with an eye toward reaching this predetermined price. Evolve appears to have either not noticed or ignored indicia that Napier manipulated certain aspects of his appraisal to reach the estimated $21 million transaction value. *See Bruister*, 823 F.3d at 264 (affirming district court's finding that an ESOP fiduciary unreasonably relied on an expert's appraisal in part because the fiduciary "overlooked communications in which [the appraiser and the seller's attorney] were obviously working together to increase the value" of the transaction).

Another indicator of Evolve's "lack of prudence was the short time period to which it agreed for approving a price" for the 2010 Transaction. *Brundle I*, 241 F.Supp.3d at 642. Gust originally contacted Evolve about the possibility of Evolve "squeeze[ing] [in] another deal in Dec[ember]" on November 9, 2010. (JX 19). Evolve likely did not begin its due diligence until approximately on or after November 12, 2010, when Evolve sent Sentry an engagement letter.

(JX 21). At some point, Evolve agreed to a closing date of December 17, 2010, which was later moved back to December 20, 2010. (Tr.1 147:9-16 (Lenoir); *see also* JX 39; JX 40; JX 42; JX 45). Even dating the beginning of Evolve's due diligence to the earliest possible point (November 9, 2010), a closing date of either December 17 or 20 left Evolve with under six weeks in which to conduct its due diligence. Evolve does not appear to have questioned why Adam Vinoskey was so keen to complete the transaction by the end of the tax year or whether approximately six weeks was an adequate amount of time to thoroughly conduct due diligence. Although the Court does not hold that an ESOP fiduciary must always insist on a due diligence period exceeding six weeks, a prudent fiduciary must at least "consider[] whether it ha[s] sufficient time to perform an adequate due diligence." *Brundle I*, 241 F.Supp.3d at 642 (finding that the record "support[ed] the conclusion that [a trustee] did not have sufficient time to complete its work thoroughly" where "no more than six weeks could have passed from the beginning" of the trustee's work to the trustee's approval of the purchase price range).

Evolve's failure to question whether it had sufficient time to conduct its due diligence resulted in a rushed process in advance of closing. Evolve only visited Sentry once on November 18, 2010; appears to have had few, if any, documented discussions with Sentry management beyond the November 18, 2010 meeting with Adam Vinoskey and Michael Connor; and convened its ESOP Administration Committee to discuss the 2010 Transaction only twice on November 17 and 18, 2010. (Tr.1 128:7-9 (Lenoir); JX 24). Moreover, Evolve had only one detailed discussion with Napier about his appraisal on December 13, 2010, (JX 33, 34), and settled on a price of $406.00 per share with Adam Vinoskey just two days later on December 15, 2010, without reviewing Napier's updated or final appraisal and without any negotiation. All of these facets of Evolve's rushed due diligence process support the conclusion that Evolve

failed to act as a prudent fiduciary in relying on Napier's appraisal and approving the 2010 Transaction. *See Brundle I*, 241 F.Supp.3d at 642 (concluding that an ESOP trustee failed to act as a prudent fiduciary in part because "[t]he frequency and duration of [the trustee's] meetings . . . suggest it was not fully engaged," the trustee had "[o]nly one meeting with [the company's] management," and the trustee negotiated favorably with the seller).

### 4. Evolve's Arguments Regarding Causation and a Hypothetical Fiduciary

Evolve contends that even if the Court finds "that Evolve did not engage in a prudent investigation," such a finding "does not automatically equate to liability for damages," as "[t]here must be a causal connection between the breach and the alleged loss." (Dkt. 212 at 60–61). Evolve argues that "[i]n order to recover for a claim of breach of fiduciary duty, including one that arises out of a" prohibited transaction, "proximate cause must exist" between the breach and an actual loss to the ESOP. (*Id*. at 60). Evolve contends that it can avoid liability by showing that "a hypothetical prudent fiduciary would have made the same decision anyway." (*Id*. at 64 (quoting *Tatum*, 761 F.3d at 364)). Relying on Kaplan's opinion that the 2010 Transaction was "fair and reasonable" to the ESOP, as well as Brown's *de novo* valuation of Sentry's stock at $493.00 per share, Evolve submits that "a hypothetical [prudent] fiduciary would have reached the same decision Evolve reached in December 2010." (*Id*. at 65).

With respect to Count One's allegations that Evolve caused the Sentry ESOP to engage in a prohibited party-in-interest transaction under 29 U.S.C. § 1106(a)(1)(A), Evolve's proximate causation argument fails. Evolve is correct that the Secretary must prove that any breach of Evolve's duty of prudence or loyalty under 29 U.S.C. § 1104(a)(1) "result[ed] in a loss to the" ESOP in order to hold Evolve liable for such breaches. *Tatum*, 761 F.3d at 361, 376 ("[I]f trustees act imprudently" under § 1104, "but not dishonestly, they should not have to pay a

monetary penalty for their imprudent judgment so long as it does not result in a loss to the Fund." (internal quotations and emphasis removed)); *see also Plasterers' Local Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 218 (4th Cir. 2011) ("Thus, while certain conduct may be a breach of an ERISA fiduciary's duties *under § 1104*, that fiduciary can only be held liable upon a finding that the breach actually caused a loss to the plan." (emphasis added)).   Moreover, Evolve is correct that a fiduciary can avoid liability for fiduciary breaches under § 1104 even where a plaintiff proves the fiduciary's "procedural imprudence and a prima facie loss" if the fiduciary "can show, by a preponderance of the evidence, that a prudent fiduciary would have made the same decision." *Tatum*, 761 F.3d at 364.

But claims arising under 29 U.S.C. § 1106(a)(1)(A)'s prohibition of party-in-interest transactions are not governed by the same proximate causation standard. *See, e.g., Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 434 (6th Cir. 2002) (finding that a violation of § 1106(a)(1)(A) "is a *per se* violation" of ERISA, notwithstanding the price a reasonable hypothetical fiduciary would have paid for the stock").   Where, as here, a defendant-fiduciary "did not engage in a good faith determination of the fair market value of" the stock in question, ERISA's definition of "adequate consideration" is "not satisfied," and "the price paid by a hypothetical reasonable fiduciary is irrelevant."   *Id.* at 437; *see also Brundle*, 919 F.3d at 780 (noting that courts evaluating alleged violations of § 1106(a)(1)(A) must primarily "look to the *conduct* of the trustee and whether it met its fiduciary obligations, not to whether the trustee arrived at a 'fair value' (emphasis in original)).

However, even assuming that the Secretary must prove that Evolve's imprudent process caused a loss to the ESOP to prevail on Count One, the evidence supports such a finding, since Evolve's lackluster due diligence resulted in the ESOP paying a price for Adam Vinoskey's

shares that exceeded the stock's fair market value.  Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *Brundle I*, 241 F.Supp.3d at 617–18 (quoting *Estate of Godley*, 286 F.3d at 214).  Given that the Sentry ESOP did not stand to gain total control over Sentry, the Court finds that a buyer "having reasonable knowledge of [that] relevant fact[]" would not have accepted a price of $406.00 per share, where, as here, that price reflected numerous pro-seller discretionary choices purportedly made on the assumption that the ESOP would gain total control over Sentry.  *Id*.  If Evolve had thoroughly questioned or followed up on Napier's various inappropriate discretionary choices as noted above, the stock price for the 2010 Transaction would have been lower than $406.00 per share.  For instance, Napier conceded that his decision to add back half of Sentry's health care expenses (which he justified on the basis of control) had the effect of raising the stock price by $50.00 per share, (Tr.2 62:1-9, 156:12-25, 157:1-7), and that his discretionary choices with respect to equity risk, company-specific risk, and growth similarly raised the stock price. (*Id*. 60:7-25, 61:1-24).  Under these circumstances, the Court need not "determine the fair market value from scratch" to conclude that the price the ESOP paid for Adam Vinoskey's shares exceeded the stock's actual fair market value.  *Brundle I*, 241 F.Supp.3d at 632–33.

In sum, although the Secretary need not prove proximate causation to prevail on Count One, the Court nonetheless finds that Evolve's imprudent process caused the ESOP to overpay for Adam Vinoskey's stock and therefore caused a loss to the ESOP.

\*      \*      \*

The Court does not find that Evolve acted in bad faith with respect to the 2010

Transaction, but "ERISA demands more to excuse a fiduciary from liability." *Brundle I*, 241 F.Supp.3d at 643. Although expert advice "can of course serve as evidence of prudence in the discharge of an ESOP trustee's duties under § 1108(e)," a plan trustee must show that its "reliance on the expert's advice was reasonably justified under the circumstances." *Brundle*, 919 F.3d at 773 (citations and internal quotations omitted). "ERISA demands a high level of scrutiny from fiduciaries" in this regard. *Id.* Here, the Court finds that Evolve's reliance on Napier's appraisal was misplaced under the circumstances then prevailing, and that Evolve's conduct in approving the 2010 Transaction fell far short of that expected of a prudent ESOP fiduciary. Because of Evolve's lack of prudence, the Sentry ESOP paid a price for Adam Vinoskey's stock that exceeded the stock's fair market value. Accordingly, Evolve has not carried its heavy burden under § 1108(e) to show that the 2010 Transaction was for no more than adequate consideration,[22] and Evolve is liable for engaging in a prohibited party-in-interest transaction in violation of 29 U.S.C. § 1106(a)(1)(A).

**B.      Whether Evolve Violated its Duties of Prudence and Loyalty (Count Two)**

In Count Two, the Secretary alleges that Evolve violated the stringent duties of prudence and loyalty ERISA imposes on ESOP fiduciaries. (Dkt. 1-1 at 9). *See* 29 U.S.C. § 1104(a)(1)(A)-(B) (outlining duties of prudence and loyalty). For the reasons outlined above in Section II.A with respect to Evolve's reliance on Napier's appraisal—an inquiry that largely centered around whether Evolve acted as a prudent fiduciary—the Court finds that Evolve violated its duty of prudence by failing to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

---

[22]      The Court addresses the amount of the overpayment in Section III.

*Id.* § 1104(a)(1)(B). Accordingly, the Court's analysis below with respect to Count Two focuses solely on whether Evolve violated its duty of loyalty to the Sentry ESOP.

### 1. Whether Evolve Violated its Duty of Loyalty

ERISA imposes a strict duty of loyalty on ESOP fiduciaries. "[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). ESOP fiduciaries must "scrupulously adhere" to this duty of loyalty, making "any decisions in a fiduciary capacity with 'an eye single to the interests of the participants and beneficiaries.'" *DiFelice*, 497 F.3d at 418–19 (quoting *Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995)); *see also Tatum*, 761 F.3d at 356 (noting same). This duty of loyalty "'requires that fiduciaries keep the interests of beneficiaries foremost in their minds, taking all steps necessary to prevent conflicting interests from entering into the decision-making process.'" *Bruister*, 823 F.3d at 261 (quoting *Bussian,* 223 F.3d at 298). In short, ERISA demands that an ESOP fiduciary maintain "complete" and "unyielding" loyalty to the ESOP participants. *DiFelice*, 497 F.3d at 419, 421.

This case presents many thorny technical questions but whether Evolve lived up to the stringent duty of loyalty ERISA imposes is not among them. The Court finds by a preponderance of the evidence that Evolve violated its duty of unwavering loyalty to the ESOP.

As outlined in Section I, Lenoir admitted at trial that he saw Evolve's role as securing a deal that was "fair to both" Adam Vinoskey and the ESOP. (*See, e.g.,* Tr.4 191:5-6, 193:11-13). Evolve contends that the Secretary "twists Lenoir's testimony to mean something he didn't say," and that Lenoir's statements about securing a deal that was "fair to both" were references to the

definition of fair market value as "what a hypothetical buyer, and a hypothetical seller, would pay." (Dkt. 212 at 53). But the Court heard the totality of Lenoir's testimony, and he unequivocally stated under both direct and cross examination that he saw his role as securing a deal that would be fair to both the ESOP and Adam Vinoskey. To be sure, as Evolve stresses, Lenoir recited the rule that an ESOP fiduciary must act in the "exclusive benefit for the [ESOP] participants." (*See, e.g.,* Tr.1 59:20–23). But Lenoir's subsequent statements that Evolve was concerned with securing a deal that would be "fair to everyone" demonstrated that Lenoir did not substantively understand or embrace Evolve's duty to act in the ESOP's exclusive interests. (Tr.4 193:11-13).

Having heard and subsequently reviewed the entirety of Lenoir's testimony, the Court concludes that it supports a finding that Evolve had divided loyalties between the Sentry ESOP and Adam Vinoskey, and failed to act with "an eye single to the interests of the participants." *Bruister*, 823 F.3d at 261–62 (upholding district court's finding that ESOP fiduciaries violated duty of loyalty based in part on "testimony that [the fiduciaries] were always concerned with [the seller's] interests despite being ESOP trustees, and that [one of the fiduciaries] actually made decisions by determining what 'was best for everyone, including [the seller]'").

Evolve's conduct in the frenzied period leading up to the December 20, 2010 closing date shows the fruits of this conflicted outlook. With respect to Napier's appraisal, Evolve largely failed to "speak up for the ESOP [p]articipants." *Id.* at 261 (affirming district court's finding that ESOP fiduciaries violated duty of loyalty in part on this basis). As outlined extensively above, Evolve failed to question various discretionary choices Napier made that benefited Adam Vinoskey and failed to follow through on other issues it did raise with Napier. Indeed, as discussed at length above, Evolve did not even wait to review Napier's updated or final appraisal

to see if Napier had acted on the issues Evolve raised before relying on the range Napier e-mailed on December 15, 2010 and offering Adam Vinoskey a price of $406.00 per share.

Evolve's failure to engage in anything resembling a negotiation with Adam Vinoskey is further evidence of Evolve's divided loyalties. Having been told by Napier that anywhere between $405.73 and $408.58 per share would constitute fair market value, (JX 41), Evolve offered Adam Vinoskey $406.00 per share. "Most economically rational actors entering a negotiation would begin by low-balling their first offer, in an effort to test the waters and drive down their counterpart." *Brundle I*, 241 F.Supp.3d at 642–43. Indeed, Evolve would have been more than justified in initially offering $285.00 per share, or something close, since Napier's 2009 appraisal (which Evolve had reviewed) valued Sentry's stock at $285.00 per share. (JX 84). Moreover, Evolve had significant leverage to make a lower initial offer, since Adam Vinoskey was plainly eager to close the deal before the agreed-upon closing date of December 17, 2010. (Tr.1 147:9-16 (Lenoir); *see also* JX 39; JX 40; JX 42; JX 45).

Lenoir conceded at trial that Evolve never offered any price lower than $406.00 per share. (Tr.1 138:21-25, 139:1). Evolve argues that "Lenoir [had] managed enough deals to know the risks in making a lowball offer to a seller" and "did not want to risk losing the opportunity for the ESOP to purchase" Sentry by making an unreasonably low initial offer. (Dkt. 212 at 58). The Court finds this explanation unavailing. Even accepting Lenoir's premise that Evolve would have lost credibility and risked the entire deal had it started with a supposedly "lowball" offer of $285.00 per share, that still does not explain why Evolve failed to initially offer $350.00, $400.00, or even $405.73 per share (*i.e.*, the low end of the range Napier communicated in his December 15, 2010 e-mail). (JX 41). "These fluctuations may seem small, but with over [51,000] shares in play, each dollar off the share price represented" a significant amount of

money the Sentry ESOP would not have to pay. *Brundle I*, 241 F.Supp.3d at 643.

Moreover, although Lenoir's defense, viewed charitably, might help explain why Evolve did not start with an aggressive lowball offer, it does not explain why Evolve failed to engage in any back-and-forth negotiation *at all*. At trial, Lenoir described offering an initial price of $285.00 or $300.00 as "cheat[ing]," (Tr.1 148:12-14), and Evolve accuses the Secretary of "inappropriately attempt[ing] to graft a mandatory negotiation requirement onto this transaction." (Dkt. 212 at 56). But the Court finds on the basis of the expert testimony presented at trial that negotiation is permissible and not uncommon in ESOP transactions. Evolve's own expert acknowledged that the purpose of an independent transactional trustee is to "create[] the actual arm's length negotiation structure that's necessary in determining the value" so a seller is not simply negotiating with him or herself, and that an ESOP fiduciary can offer prices lower than an expert appraiser's value. (Tr.4 124:17-23, 136:17-25, 137:1-15 (Kaplan)). Indeed, Kaplan acknowledged that, in ESOP transaction negotiations, it is typical to "start with the low end of the range," which supports the conclusion that Evolve should at least have initially offered $405.73 per share (the low end of Napier's e-mailed range). (*Id*. 137:1-5). Messina also testified that negotiation is standard in private transactions and that "the reason an ESOP has a fiduciary is so that there is that sort of real world negotiation so that you can end up with a fair price." (Tr.3 7:9-16; *see also id*. 7:17-22 (Messina, testifying that Evolve's initial, and only, offer "made no sense from the standpoint of how a buyer of a private business in the real world would act in that situation")).[23]

---

[23] Evolve correctly notes that a fiduciary's failure to negotiate is appropriately considered as one factor among the totality of the circumstances bearing on whether the fiduciary lived up to the stringent duties of prudence and loyalty ERISA imposes. *See, e.g., Perez v. First Bankers Trust Services, Inc.*, 210 F.Supp.3d 528, 533 (S.D.N.Y. 2016) (noting that a fiduciary's "failure to negotiate the purchase price on behalf of the [] ESOP is one factor that" courts "may consider

Although these factors alone might not be sufficient to find that Evolve violated its duty of loyalty, the Court finds that, taken together, Lenoir's statements at trial, Evolve's failure to seriously challenge Napier's pro-seller assumptions, and Evolve's lack of negotiation establish by a preponderance of the evidence that Evolve violated ERISA's stringent duty of loyalty. ERISA demands that ESOP fiduciaries "place the interests of participants and beneficiaries first and foremost." *Bruister*, 823 F.3d at 262. Evolve plainly failed to live up to that obligation.

### 2. Whether Evolve's Breach of its Duties of Prudence and Loyalty Caused a Loss to the Sentry ESOP

With respect to Count Two's allegations that Evolve violated its duties of prudence and loyalty under 29 § 1104(a)(1), the Secretary must show that the above violations "result[ed] in a loss to the" ESOP in order to hold Evolve liable for such breaches. *Tatum*, 761 F.3d at 361. "[W]hile certain conduct may be a breach of an ERISA fiduciary's duties under § 1104, that fiduciary can only be held liable upon a finding that the breach actually caused a loss to the plan." *Plasterers' Local Union*, 663 F.3d at 218. Evolve can avoid liability under Count Two if it "can show, by a preponderance of the evidence, that a prudent fiduciary would have made the same decision" Evolve made with respect to approving the 2010 Transaction at a price of $406.00 per share or, put differently, that Evolve "would have reached the same decision had it undertaken a proper investigation." *Tatum*, 761 F.3d at 364.

The Court already concluded in Section II.A that Evolve's imprudent process proximately caused an actual loss to the ESOP, in that Evolve approved a price for the 2010

---

when determining whether [the fiduciary] acted in good faith," and collecting cases relying on "the failure to negotiate the ESOP transaction price" as one relevant factor in that calculus); *Hugler v. First Bankers Trust Services, Inc.*, No. 12:cv-8649-VB, 2017 WL 1194692, at *13 (S.D.N.Y. Mar. 30, 2017) (noting same); *Brundle I*, 241 F.Supp.3d at 642–43 (considering a fiduciary's lack of negotiation as one factor supporting a finding that the fiduciary failed to act prudently), *aff'd*, 919 F.3d at 779. Here, both with respect to the duty of prudence and the duty of loyalty, the Court considers Evolve's failure to negotiate as just one relevant factor.

Transaction that exceeded the fair market value of Adam Vinoskey's stock, thus resulting in an overpayment by the ESOP. The Court further found that a hypothetical prudent fiduciary would not have approved this transaction at a price of $406.00 per share, where that price was so tethered to the faulty assumption that the ESOP was acquiring unfettered control over Sentry.

Evolve's divided loyalties similarly caused a loss to the ESOP, since Evolve would have questioned Napier's pro-seller discretionary choices and negotiated in the ESOP's exclusive interest had it grasped its role as a zealous advocate for the ESOP and the ESOP only. Indeed, had Evolve engaged in even a modicum of negotiation by initially offering the low end of Napier's e-mailed range ($405.73) and had Adam Vinoskey accepted this price, the ESOP would have paid $13,770.00 less than it actually paid for Adam Vinoskey's stock. Had Evolve initially offered $285.00 per share—Napier's appraised value in 2009—and had Adam Vinoskey accepted that price, the ESOP would have paid $6,171,000.00 less than it actually paid. Although we will never know whether Adam Vinoskey would have accepted these hypothetical offers, the Court finds it more likely than not that Evolve's total failure to negotiate—which comprises just one facet of Evolve's divided loyalties—caused the ESOP to sustain a definite, quantifiable loss.

Moreover, Evolve has failed to "show, by a preponderance of the evidence, that a prudent [and loyal] fiduciary would have made the same decision[s]" Evolve made with respect to relying on Napier's appraisal and approving the 2010 Transaction. *Tatum*, 761 F.3d at 364. Simply put, Evolve has not presented evidence that a prudent and loyal fiduciary who understood the errors in Napier's appraisal and that the ESOP did not stand to gain total control would have a) relied on Napier's appraisal; or b) approved the transaction at a price of $406.00 per share, where that price was justified largely by erroneous assumptions that the ESOP would gain

complete control over Sentry after the transaction. Accordingly, Evolve can be held liable for violating its duties of prudence and loyalty under 29 § 1104(a)(1).

**C.    Whether Adam Vinoskey is Jointly Liable as a Knowing Participant in a Prohibited Transaction or as a Co-Fiduciary (Count Three)**

In Count Three, the Secretary alleges that 1) Adam Vinoskey and the Adam Vinoskey Trust are liable as knowing participants in a prohibited transaction under ERISA Section 502(A)(5) (*i.e.,* 29 U.S.C. § 1132(a)(5)); and 2) Adam Vinoskey is liable as a co-fiduciary for Evolve's fiduciary breaches under ERISA Sections 405(a)(1), (3) (*i.e.,* 29 U.S.C. § 1105(a)). The Court analyzes each of these claims in turn, and finds that Adam Vinoskey and the Adam Vinoskey Trust are jointly and severally liable with Evolve under both provisions of ERISA.

**1.    Whether Adam Vinoskey and the Adam Vinoskey Trust are Liable as Knowing Participants in a Prohibited Transaction**

Section 502(A)(5) of ERISA permits the Secretary to bring claims to "enjoin any act or practice which violates any provision" of ERISA or to "obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of" ERISA. *See* 29 U.S.C. § 1132(a)(5). In *Harris Trust & Savings Bank v. Saloman Smith Barney Inc*., 530 U.S. 238, 251 (2000), the Supreme Court held that a party on the receiving end of a prohibited party-in-interest transaction may be liable under ERISA if it "had actual or constructive knowledge of the circumstances that rendered the transaction unlawful." "Those circumstances, in turn, involve a showing that the plan fiduciary, with actual or constructive knowledge of the facts satisfying the elements of a" prohibited party-in-interest transaction, "caused the plan to engage in the transaction." *Id*.

To be held liable as a knowing participant in a prohibited transaction, the non-fiduciary transferee defendant needs to actually or constructively know (1) "they were transacting with an

ERISA fiduciary," and (2) "the factual circumstances underlying the transaction" that make it a prohibited transaction. *Haley v. Teachers Ins. & Annuity Assoc. of Am.*, 377 F.Supp.3d 250, 264 (S.D. N.Y. 2019). "Additionally, the fiduciary [transferor] needs to know the facts underlying the transaction that" make it a prohibited transaction. *Id*. at 261. "But nothing in *Harris* requires the fiduciary transferor or the non-fiduciary transferee to have knowledge of the law, *i.e.*, knowledge that the transaction violated ERISA." *Id*. Moreover, a "non-fiduciary need not have engaged in any wrongdoing" to be held liable as a knowing participant. *Acosta v. Saakvitne*, 355 F.Supp.3d 908, 924-25 (D. Hawaii 2019). "It is enough if he had knowledge, based on the surrounding circumstances, that the fiduciary was engaging in a prohibited transaction." *Id*.

Essentially, then, to hold Adam Vinoskey liable as a knowing participant in a prohibited transaction, the Secretary must have proven by a preponderance of the evidence that Adam Vinoskey knew or should have known "of the circumstances that rendered the transaction unlawful." *Harris Trust*, 530 U.S. at 251. A party-in-interest transaction is prohibited under 29 U.S.C. § 1106(a)(1)(A) unless the fiduciary can establish § 1108(e)'s affirmative defense that the transaction did not exceed adequate consideration. Under proposed DOL regulations to which courts look for guidance, adequate consideration must "(1) reflect the stock's fair market value, and (2) be the product of a determination made by the fiduciary in good faith." *Brundle*, 919 F.3d at 770 n.2 (internal quotations omitted); *see also* 29 U.S.C. § 1102(18)(B) (defining "adequate consideration" as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan in accordance with the regulations promulgated by the Secretary"). Accordingly, if the Secretary proves by a preponderance of the evidence that Adam Vinoskey had actual or constructive knowledge *either* that the $406.00 per share he received for his 51,000 shares exceeded the stock's fair market value *or* that Evolve did

not arrive at this price through a good faith determination (*i.e.,* through a prudent process), Adam Vinoskey can be held liable as a knowing participant in a prohibited transaction.[24]

Two facets of establishing liability for Adam Vinoskey as a knowing participant in a prohibited transaction can be dispensed with at the outset. First, there is no dispute that Adam Vinoskey knew he was transacting with Evolve in Evolve's capacity as the independent transactional trustee for the Sentry ESOP (*i.e.,* as "an ERISA fiduciary"). *Haley*, 377 F.Supp.3d at 264. Second, Evolve knew "the facts underlying the [2010] transaction" that rendered it a prohibited transaction under 29 U.S.C. § 1106(a)(1)(A). *Id.* at 261. The only remaining question is whether Adam Vinoskey had "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Trust*, 530 U.S. at 251.

As the Court found in Section I, Evolve did not have direct contact with Adam Vinoskey in conducting its due diligence after the November 18, 2010 meeting at Sentry. There is no evidence that Adam Vinoskey knew, or should have known, that Evolve failed to question many of the specific flaws in Napier's appraisal discussed above, failed to follow through on the issues it did raise, or failed to review Napier's updated or final appraisal before offering $406.00 per

---

[24] Adam Vinoskey contends that he cannot be held liable as a knowing participant in a prohibited transaction unless the Secretary proves that he had actual or constructive knowledge *both* that he was overpaid for his stock *and* that Evolve engaged in an imprudent process. (Dkt. 213 at 14). This argument is without merit, and its source is unclear, as none of the out-of-circuit district court decisions Vinoskey cites actually supports his argument that "the Secretary must prove the requisite knowledge by Vinoskey with respect to both fiduciary process and price." (*Id.* (citing *Hans v. Tharaldson*, No. 3:05-cv-115, 2011 WL 7179644, at *14-18 (D. N.D. Oct. 31, 2011); *Heritage Equity Group 401(k) Sav. Plan v. Crosslin Supply Co.*, 638 F.Supp.2d 869, 876 (M.D. Tenn. 2009), and *Marks v. Independence Blue Cross*, 71 F.Supp.2d 432, 438 (E.D. Pa. 1999)). A party-in-interest transaction is prohibited if the price exceeds fair market value *or* if the fiduciary arrives at this price through an imprudent process. Thus, if Adam Vinoskey had actual or constructive knowledge of either of these aspects of the 2010 Transaction, he is liable as a knowing participant in a prohibited transaction.

share. Thus, the evidence does not support a finding that Adam Vinoskey had actual or constructive knowledge of the exact details of Evolve's imprudent process.

However, the Court finds by a preponderance of the evidence that Adam Vinoskey had actual knowledge that the $406.00 per share he received for his 51,000 shares exceeded the stock's fair market value. Four pieces of evidence in particular support this finding. First, the evidence supports a finding that Adam Vinoskey reviewed Brian Napier's appraisal and Sentry's financials before agreeing to the $406.00 per share price. (*See, e.g.,* PTX M 113:2-12, 146:4-13 (Vinoskey Depo.); Tr.2 225:4-11, 229:25, 218:1-8 (Vinoskey, denying at trial that he had reviewed Napier's appraisal and Sentry's financials but admitting that his memory was "[m]uch better" at the time of his deposition)). Second, Adam Vinoskey had reviewed the stock price in each of Napier's annual appraisals; knew that from 2004 to 2009, Napier's appraised price ranged from $220.00 to $285.00 per share; and understood Napier's general methodology. (Tr.2 180:6-25, 181:1-22 (Vinoskey); *id.* 8:10-21, 9:8-24 (Napier)). Third, although he would have the Court believe that he left all of Sentry's financials to his wife, a preponderance of the evidence supports a finding that Adam Vinoskey reviewed Sentry's financials on a regular basis, (Tr.1 214:4-25, 215:1 (Holcomb)), and had a keen understanding of certain fundamentals, such as, for instance, how much working capital Sentry required to operate and the fact that Sentry's earnings had been lackluster in 2009. (Tr.2 209:10, 234:14-16 (Vinoskey)).

Fourth, Adam Vinoskey knew that he was not really relinquishing control over Sentry by selling his shares to the ESOP, and, by extension, knew that the ESOP did not stand to gain absolute control over the company after the 2010 Transaction. Although Adam Vinoskey was amenable to Lenoir's suggestion that the Board of Directors be expanded to include two outside Directors after the transaction, (Tr.1 62:16-25 (Lenoir)), he knew that he would stay on as

Chairman of the Board, and that he and Carole Vinoskey would continue to comprise a majority of the ESOP Trustees after the 2010 Transaction, thus preserving their ability to exert control over the vast majority of corporate decisions (including electing and removing members of the Board) without taking instruction from the ESOP participants. Adam Vinoskey's understanding that he would essentially retain control over Sentry following the 2010 Transaction is further evidenced by his insistence during Evolve's November 18, 2010 visit to Sentry that he would not cut health care expenses after the transaction, suggesting that he thought he—rather than the ESOP—would be able to make this decision after the 2010 Transaction. (Tr.2 205:1-25 (Vinoskey); Tr.1 88:18-25, 89:1-6, 100:3-10 (Lenoir)).

"[A] nonfiduciary's knowledge of [a] breach can be inferred from surrounding circumstances raising a reasonable inference of knowledge." *Brock v. Hendershott*, 840 F.2d 339, 342 (6th Cir. 1988). Taken together, the above evidence supports a reasonable inference that Adam Vinoskey knew that the $406.00 per share—a price justified largely on an assumption that he would be ceding full control over Sentry to the ESOP—he received exceeded the fair market value of his stock. Thus, the Court finds that the Secretary has established by a preponderance of the evidence that Adam Vinoskey had actual knowledge of one of "the circumstances that rendered the transaction unlawful," namely that the price he received for his shares exceeded fair market value. *Harris Trust*, 530 U.S. at 251.

Even if the Secretary had not met his burden with respect to actual knowledge, a preponderance of the evidence certainly supports a finding that Adam Vinoskey had at least constructive knowledge that his stock was not really worth $406.00 per share. A party has constructive knowledge of a breach when they "should have known" about "the circumstances that rendered the transfer in breach." *Id.* The Fourth Circuit has defined "constructive

knowledge" as "knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Hoschar v. Appalachian Power Co*., 739 F.3d 163, 175 (4th Cir. 2014) (citing Black's Law Dictionary (9th ed. 2009)).  Given the above evidence establishing Adam Vinoskey's review of Napier's 2010 Transaction appraisal, review of Napier's prior appraisals, general understanding of Napier's methodology, familiarity with Sentry's financials, and understanding that he was not truly giving up control of Sentry, the Court finds that, at the very least, Adam Vinoskey "should have known" that the price he received for his shares exceeded fair market value.  *Harris Trust*, 530 U.S. at 251.[25]  In sum, Adam Vinoskey and the Adam Vinoskey Trust are jointly and severally liable for the ESOP's losses as knowing participants in a prohibited transaction.[26]

### 2.     Whether Adam Vinoskey is Liable as a Co-Fiduciary

In addition to being the seller in the 2010 Transaction, Adam Vinoskey was a fiduciary of the ESOP at the time of the transaction, as he served as an ESOP Trustee.  Thus, the Secretary contends that, in addition to being liable as a knowing participant in a prohibited transaction, Adam Vinoskey should be held jointly liable as a co-fiduciary for Evolve's breaches.  ERISA Sections 405(a)(1) and (3) provide that a plan fiduciary "shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan" if he "participates knowingly in

---

[25]     Vinoskey relies heavily on the Northern District of North Dakota's decision to grant summary judgment with respect to a knowing participation claim in *Hans v. Tharaldson*, No. 3:05-cv-115, 2011 WL 7179644 (D. N.D. Oct. 31, 2011), but this decision is inapposite.  This is not a case where the alleged knowing participant merely "signed where they were told to sign" and otherwise played no role in the prohibited transaction.  *Id*. at *16-17.  Rather, the evidence demonstrates that Adam Vinoskey "participated in [at least one] discussion[] or meeting[] in contemplation of the transaction[]" and had "knowledge of material facts of the transaction."  *Id*.

[26]     There is no dispute that Adam Vinoskey controls the Adam Vinoskey Trust, (*See, e.g.,* Vinoskey Answer ¶ 7), and the Court therefore finds that the Adam Vinoskey Trust is a "party in interest subject to equitable recovery under ERISA § 1132(a)."  *Bruister*, 54 F.Supp.3d at 672, *aff'd*, 823 F.3d at 272 (citing *Harris Trust*, 530 U.S. at 245–54).

or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach," or "if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."  29 U.S.C. § 1105(1), (3).  Sections 1105(a)(1) and (3) "require actual knowledge of the breach."  *Renfro v. Unisys Corp.*, 671 F.3d 314, 324 (3d Cir. 2011).  "[T]he fiduciary must know the other person is a fiduciary with respect to the plan, must know that he participated in the act that constituted a breach, and must know that it was a breach."  *Id*. (quoting *Donovan*, 716 F.2d at 1475).

There is no dispute that Adam Vinoskey knew Evolve was a fiduciary with respect to the Sentry ESOP by virtue of its stance as the independent transactional trustee.  Although the Court found in the subsection above that Adam Vinoskey knowingly accepted a price for his 51,000 shares that exceeded fair market value, there is no evidence that he actively "*participated in*" or "knowingly undert[ook] to *conceal*" Evolve's imprudent process in relying on Napier's appraisal and reaching the $406.00 per share price.  29 U.S.C. § 1105(1) (emphasis added).  However, the Court concluded above that Adam Vinoskey had actual knowledge that the price he received in the 2010 Transaction exceeded fair market value.  By extension, Vinoskey also had actual knowledge that Evolve had breached its fiduciary duty by approving a prohibited transaction for more than adequate consideration.  There is no evidence that Adam Vinoskey made any efforts to remedy Evolve's breach by, for instance, not accepting $406.00 per share.  Thus, the Court concludes that Adam Vinoskey is jointly liable for Evolve's breaches because he knowingly participated in Evolve's approval of a prohibited transaction by accepting a price above fair market value, and because he "ha[d] knowledge of [Evolve's] breach" and did not make any "reasonable efforts under the circumstances to remedy the breach."  29 U.S.C. 1105(1), (3).[27]

---

[27]    The Court's conclusion that Adam Vinoskey is jointly liable as a co-fiduciary is not

Accordingly, Adam Vinoskey is jointly and severally liable for Evolve's fiduciary breaches as a co-fiduciary, "since co-fiduciary liability is joint and several under ERISA." *Leister v. Dovetail, Inc.*, 546 F.3d 875, 878 (7th Cir. 2008).

## III.    CALCULATION OF DAMAGES

"To calculate the loss to an ESOP and compensate it for a fiduciary's ERISA violation, a court typically subtracts the stock's fair market value, as determined by the court, from the inflated price paid by the ESOP." *Brundle*, 919 F.3d at 781; *see also Bruister*, 823 F.3d at 265 (collecting cases)). Both Messina and Brown provided damages estimates. Using the DCF methodology—which the Court found above to be widely-used and reliable—Messina's opinion is that Adam Vinoskey's shares were worth $180.00 per share at the time of the 2010 Transaction, resulting in an overpayment by the ESOP of $11,522,000.00. (Tr.3 17:2-7, 89:16-23, 99:11-19 (Messina)). Messina also provided analysis of what the fair market value of Sentry's stock would have been at the time of the 2010 Transaction had Napier consistently and correctly used his capitalization of cash flow methodology. (JX 96 at 25, Fig. 19). Under this analysis, Messina found that the stock would have been worth $257.50 per share at the time of the transaction, resulting in an overpayment of $7,573,500.00. (*Id.*). Employing DCF, Brown's opinion is that Adam Vinoskey's stock had a fair market value of $493.17 per share at the time

---

altered by Adam Vinoskey's argument that he could not have taken any steps to remedy Evolve's alleged breaches because he was recused as an ESOP Trustee during the course of the 2010 Transaction. First, although the evidence does support a finding that Adam Vinoskey did not have direct contact with Evolve after Evolve's November 18, 2010 visit to Sentry, there is no evidence that Adam Vinoskey *formally* recused himself as an ESOP Trustee or otherwise. Second, even if the Court accepted Adam Vinoskey's theory that he recused himself as an ESOP Trustee and delegated the fiduciary duty for determining the 2010 Transaction price to Evolve, "[e]ven a proper delegation of authority . . . does not remove entirely the delegating fiduciary's duties," and a "delegating fiduciary who knows of a breach by the delegated fiduciary cannot 'escape liability by simply casting a blind eye toward the breach.'" *Chesemore v. Alliance Holdings, Inc.*, 886 F.Supp.2d 1007, 1049–50 (W.D. Wis. 2012) (quoting *Willett v. Blue Cross & Blue Shield*, 953 F.2d 1335, 1341 (11th Cir. 1992)).

of the transaction, and that the ESOP's purchase of the stock at $406.00 per share was therefore not an overpayment at all. (*See* JX 98 at 5). Brown did, however, perform a damages analysis, concluding that any overpayment only amounted to $5,472,000.00. (*Id*. at 48).

Although the Court will consider Brown's testimony and report in assessing how to adjust Messina's damages calculations, the Court will not use as its starting point Brown's *de novo* valuation of Sentry's stock at $493.17 per share or his damages analysis assessing the amount of any overpayment at $5,472,000.00. With respect to Brown's *de novo* valuation, the Court already determined in Section II that the actual transaction price of $406.00 per share exceeded the stock's fair market value, in large part because this price was built on the faulty assumption that the Sentry ESOP stood to gain total control over Sentry. Brown similarly assumed that Sentry would gain complete control over Sentry by not applying a lack-of-control discount in his DCF analysis, (JX 98 at 38), and Brown reached an even higher appraisal value than $406.00 per share. Thus, as a general matter, the Court finds Messina's DCF valuation— which applied a 20 percent lack-of-control discount—a more reliable starting point.

The Court will not use Brown's damages calculation as its starting point for two reasons. First, the Court finds Brown's explanation of his "but for" method of calculating damages and his ultimate damages calculation of $5,472,000.00 insufficiently thorough, taking up only two pages of his report. (JX 98 at 46-48). Brown's brief trial testimony on the subject was no less conclusory and no more illuminating. (Tr.5 45:5-25, 46:1-7). Second, Brown's damages calculation itself assumes Messina's fair market value calculation as a baseline, (*id*.), supporting the Court's conclusion that Messina's valuation and damages calculations are more reliable touchstones for the Court's assessment of damages.

As the Court sees it, there are two viable methods of calculating damages in this case.

First, the Court could work its way through Messina's damages bridge and testimony about this damages bridge, calculating a discrete damages amount for each of Napier's alleged errors and making appropriate adjustments based on Brown's critique of Messina's calculations. (JX 96 at 35, Fig.27 (Messina's original damages bridge); *see generally* Tr.3 (Messina's testimony about how his original damages bridge changed as a result of the Court's exclusion of the market comparable method)). If the Court accepted Messina's calculations in full, this method would result in a damages award of $11,522,000.00. Second, the Court could credit Messina's correction of Napier's capitalization of cash flow methodology, in which Messina reworked Napier's model to reverse certain errors and keep various discretionary choices consistent. (JX 96 at 25, Fig. 19). Messina's correction of Napier's methodology resulted in a fair market value of $257.50 per share for Sentry's stock at the time of the 2010 Transaction, which—if the Court credited this calculation in full—would result in a damages amount of $7,573,500.00.

Below, the Court works its way through each of these two methods, making appropriate adjustments as necessary to arrive at a per-share value and a damages calculation under each method. After making adjustments under the first method, the Court reaches a per-share value of $252.42 and a total damages amount of $7,832,500.00. After making adjustments under the second method, the Court reaches a per-share value of $278.50 and a total damages amount of $6,502,500.00. The Court then explains its decision to credit the second method and award damages in the amount of $6,502,500.00.

A.     **Damages Method No. 1: Messina's Damages Calculations Based on his DCF Methodology**

Under the Court's first possible method of calculating damages, the Court will work its way through various errors in Napier's appraisal and use Messina's discrete damages calculations for each item "as its baseline," making "appropriate adjustments based on the

evidence adduced at trial and the relative credibility of the experts." *Brundle I*, 241 F.Supp.3d at 645. In his report, Messina presented a "damages bridge" offering individual calculations of how much each of Napier's major errors overvalued Sentry; this original damages bridge was calculated using DCF and another method the Court subsequently excluded under *Daubert* as unreliable for use in this case (the "market comparable" method). (JX 96 at 35, Fig. 27; dkt. 140). At trial, Messina testified about how these original figures changed as a result of the Court's exclusion of the "market comparable" method. (*See generally* Tr.3). The Court will rely on this testimony to assess how much each of Napier's errors overvalued Sentry; these figures can be converted into discrete damages amounts by multiplying the amount of the overvaluation by 52 percent, since the ESOP acquired 52 percent of Sentry's stock when it purchased Adam Vinoskey's 51,000 shares.[28] Napier valued Sentry at approximately $39,645,000.00, resulting in the $406.00 per share price, while Messina valued Sentry at $17,550,000.00, resulting in his $180.00 per share price. (JX 96 at 35, Fig. 27; Tr.3 17:2-7, 89:16-23, 99:11-19 (Messina)). Below, the Court will assess each of Messina's damages calculations for Napier's alleged errors, making adjustments as necessary based on Brown's expert testimony and other evidence.[29]

---

[28] The Court denied Defendants' motion *in limine* seeking to exclude Messina's updated damages calculations reflecting the removal of the market comparable method under Fed. R. Civ. P. 26. (Dkt. 184). The Court found that Messina's revised calculations were not "new" opinions requiring supplemental disclosure under Rule 26, since Messina's revised calculations were simply the "natural mathematical result of Defendants' earlier *Daubert* motion challenging Messina's use of the market comparable method." (*Id*. at 3). The Court further found that, even assuming Messina's updated calculations qualified as "new" opinions under Rule 26, the Secretary's failure to timely supplement Messina's report was harmless to Defendants and "substantially justified by the timing of this Court's ruling on Defendants' *Daubert* motion." (*Id*. at 14). The Court admitted Messina's final damages bridge as a demonstrative exhibit. (PTX J-9B). In assessing damages, the Court has not relied on this demonstrative exhibit, but has instead relied on Messina's trial testimony about how the values in his original damages bridge changed as a result of the Court's exclusion of the markets comparable method. The former is not evidence upon which the Court can rely, but the latter is.

[29] The Court notes that although Brown provided a damages bridge between himself and

### 1.    Napier's 3-Year Lookback Period

The Court found in Section I that Napier unreasonably employed a three-year look-back period in computing Sentry's average yearly cash flow since this period did not fully capture Sentry's business cycle.  Messina employed a seven-year look-back period in his DCF analysis, and opines that Napier's use of a three-year period led him to overvalue Sentry by $5,895,000.00, which would result in $3,065,400.00 in damages to the ESOP.  (Tr.3 86:5-18 (Messina); JX 102 at 9; JX 96 at 13).  Brown employed a six-year look-back period in his DCF analysis, and contends that Messina's use of a seven-year period resulted in Messina undervaluing Sentry by $2.7 million.  (JX 98 at 16-18).  Messina replies that his overall calculation of Sentry's value would have increased by only $1 million if he had used a six-year period rather than a seven-year period.  (JX 102 at 11).  The Court agrees with Brown that a six-year look-back period is more appropriate for the DCF analysis, since, as Brown points out, Messina's own data from the National Bureau of Economic Research suggests that an average business cycle lasts 5.7-5.8 years.   (JX 96 at 13, n.6; JX 98 at 17).

Both experts provide charts and conclusory explanations to support their opinion about how much Messina's calculation of Sentry's value should be reduced if the Court finds a six-year look-back period more reasonable.  (JX 98 at 18, 131; JX 102 at 11, 25).  "As other courts have done in the past, faced with two competing expert analyses and no precise mechanism for resolving them, this Court will use the midpoint between" $2.7 million and $1 million, reducing by $1,850,000.00 Messina's calculation that Napier's three-year look-back period overvalued Sentry by $5,895,000.00.  *Brundle I*, 241 F.Supp.3d at 648.  The Court therefore concludes that Evolve's failure to correct Napier's use of a three-year look-back period resulted in Napier

---

Messina, (JX 98 at 41), he did not provide a damages bridge calculating the discrete harm the ESOP suffered as a result of each of Napier's alleged errors.

overvaluing Sentry by $4,045,000.00, and the Court would award damages in the amount of $2,103,400.00 for this error.

## 2. Napier's Discount Rate

The Court determined in Section I that Napier made unreasonable adjustments to the equity risk and company-specific risk percentages, the sum of which, combined with the risk free rate, comprises the discount rate in Napier's capitalization of cash flow methodology. Napier chose a risk-free rate of 4 percent, which the Court deemed reasonable given Messina's testimony that the risk-free rate often changes slightly with the fluctuation of the rates on U.S. Treasury bond rates. (Tr.3 91:20-22). Napier dropped his equity risk premium from 6 percent in 2009 to 5.5 percent for the 2010 Transaction appraisal, citing his assumption that the ESOP would be gaining total control over Sentry as a justification. (Tr.2 24:1-6, 35:8-13). Napier dropped his company-specific risk figure from 8 percent in 2009 to 6 percent for the 2010 Transaction appraisal, again citing control as his justification. (Tr.2 24:23-25). These three values left Napier with a discount rate of 15.5 percent for the 2010 Transaction, whereas his discount rates in 2007, 2008, and 2009 had been 21.4 percent, 18.8 percent, and 18.5 percent, respectively. (*See, e.g.,* JX 96 at 16, Fig. 12). Napier's discount rate played a large role in the computation of his unusually low capitalization rate of 12.2 percent. (*See id.*).

In conducting his DCF analysis, Messina computed a discount rate of 19.5 percent, based on a formula consisting of the following inputs: a risk free rate of 3.5 percent; a beta of the stock not at issue here; an equity risk premium of 6 percent; a size premium of 5 percent; and a company-specific risk premium of 5 percent. (JX 96 at 28, 32, Fig. 24). Based on his own discount rate of 19.5 percent, Messina concluded in his original damages bridge that Napier's unreasonable discretionary decisions in calculating his discount rate led him to overvalue Sentry

by $4,363,000.00. (JX 96 at 35, Fig. 27). Because the market comparable method is not affected by the discount rate, (Tr.3 87:22-25 (Messina)), removing the market comparable method from the damages bridge calculation led this overvaluation estimate to roughly double to $8,055,000.00, a figure that would translate to a damages amount of $4,188,600.00. (*Id*. 86:19-25, 87:1-25, 88:1-5 (Messina); *see also id*. 20:18-25, 21:1-5 (Messina)).

Brown, who applied a 15 percent discount rate in his DCF analysis, contends that Messina made unreasonable choices with respect to several of his discount rate inputs, resulting in Messina undervaluing Sentry by $5.6 million. (JX 98 at 23). The Court will address each of these purported errors and assess whether Messina's damages calculation should be reduced.

With respect to Messina's risk-free rate of 3.5 percent, Brown selected a risk-free rate of 4.21 percent, which is "equal to 20-year Treasury yield to maturity" at the time of the 2010 Transaction. (*Id*. at 24). Messina contends that he simply chose the midpoint between the 10-year Treasury yield at the time of the transaction (3.007 percent) and the 30-year Treasury yield (4.3 percent). (JX 102 at 14). The Court already concluded that Napier's risk-free rate of 4 percent was essentially reasonable given the modest fluctuations in the rates on U.S. Treasury bonds from year to year, and thus was not something a prudent fiduciary necessarily would have probed. Accordingly, the Court agrees with Brown that a risk-free rate of 4.21 percent would have been more appropriate for the DCF analysis. Brown opined that Messina's use of a 3.5 percent risk-free rate, rather than a 4.21 percent rate, caused Messina to undervalue Sentry by $600,000.00. (JX 98 at 24). The Court finds it appropriate to reduce the overvaluation amount it would use to calculate damages for Napier's discount rate from $8,055,000.00 to $7,455,000.00.

With respect to Messina's equity risk premium of 6 percent, Brown selected a market-risk premium of 5.2 percent based on appraisal literature and opines that Messina's selection of a

6 percent premium caused him to undervalue Sentry by $800,000.00. (*Id*.). The Court finds Messina's equity risk premium of 6 percent reasonable, given its finding above that Napier used an equity risk premium of 6 percent in 2009 and dropped this premium to 5.5 percent for the 2010 Transaction appraisal purportedly because the ESOP would be gaining total control over Sentry, a justification the Court has already rejected. Accordingly, the Court does not find that Messina's equity risk premium of 6 percent caused him to undervalue Sentry by $800,000.00.

With respect to Messina's size premium of 5 percent, Brown selected a size premium of 4.65 percent using "a build-up model and a Duff & Phelps model," and contends that Messina's selection of a 5 percent size premium caused him to understate Sentry's value by $300,000.00. (JX 98 at 25). The difference between these two size premiums is negligible, and, although the experts disagree, Brown's conclusory explanation of his 4.65 percent size premium does not undermine the Court's view that Messina's 5 percent size premium is essentially reasonable. (See JX 102 at 14-15). Thus, the Court does not find that Messina's size premium of 5 percent caused him to undervalue Sentry by $300,000.00.

With respect to Messina's company-specific risk premium of 5 percent, Brown selected a company-specific risk premium of 1 percent and contends that Messina's premium caused him to undervalue Sentry by $4.8 million. (JX 98 at 25-28). Brown faults Messina for basing his decision about company-specific risk primarily on his view that Sentry had relatively high customer concentration, a view Brown does not share. (*Id*.). The Court finds Messina's selection of a 5 percent company-specific risk premium reasonable. Messina supports his 5 percent premium with data from Sentry showing that Sentry's top two customers accounted for 35 percent and 16 percent of Sentry's accounts receivables respectively. (JX 96 at 31, n.7; *see also* Tr.4 212:12-18 (Connor, stating that Sentry is "highly diversified enough" but

acknowledging that there are still some "some risks" with Sentry's customer concentration; *id*. 236:6-25 (Connor, stating that he thought Sentry "needed to diversify . . . into other industries" in 2010) PTX M 10:14-20 (Vinoskey Depo., stating that soft drink companies account for 80 percent of Sentry's business)).  Given this level of customer concentration, the Court finds Messina's 5 percent company-specific risk premium more reasonable than Brown's aggressively low 1 percent premium.

In sum, if the Court relies on the first method of calculating damages, the Court would find that Napier's errors with respect to the discount rate caused him to overvalue Sentry by $7,455,000.00.  The Court would impose a damages amount of $3,876,600.00 for this error.

### 3.  Napier's Long-Term Growth Rate

In Section I, the Court found that Napier unreasonably raised the long-term growth rate from 2 percent in 2008 to 3 percent for the 2010 Transaction appraisal, even though Sentry's earnings in 2009 and 2010 were lower than in 2008.  In completing his DCF valuation, Messina employed a 2 percent growth rate, opining that he saw "no company-specific factors [about Sentry] that strongly suggest out-performance into perpetuity" of the overall rate of inflation, which generally sits at approximately 2 percent.  (JX 96 at 17-18).  Messina estimates that Napier's long-term growth rate of 3 percent caused him to overvalue Sentry by $2,700,000.00. (*Id*. at 35, Fig. 27; *see also* Tr.3 18:14-15 (Messina, testifying that his growth rate calculation did not change after removing the market comparable method from his damages bridge)).  Brown used a 3 percent growth rate in his DCF valuation, the midpoint between the "inflation rate of approximately 2 percent and [the nominal] GDP growth rate of [approximately] 4 percent."  (JX 98 at 20-22).  Brown opines that Messina's use of a 2 percent long-term growth rate caused him to understate Sentry's value by approximately $600,000.00.

The experts have a reasonable disagreement on this subject. (*See, e.g.,* JX 102 at 13 (Messina acknowledging that a growth rate of 2-3% "would be reasonable values if the growth prospects were held constant")). The Court finds it appropriate to adopt the midpoint between the experts' positions, and finds that it would have been more appropriate for Messina to apply a 2.5 percent growth rate in his DCF analysis. Accordingly, the Court finds that Messina's overvaluation amount should be reduced by $300,000.00. Under this calculation, Napier's decision to use a 2 percent growth rate caused him to overvalue Sentry by $2,400,000.00. The Court would therefore award $1,248,000.00 in damages for this error.

### 4. Napier's Controlling-Interest Assumption

As has been discussed at length, Napier incorrectly assumed that Sentry stood to gain unfettered control over Sentry as a result of the 2010 Transaction. This assumption fueled many of his discretionary choices in calculating his range of free market value for the 2010 Transaction. In conducting his DCF analysis, Messina applied a 20 percent lack-of-control discount. (*See, e.g.,* JX 96 at 33, Fig. 25). Brown opines that a lack of control discount is inappropriate because the ESOP stood to gain total control over Sentry, (JX 98 at 38), a position the Court has rejected. In his original damages bridge, Messina calculated that Napier's lack of control discount caused him to overvalue Sentry by $5,548,000.00. (JX 96 at 35, Fig. 27). At trial, Messina explained that when he adjusted his model to account for the exclusion of the markets comparable method, it led to an overvaluation estimate of "about $4.6 [to] $4.7 million." (Tr.3 15:11-15). The Court finds it appropriate to take the midpoint of these values and thus finds that, if one applied a 20 percent lack-of-control discount in a DCF analysis, Napier's lack of a control discount led him to overvalue Sentry by $4,650,000.00.

Although the Court agrees with Messina that damages should be awarded for Napier's

failure to account for the ESOP's lack of control, the Court finds that Messina has not adequately acknowledged that the Sentry ESOP did stand to gain some elements of control, such as the capacity to control the ESOP Trustees' votes in important corporate matters enumerated in the ESOP Plan. Accordingly, the Court finds it more appropriate to apply a 5 percent lack-of-control discount. The Court will therefore reduce the overvaluation estimate for this error ($4,650,000.00) by 75 percent. Under this calculation, the Court finds that Napier's failure to account for the ESOP's inability to totally control Sentry caused him to overvalue Sentry by $1,162,500.00. The Court would therefore award $604,500.00 in damages for this error.

### 5. Messina's Damages Calculation for "Rounding & Other Errors"

Messina contends that "rounding and other" errors led Napier to overvalue Sentry by over $1.8 million. (JX 96 at 35, Fig. 27 (listing amount of overvaluation as $1,855,000.00); Tr.3 223:23-25, 224:1-19 (Messina, explaining how the overvaluation amount on his original damages bridge rises by approximately $80,000.00 upon removing the markets comparable method)). The record is devoid of any specific evidence about what Messina means by "rounding and other," and Messina's trial testimony on the subject, (Tr.3 224:6-24), did not further illuminate the matter. Accordingly, under the first method of calculating damages, the Court would not award any damages for Messina's "rounding and other" category.

### 6. Errors Not Specifically Addressed Under Messina's Damages Calculations

#### i. Napier's Health-Care Add-Back

The Court found in Section I that Napier unreasonably added back half of Sentry's health care expenses. In conducting their DCF analyses, neither Brown nor Messina included an add-back for any portion of Sentry's health care expenses. Messina testified at trial that the health-care add-back caused Napier to add $5.3 million to his enterprise value calculation, raising the

stock price for the 2010 Transaction by $50.00 per share.  (Tr.3 70:2-7).  Napier agreed that this add-back raised his enterprise value by $5.3 million.  (Tr.2 156:12-25, 157:1-7).  However, Messina's damages bridge does not provide a discrete calculation for how much Napier's health-care add-back caused him to overvalue Sentry, and Messina's testimony at trial did not make clear how Napier's health-care add-back is accounted for, if at all, on his damages bridge.  (*See* JX 96 at 35, Fig. 27).  The Court finds that the record is underdeveloped on the subject of how Napier's health-care add-back should be accounted for under the first method of calculating damages, and therefore would not award any additional damages under the first method for Napier's decision to add-back half of Sentry's health-care expenses.

### ii.    Napier's ESOP Contribution Add-Back

The Court found in Section I that Napier unreasonably added back Sentry's ESOP contributions when calculating Sentry's net-adjusted income.  Messina did not add back Sentry's ESOP contributions when conducting his DCF analysis, (JX 102 at 12), but Brown did, contending that Messina's failure to normalize his EBIT margins for ESOP contributions—as well as his failure to normalize for executive compensation, which the Court will address below—led him to overvalue Sentry by $8 million.  (JX 98 at 19).  For the same reasons that the Court concluded in Section I that Napier's add-back of Sentry's ESOP contributions was unreasonable, the Court credits Messina's decision not to normalize his EBIT margins for ESOP contributions.  However, no party has provided the Court with a discrete estimate of precisely how much Napier's add-back of ESOP contributions damaged the ESOP, and the Court is therefore left to guess whether the parties have simply failed to submit this figure or whether Messina already accounted for Napier's ESOP contribution add-back in one of his other damages calculations.  Because of the paucity of evidence on this subject, the Court would not award any

additional damages for this error under the first method of calculating damages.

### iii.    Napier's Working Capital Assumption

In his 2010 Transaction appraisal, Napier assumed that Sentry required 10 percent of its total assets in cash to operate, a decision the Court found unreasonable in Section I, in part because Sentry has historically kept at least 30 percent of its total assets in cash.  (JX 85 at 1835).   In conducting his DCF analysis, Messina assumed that Sentry required 15 percent working capital to operate, (JX 102 at 5), while Brown assumed that Sentry required only 5 percent working capital.  (JX 98 at 16).  Brown opines that Messina's 15 percent working capital assumption caused him to understate Sentry's value by $3.4 million.  The Court will not credit Brown's opinion that Sentry required only 5 percent working capital, since this amount is even lower than Napier's 10 percent working capital assumption, which the Court already deemed unreasonable in Section I.  Moreover, the Court finds Messina's 15 percent working capital assumption reasonable, as it is slightly higher than Napier's 10 percent working capital assumption and half of Sentry's historical habit of keeping at least 30 percent of its assets in cash.  However, neither party has provided a discrete damages analysis for Evolve's failure to correct Napier's working capital assumption, and the Court is again left to guess whether this error is already baked into some other component of Messina's damages calculations.  Given the dearth of evidence on this subject, the Court would not award any damages for this error.

### 7.    Brown's Other Criticisms of Messina's Damages Calculations

Brown opines that Messina's revenue growth rate of 9 percent (as opposed to Brown's 7 percent) inflated Messina's DCF value by $100,000.00, and that Messina's application of a 35 percent tax rate (as opposed to Brown's 38.9 percent tax rate) inflated Messina's DCF value by $1.3 million.  (JX 98 at 28).  The Court finds the difference in value between the parties' revenue

growth rates too negligible to justify any adjustment to Messina's calculations, which the Court finds reasonable. Moreover, the Court finds Messina's rebuttal that his tax rate actually increased Sentry's value under his DCF model persuasive. (JX 102 at 16). Brown also opines that Messina should have normalized his EBIT margins to account for savings from the elimination of Adam and Carole Vinoskey's executive salaries, since both were planning retirement at the time of the 2010 Transaction. (JX 98 at 18). The Court rejects this argument, since there were no compensation agreements in place at the time of the 2010 Transaction limiting the Vinoskeys' compensation going forward, and since Napier himself did not make any adjustments to account for executive compensation savings. (*See* Tr.5 124 (Messina)).

### 8. Total Damages Calculation under Method No.1

Adding all of the discrete damages calculations reached above, the Court would find that Evolve's reliance on Napier's appraisal caused the ESOP to overpay for Adam Vinoskey's stock by $7,832,500.00 if it fully credited this first method of calculating damages. Subtracting $7,832,500.00 from the total purchase price of $20,706,000.00 means the Sentry ESOP should have paid $12,873,500.00 or $252.42 per share to purchase Adam Vinoskey's 51,000 shares. The following chart illustrates the various components of this damages analysis:

| Item / Error | Court's Damages Finding |
|---|---|
| Three-Year Look-Back Period | $2,103,400.00 |
| Discount Rate | $3,876,600.00 |
| Long-Term Growth Rate | $1,248,000.00 |
| Controlling-Interest Assumption | $604,500.00 |
| **Total Damages Amount** | $7,832,500.00 |

**B.     Damages Method No. 2: Messina's Correction of Napier's Capitalization of Cash Flow Methodology**

Under the second possible method of calculating damages, the Court could look to Messina's calculation of what the per-share value of Sentry's stock would have been at the time of the 2010 Transaction under Napier's capitalization of cash flow methodology had Napier correctly and consistently applied that method.  Although Messina "did not include this method in [his] final valuation" because he believes DCF "to be a more complete and thorough version of this method," the Court finds that this is one reasonable method of calculating damages.  (JX 96 at 24).  The following chart from Messina's report shows how he reworked Napier's model in 2007, 2008, 2009, and for the 2010 Transaction (represented in the farthest column to the right), eventually concluding that Napier would have reached a per-share value of $257.50 had he correctly and consistently applied the capitalization of cash flow methodology:

| Messina 2007 to 2010 Adjusted Sentry Valuations | | | | |
|---|---|---|---|---|
| Report date | 8-Apr-08 | 20-Apr-09 | 15-Apr-10 | 3-Dec-10 |
| As of date | **31-Dec-07** | **31-Dec-08** | **31-Dec-09** | **30-Nov-10** |
| | | | | |
| Method | cash flow | cash flow | cash flow | cash flow |
| Capitalization of cash flows: | | | | |
|    Cash flows per share | $    30.15 | $    36.95 | $    36.37 | $    37.15 |
|    Risk free rate | *4.6%* | *3.0%* | *4.0%* | *3.5%* |
|    Equity risk premium | *11.0%* | *11.0%* | *11.0%* | *11.0%* |
|    Company specific risk | *5.0%* | *5.0%* | *5.0%* | *5.0%* |
|      Discount rate | *20.6%* | *19.0%* | *20.0%* | *19.5%* |
| | | | | |
| Growth rate | *2.0%* | *2.0%* | *2.0%* | *2.0%* |
| Cap rate | *18.6%* | *17.0%* | *18.0%* | *17.5%* |
| | | | | |
| **Enterprise Value per Share** | **$162.07** | **$217.36** | **$202.07** | **$212.29** |
| | | | | |
| + Cash per Share | 193.4 | 273.3 | 223.1 | 68.2 |
| + Land per Share | 5.7 | 5.7 | 5.7 | 5.7 |
| | 361.1 | 496.3 | 430.9 | 286.1 |
| | | | | |
| Marketability discount | *10.0%* | *10.0%* | *10.0%* | *10.0%* |
|  - Marketability | (36.1) | (49.6) | (43.1) | (28.6) |
|    **Equity value per share** | **325.0** | **446.7** | **387.8** | **257.5** |
| | | | | |
| CAI value per share | 241.0 | 285.0 | 285.0 | 407.2 |
|   Difference per share (overvalued)/undervalued | $    84.4 | $    161.8 | $    102.8 | $    (148.3) |

(JX 96 at 25, Fig. 19). In this model, Messina corrected several flaws in Napier's application of the capitalization of cash flow methodology. First, in determining Sentry's historical cash flows for each year, Messina did not use pre-tax income as Napier did in 2007, opining that the use of pre-tax income is generally inappropriate "because taxes are a real cash expense that will in most cases substantially reduce the return of the investment." (*Id.* at 24). Second, Messina used a seven-year look-back period when calculating Sentry's cash flow per-share, whereas Napier used a five-year look-back period before 2008, when he switched to a three-year period. (Tr.3 59:2-23 (Messina)). Third, Messina added back all of Sentry's excess cash and land for 2007, 2008, and 2009, which Napier had not done, and added back the exact same amounts of excess cash and land as Napier added back for the 2010 Transaction appraisal. (*Id.* 60:18-22, 170-173 (Messina)). Fourth, Messina kept certain values constant across the years, such as the equity risk premium (11 percent), the company-specific risk premium (5 percent), and the growth rate (2 percent). (*Id.* 60:11-20).

Like all methods of valuing stock, this method is imperfect. For instance, Messina employed a seven-year look-back period, whereas the Court found above that a six-year period would have been more appropriate in Messina's DCF model. Messina applied a 3.5 percent risk-free rate, whereas the Court found above that Napier's 4 percent risk-free rate was essentially reasonable. And Messina applied a 2 percent growth rate, whereas the Court found above that a growth rate of 2.5 percent would have been more appropriate in Messina's DCF model.[30]

In recognition of these imperfections, the Court will make two adjustments to Messina's

---

[30]    The Court notes that Messina applied several values that he also applied in his DCF model, and that the Court found reasonable above. For instance, Messina applied a company-specific risk premium of 5 percent here and in his DCF analysis, and selected an equity risk premium of 11 percent, which is the sum of the equity risk premium and size premium he applied in his DCF model. (*See* JX 96 at 28, 32, Fig. 24).

calculation of Sentry's value under the capitalization of cash flow methodology. First, in accordance with the reasoning laid out in the preceding subsection, the Court finds it appropriate to change Messina's 2010 Transaction risk-free rate of 3.5 percent to the 4 percent Napier used, and will change Messina's 2 percent growth rate to 2.5 percent. These changes cancel each other out, resulting in the same discount rate of 17.5 percent Messina reached.

Second, Defendants criticized Messina for adding back all of Sentry's excess cash and land for 2007, 2008, and 2009, but only adding back the specific amounts Napier used in his 2010 Transaction appraisal for his 2010 Transaction calculation. (*See generally* Tr.3 170-175). Messina testified that he used Napier's specific add-backs for the 2010 Transaction to give him "the benefit of the doubt," (*Id.* 173:20-21), and that adding back all of Sentry's excess cash and land for the 2010 Transaction appraisal would have raised the per-share stock price he reached ($257.50) by $21.00 per share (*i.e.*, to $278.50). (Tr.4 33:14-25, 34:1-2). The Court finds Defendants' critique on this front persuasive, and will therefore increase the per-share value Messina reached under this model by $21.00 per share. Thus, under the second possible method of calculating damages, the Court would find a fair market value of $278.50 per share. Under this calculation, the Sentry ESOP should have paid $14,203,500.00 for Adam Vinoskey's stock. Subtracting this amount from the amount the ESOP actually paid ($20,706,00.00) leads to a total damages amount of $6,502,500.00 under the second method of calculating damages.

## C. Court's Final Damages Calculation

In assessing damages, the Court is mindful that "[d]etermining the amount of overpayment is difficult but not impossible," and that "'appraisal of closely-held stock is a very inexact science' with a 'level of uncertainty inherent in the process.'" *Bruister*, 54 F.Supp.3d at 676 (quoting *Cunningham*, 716 F.2d at 1473). "It is well-settled that the district court is only

required to determine the extent of the damages as a matter of just and reasonable inference and that the result need only be approximate." *Bruister*, 823 F.3d at 269 (quoting *In re Liljeberg Ents., Inc.*, 304 F.3d 410, 457 (5th Cir. 2002)).

Both of the methods outlined above are imperfect. Both are also reasonable methods of calculating damages in this case. The Court credits Messina's correction of Napier's capitalization of cash flow methodology as adjusted above (*i.e.,* the second method of calculating damages), and finds by a preponderance of the evidence that the fair market value of Sentry's stock at the time of the 2010 Transaction was $278.50. Multiplying this per-share value by the 51,000 shares the ESOP purchased means the ESOP should have paid $14,203,500.00 for Adam Vinoskey's stock rather than the $20,706,000.00 it actually paid. Subtracting what the ESOP should have paid from the amount the ESOP actually paid leads to a total damages amount of $6,502,500.00. Accordingly, the Court finds by a preponderance of the evidence that the fair market value of Sentry's stock at the time of the transaction was $278.50, that the ESOP overpaid for Adam Vinoskey's stock by $6,502,500.00, and that Defendants Evolve, Adam Vinoskey, and the Adam Vinoskey Trust are jointly and severally liable for that amount.

### D. Evolve's Arguments Regarding Adam Vinoskey's Post-Transaction Debt Forgiveness & ESOP Participants' Post-Transaction Gains

Defendants contend that even if the Court finds that their fiduciary breaches caused the ESOP to suffer a loss, the Court should "nonetheless reduce any damage award by $4.6 million," the "amount of the debt that Adam Vinoskey forgave in 2014." (Dkt. 212 at 79). This argument fails. "ERISA expressly requires a fiduciary to 'make good to [an ESOP] any losses' resulting from a given breach of duty." *Brundle*, 919 F.3d at 782 (quoting 29 U.S.C. § 1109(a)). "Thus, in cases involving overpayment for ESOP assets, courts generally compute restitution damages exactly as" the Court has done here: "by deducting the fair market value of the stock from the

amount the ESOP actually paid." *Id*. When a fiduciary breaches "by *overpaying* for" stock, "[p]rinciples of restitution . . . entitle the ESOP and its participants to compensation for the loss from the *overpayment*." *Id*. (emphasis in original).

Courts have generally "rejected the Defendants' contention that the proper measure of recovery excludes the debt that . . . is later forgiven." *Bruister*, 823 F.3d at 270-71. Here, the ESOP undertook significant debt to purchase Adam Vinoskey's stock, and "[t]he assumption of indebtedness has immediate legal and economic consequences even before the borrower begins to repay the debt." *Henry v. U.S. Trust Co. of Cal., N.A.*, 569 F.3d 96, 99 n.4 (2d Cir. 2009). "Had the ESOP not incurred debt for [Adam Vinoskey's] overpriced . . . stock, it could have made other, more fruitful investments." *Bruister*, 823 F.3d at 271. That a portion of this debt "was eventually not paid off" due to Adam Vinoskey's forgiveness of $4.6 million "does not properly offset the damage done, nor should the Defendants benefit from this circumstance." *Id*. Accordingly, the Court will not offset damages by the amount of debt forgiven in 2014.[31]

The Court also rejects Evolve's argument that the ESOP suffered no loss at all because "the participants in the 2010 Transaction had higher year-end balances after the Transaction than they did before the Transaction." (Dkt. 212 at 66). Regardless whether the participants had higher year-end balances after the transaction, the fact remains that the ESOP overpaid for Adam Vinoskey's stock and took on considerable debt to do so. The sheer fact of this overpayment, and of the "immediate legal and economic consequences" of indebtedness, establish that the ESOP did in fact sustain a loss as a result of the 2010 Transaction. *Henry*, 569 F.3d at 99, n.4.

---

[31]     Although the Court is constrained by the weight of authority disfavoring any reduction of damages by the amount of subsequent debt forgiveness, the Court notes that it would otherwise be disposed to do so.

**E.     The Secretary's Request for Pre-Judgment Interest & Lifetime Fiduciary Bans**

Lastly, the Court addresses the Secretary's requests for pre-judgment interest and lifetime fiduciary bans for Evolve and Adam Vinoskey to prevent either defendant from serving as an ESOP fiduciary in the future.  With respect to pre-judgment interest, "ERISA does not specifically provide for pre-judgment interest, and absent a statutory mandate the award of pre-judgment interest is discretionary with the trial court."  *Brundle I*, 241 F.Supp.3d at 649 (quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1030 (4th Cir. 1993) (en banc)).  "In federal question cases, the 'rate of pre-judgment interest is a matter left to the discretion of the district court.'"  *Id.* (quoting *Quesinberry*, 987 F.2d at 1031).  "Prejudgment interest is not granted 'according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness.'"  *Bruister*, 54 F.Supp.3d at 680 (quoting *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 546 n.63 (5th Cir. 2012)).  The Court recognizes that nearly a decade has passed since the Sentry ESOP overpaid for Adam Vinoskey's stock in the 2010 Transaction.  However, since the Court cannot offset its damages award by the amount of debt Adam Vinoskey forgave in 2014, the Court will not award pre-judgment interest.

With respect to the Secretary's request for an injunction preventing Evolve and Adam Vinoskey "from ever again serving as ERISA fiduciaries," the Court also declines to take this step.  (Dkt. 211 at 78).  Where ERISA fiduciaries "have engaged in egregious misconduct," courts have permanently enjoined defendants from serving as fiduciaries in the future.  *See, e.g., Bruister*, 54 F.Supp.3d at 681, *aff'd*, 823 F.3d at 275 (noting that "[i]t is not the magnitude of the losses to the ESOP . . . but the nature of the fiduciary (mis)conduct that should principally undergird an injunction"); *Martin v. Feilen*, 965 F.2d 660, 672–73 (8th Cir. 1992).  Although the Court finds that Evolve engaged in serious fiduciary breaches, and that Adam Vinoskey

knowingly accepted a price for his stock that exceeded fair market value, the Court cannot say that Defendants' conduct has been so egregious as to warrant an injunction preventing them from serving as ERISA fiduciaries in the future.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that Evolve caused a prohibited transaction under 29 U.S.C. § 1106(a)(1)(A) by failing to ensure that the ESOP paid no more than adequate consideration for Adam Vinoskey's stock in the 2010 Transaction; that Evolve violated its duties of prudence and loyalty under 29 U.S.C. § 1104(a)(1); and that Adam Vinoskey is jointly liable for Evolve's breaches as a knowing participant in a prohibited transaction and as a co-fiduciary. As a result of these breaches, the Sentry ESOP overpaid for Adam Vinoskey's stock by $6,502,500.00, an amount for which Evolve, Adam Vinoskey, and the Adam Vinoskey Trust are jointly and severally liable.   An appropriate order entering judgment consistent with this memorandum opinion will issue.

Entered this __2nd__ day of August, 2019.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE